# EXHIBIT A

# TRANS UNION LLC

## DEVELOPMENT AGREEMENT AND CONTRACT FOR SERVICES

TRANS UNION LLC, 555 West Adams Street, Chicago, Illinois 60661("TU") and <u>Endless River Technologies</u> ("Provider" and/or "ERT"), agree as follows:

1. <u>Scope of Work.</u>  Provider shall provide business development services, technical operations support and technical project services as such work is more fully described in Provider's proposal, entitled "Summary of Proposed Structure," attached hereto and incorporated herein as Exhibit A (the "Work").  Provider shall complete the Work in form and content approved by TU's Project Manager, David Drotos.  Moreover, Provider shall perform the Work in a professional competent and timely manner.  Notwithstanding the incorporation of the aforementioned proposal, in the event of an inconsistency between any provisions set forth in said proposal and the provisions set forth in this Contract, the provisions set forth in this Contract shall govern.

2. <u>Term of Contract.</u>  The Period of Performance of this Contract shall be from January 1, 2014 to December 31, 2018, inclusive.  The foregoing notwithstanding, TU shall have the right to terminate this Contract at any time upon 180 days prior written notice to Provider.  TU's obligation to pay consulting fees shall survive during the notice period.  In the event of termination of this Agreement, intellectual property rights to the Quote Exchange concept/platform shall revert to ERT as outlined in Exhibit A.

3. With the exception of Provider's obligations after the expiration date of this Contract or, if applicable, the effective date of any such termination, and TU's obligation to pay for services performed by Provider after the expiration date of this Contract or, if applicable, the effective date of any such termination, all provisions of this Contract shall survive the expiration or termination of this Contract.  In the event this Contract is terminated, the parties shall distribute all Work Product (as defined below in Section 6) deliverables, as they then exist, pursuant to Exhibit A.

4. <u>Compensation.</u> As consideration for the performance of the Work by Provider under the terms of this Contract, TU shall pay Provider at the annual rate of <u>$300,000,00</u> Dollars, paid in monthly increments of $25,000 fixed per month for the consulting services outlined in Exhibit A.  However, in addition to the aforementioned fee amount, TU shall reimburse Provider for actual and reasonable out-of-pocket expenses incurred in performance of the Work.  Provider shall submit invoices to TU no more than once a month.  TU shall use best efforts to pay such invoices within forty-five (45) days of its receipt of such invoices.  Provider shall include, with such invoices, original receipts for all expenses in excess of twenty-five dollars ($25.00).  In addition, Provider must receive prior written authorization from TU for all air travel and all such air travel undertaken by Provider shall be by common carrier at coach or economy rates. The aggregate total expense payments to Provider shall not exceed ten thousand Dollars ($10,000.00) per month unless TU amends such limitation in a written amendment, to this Contract,duly executed by the authorized representatives of both Provider and TU.  All amounts set forth in this Contract are in United States Dollars Provider expenses incurred in performance of the Work are included in the above fees and shall not be reimbursed.

5.1 <u>Confidentiality.</u>  Each party shall hold in confidence and shall not copy, publish, disseminate or otherwise use any confidential information it receives from the other Party by virtue of this Contract including, but not limited to, with respect to ERT any consumer credit information; provided however, that either Party may use (but not copy, publish, disseminate nor use for any other purpose) any such confidential information solely to the extent necessary for the Parties respective performance under this Contract.  Such obligations of confidentiality shall not apply to information (a) which either Party can demonstrate, by its written records, was already in the possession of the receiving Party prior to the first date of disclosure by the other Party; (b) which is now or becomes publicly known through no fault of the receiving Party; (c) which the receiving Party rightfully receives from third parties; (d) which by Party owning the confidential information written authorization is approved for use or release by the receiving Party; or (e) which is required by law (i.e., an order of a court or data request from an administrative or governmental agency with competent jurisdiction) to be disclosed; provided however, that receiving Party shall provide the other Party at least ten (10) days prior written notice before the disclosure of such information pursuant to this Subparagraph (e).

5.2 Any portion of such confidential information that is specific (i.e., business practices, etc.) shall not be within the foregoing exceptions to such obligations of confidentiality merely because such information is embraced by general disclosures that are within such exceptions.  Moreover, the foregoing exceptions to such obligations of confidentiality shall not apply to a combination of features found in such information unless that combination and not just the individual features are within such exceptions.

5.3 Except as otherwise described in Exhibit A, all tangible information each Party receives by virtue of this Contract shall be returned to the owner no later than the completion date of this Contract or, if applicable,

the termination date of this Contract; provided however, that the obligations of confidentiality set forth in this Contract shall survive any such return of information.

    5.4    Neither Party shall publish, nor otherwise disclose to any third party, the results of the work which is the subject of this Contract including, without limitation, the Work Product (as defined below), without the prior written authorization of the other Party.

    6.    <u>Ownership of Work Product.</u>  The entire right, title and interest in and to all copyrights, patents, trade secrets, trademarks, trade names, and all other intellectual property rights associated with any and all ideas, concepts, techniques, inventions, processes, or works of authorship including, but not limited to, all materials in written or other tangible form developed or created by Provider during the course of performing the Work for TU under this Contract (collectively, the "Work Product") shall be determined pursuant to the terms set forth in Exhibit A.  Each party hereby automatically assigns to the owning party at such time described in Exhibit A, without any requirement of further consideration, the entire right, title, and interest in and to the Work Product including, without limitation, any and all copyrights or other intellectual property rights pertaining thereto. Upon request of the owning party, the other party shall take such further actions including, without limitation, execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.  Moreover, the transferring party shall also cooperate in prosecuting patent applications, infringement actions, and other patent enforcement procedures deemed necessary by the owning party with such directly related reasonable and actual expenses incurred by the cooperating party reimbursed by the owning party.

    6.1    <u>Residual Rights of Personnel.</u>  Notwithstanding anything to the contrary herein, each party and its employees shall be free to use and employ its and their general skills, know-how, and expertise, and to use, disclose, and employ any generalized ideas, concepts, know-how, methods, techniques, or skills gained or learned during the course of any assignment, so long as it or they acquire and apply such information without disclosure of any confidential or proprietary information of the other party and without any unauthorized use or disclosure of Work Product.

    6.2    <u>Intellectual Property Rights.</u>  Except as otherwise described in Exhibit A, nothing in this Contract shall be construed, by implication or otherwise, to grant any right or license to the other party under any patent, invention, copyright, or any other intellectual property right, now or hereafter owned or controlled by each party.

Each party hereby grants to the other party a royalty-free, non-exclusive license, including the right to sublicense, in and to any and all including, without limitation, each of it subcontractor's) owned or controlled intellectual property rights which are necessary for each party to be able to exercise unencumbered, its rights (set forth in this Contract.

    7.    Each Party represents and warrants that (1) that Party has the legal right to give to the rights set forth in this Contract to the other Party; and (2) each Party is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere or conflict with this Contract.

    8.1    To the extent any third party claims directly result from a Parties' gross negligence and/or intentional wrongful conduct related to its performance of this Contract, that Party agrees to and hereby indemnifies and holds the other Party harmless from and against any and all such claims, including but not limited to liability for injury to persons or damage to property, including any and all reasonable expenses, costs, attorneys' fees, settlements, judgments or awards incurred by the other Party in the defense of any such claim or lawsuit.

    8.2    <u>Waiver of Liability.</u>  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, AND BOTH TU AND PROVIDER HEREBY WAIVE AS TO THE OTHER PARTY, ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTY AND ARISING OUT OF THE PERFORMANCE OF THIS CONTRACT, INCLUDING BUT NOT LIMITED TO LOSS OF GOOD WILL AND LOST PROFITS OR REVENUE, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.  THE FOREGOING NOTWITHSTANDING, AS TO SUCH DAMAGES INCURRED BY TU AS A RESULT OF THIRD PARTY CLAIMS, NOTHING IN THIS CONTRACT SHALL BE CONSTRUED AS LIMITING PROVIDER'S OBLIGATIONS UNDER SECTION 8.1 ABOVE.

    8.3    <u>Insurance.</u>  Provider shall obtain, and maintain for the period of performance of this Contract: (a)

Worker's Compensation and/or all other Social Insurance in accordance with the statutory requirements of the jurisdiction in which Work will be performed and (b) Comprehensive General Liability and Professional Liability Insurance including, without limitation, errors and omissions coverage, covering all Provider's operations under this Contract, in an appropriate amount, but in any event in a minimum amount of One Million Dollars ($1,000,000.00) per occurrence. Upon written request, Provider shall deliver to TU certificates evidencing the insurance obtained pursuant to the requirements set forth in this Contract. All policies of insurance obtained pursuant to this Contract shall (a) name TU as an additional insured; and (b) provide that such insurance will not be changed or canceled until thirty (30) days prior written notice has been given to TU.

9. This Contract shall be governed by and construed in accordance with the laws of the State of Illinois regardless of the laws that might otherwise govern under applicable Illinois principles of conflicts of law.

10. This Contract and the rights and the obligations thereunder with respect to each Party are personal to that Party and may not be assigned nor subcontracted by any act of the Party or by operation of law without the prior written consent of the Party providing the right under this Contract. Except that either Party shall have the unrestricted right to assign this Contract to a wholly-owned subsidiary, a successor in interest to the Party or to the purchaser of a portion of the assets of the Party.

11. All references in this Contract to the singular shall include the plural where applicable. Titles and headings to sections or paragraphs in this Contract are inserted for convenience of reference only and are not intended to affect the interpretation or construction of this Contract.

13.1 Independent Contractor. Provider is an independent contractor. This Contract is not intended to create or evidence any employer-employee arrangement, agency, partnership, joint venture, or similar relationship of any kind whatsoever, between TU and Provider. Provider shall retain the right to perform services for others during the term of this Contract. TU shall retain the right to cause services of the same or a different kind to be performed by its own personnel or other contractors during the term of this Contract.

13.2 Income Taxes. Provider understands that TU will not contribute to Medicare, Social Security or any other required employment taxes, nor will TU withhold income taxes from compensation paid to Provider. Provider understands that Provider will be responsible for paying and reporting one hundred percent (100%) of all applicable taxes and social insurance including, but not limited to, federal and state employment and income taxes, and social security taxes for itself.

13.3 Employment Benefits. Provider understands that Provider will not be entitled to receive any employment benefits from TU including, but not limited to, health, life or disability insurance; retirement or pension plans; paid vacation or sick leave; unemployment compensation or worker's compensation insurance.

14. Solicitation of Employment. The parties agree that their respective employees, who have integrally participated in the implementation of this Agreement, shall not attempt to hire, solicit for employment or otherwise enter into a contract with any employee(s) of the other party, who becomes known to them by virtue of this Agreement, during this Contract and for six (6) months thereafter, unless expressly agreed to in writing by the other party.

15. Notices. Any notice required to be sent under this Agreement, may be delivered by hand, confirmed telecopier (facsimile) transmission, confirmed electronic-mail transmission, via nationally-recognized overnight courier, or mail, postage pre-paid, certified (or any foreign counterpart), return receipt requested, to the address set forth in the introductory paragraph, above. All such notices intended for TU shall be sent to the attention of TU's Project Manager.

16. Force Majeure. Neither party shall be liable to the other for failure to perform or delay in performance under this Agreement if, and to the extent, such failure or delay is caused by conditions beyond its reasonable control and which, by the exercise of reasonable diligence, the delayed party is unable to prevent or provide against. Such conditions include, but are not limited to, acts of God; failure of utilities; strikes, boycotts or other concerted acts of workmen; laws, regulations or other orders of public authorities; military action, state of war or other national emergency; fire or flood. The party affected by any such force majeure event or occurrence shall give the other party written notice of said event or occurrence within five (5) business days of such event or occurrence.

17. This Contract constitutes the entire agreement between the parties hereto and supersedes all previous agreements and understandings, whether oral or written, express or implied, with respect to the subject matter contained in this Contract. Except as set forth above in Section 2, this Contract may not be altered, amended, or modified except by written instrument, signed by the duly authorized representatives of both

parties.

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be executed as of the last date and year written below.  The parties hereto agree that a facsimile transmission of this fully executed Agreement shall constitute an original and legally binding document.

**Endless River Technologies.**

By: _____

RICHARD BONITZ, MANAGING PARTNER
Name and Title of Signer

3/13/14
Date Signed

**TRANS UNION LLC**

By: _____

Geoffrey Hovel, SVP
Name and Title of Signer

3/31/14
Date Signed

APPROVED
TRANS UNION
Law Department
By: _____
Date: 3/27/14

LR 13361

Exhibit A

## Summary of Proposed Structure

The Quote Exchange concept is a proposed TransUnion Service developed with Endless River Technologies ("ERT" comprised of Key Personnel, Rich Bonitz, Phil Wintering and Ron Somich) of a unique solution for the insurance industry (and other industries) to help carriers reduce online acquisition costs by monetizing underperforming web quoting traffic while simultaneously providing a marketplace for carriers to offer quotes to a large pool of in-market customers that fit their target demographic. At a summary level, this proposal sets forth the following obligations of each party:

This Exhibit is intended to document ERT's responsibilities as consultants performing the Work initially and ongoing on the Project Quote Exchange ("QE" or "Quote Exchange").

**Endless River Technologies, Inc.**
- ERT shall service initially in a business development role assisting TU and positioning the Quote Exchange service to TU customers as specified by TU. TU shall be present at all such TU customer meetings; after a minimum of four insurance carriers agree to participate in the Quote Exchange, in addition to business development obligations, ERT shall serve as a technical consultant/product design/development and IT management role including the launch, expansion and ongoing maintenance of the Quote Exchange platform through 2018; ERT shall contribute up to 160 hours combined services per month throughout Phase V as detailed in this Exhibit; following Phase I, ERT will be paid a $300,000 annual flat consulting fee (this figure does not include any required travel costs incurred by ERT. These costs shall be billed separately) paid 1/12 each month and prorated from January 1, 2014 to December 31, 2018. Upon the Quote Exchange reaching profitability milestone, ERT will receive a percentage of net profits as detailed in this Exhibit; ERT agrees to transfer all intellectual property and application rights to TU at the conclusion of the buyout schedule set forth herein.

**TransUnion**
- TU will work with ERT collaboratively in a business development role to position the Quote Exchange solution to secure initial participation of a minimum of four TU insurance customers; TU will fund the Quote Exchange development; TU shall have approval rights on ERT's product design plans/development/IT management efforts related to the development, launch, expansion and maintenance of the Quote Exchange; TU will secure and maintain resources reasonably required to bring Quote Exchange to market; TU will own all intellectual property and application rights related to the Quote Exchange at the completion of the buyout schedule set forth herein.

**Terms for Quote Exchange Project between Endless River Technologies ("ERT") and TransUnion LLC ("TU")**

### Phase I: Initial Business Development / Due Diligence

The initial business development phase will last from **8/1/2013 through 1/31/14**. For the initial phase of the Due Diligence process with the carriers and TU's application development staff, TU will compensate ERT for T&E (per TU's guidelines) on those occasions in which ERT is physically present. Trips must be agreed upon/approved in advance of each trip. For this, ERT will:
- Continue to develop / modify presentation materials, business cases and content for carrier meetings;
- Continue to present the product to the carrier marketplace so as to onboard as many partners as possible prior to launch; and
- Meet with TU application development staff to explain the concept, and to enable the development of high level requirements and design documents.

All such requirements documents shall be attached hereto as schedules to this Contract.

### Phase II: Business Development

Starting 1/1/2014 and thru 2018, ERT will be compensated an annual flat consulting fee of $300,000.00 (paid 1/12 each month and prorated for 2013 as well as having T&E compensated, per TU's guidelines). Such fee will be paid to ERT for the following Work:
- Continue to develop / modify presentation materials, business cases and content for carrier meetings

- Work with TU to present the Quote Exchange to the insurance carrier marketplace so as to onboard as many partners as possible prior to launch
- Work with the TU team to identify the appropriate integration of TU data with the incoming exchange quotes
- Begin the requirements documentation so that, upon onboarding 4 carriers, the parties can quickly begin product development
- ERT agrees to devote a minimum of 160 man hours per month to Quote Exchange. In the event ERT declines to provide the 160 hours, the consulting fee will be prorated for that period. In the event ERT provide more than 160 of consulting services in a given month, ERT shall invoice TU at a rate of $175 per hour. Additional hours of consulting must be approved by TU in advance.
- In the event that the Quote Exchange does not meet expectations by April 1, 2014 as evidenced by the receipt of four (4) customer executed letters of intent for Quote Exchange, TransUnion may terminate this Contract upon sixty (60) days' notice to ERT.

**Phase III: Product Build**

Once the parties achieve commitments from four (4) insurance carriers, Phase III will be triggered – the actual build of the Quote Exchange

Compensation will continue at the consulting fee rates outlined in Phase II. In addition, TU will reimburse ERT for reasonable T&E expenses in accordance with TU policies and guidelines.

The parameters of this phase will be:

- ERT will assist in the business development role with TU's account management and sales teams to add additional insurance carriers to the Quote Exchange as requested by TU.
- In addition to the business development role, ERT will work with TU product development / project management to build the Quote Exchange system. Specifically, ERT will:
    - Complete, modify and maintain all requirements and development documentation which shall be attached hereto;
    - Consult with TU on the hiring and management of the development staff (as determined to be necessary by TU). The staff will be TU employees or contractors and compensated as determined solely by TU;
    - Coordinate the lease of facilities (if determined to be necessary by TU);
    - Manage all facets of product build, test and release in accordance with the written specifications agreed to by TU;
    - Coordinate with insurance carriers the business rules and technical interfaces between the Quote Exchange and the insurance carriers in accordance with the written specifications agreed to by TU; and
    - Coordinate with TU's IT / application development teams to integrate selected TU offerings to the Quote Exchange.
- During this Phase III and through 2018, ERT's compensation will consist of the agreed upon consulting fee's outlined in Phase II. ERT will determine how those fees are divided between Mr. Bonitz, Mr. Wintering and Mr. Somich.
- Also, during Phase III and through 2018, should TU choose to terminate the Contract and should ERT continue to market and monetize the TU developed code, repayment of TU incurred development fees shall be paid to TU from future ERT revenues generated over a time period not to exceed 36 months. In this instance, the Quote Exchange platform source code developed hereunder will revert to ERT ownership.

**Phase IV: Product Launch:**

At Product Launch the following will occur:
- TU shall receive 60% and ERT 40% of revenue (net of direct expenses contributed by TU and ERT) on a monthly basis once cumulative net profitability is achieved;
- Additionally, ERT will continue to receive guaranteed consulting compensation per year thru 2018 (or until notice of business closing as otherwise provided for herein).
- Once the Quote Exchange is built and viable, ERT will continue to assist TU in the business development role, but will also serve in an account management / product improvement capacity as the parties seek to add more insurance carriers to the Quote Exchange platform while optimizing the performance of customers already using Quote Exchange; and

- TU will invoice insurance carrier customers monthly for the Quote Exchange.

**Phase V: Full Transition to TU:**

Once the Quote Exchange cumulative profits (revenue, less direct expenses) exceed $3,000,000, TU may in its sole discretion, exercise a 5-year buyout of ERT's interest in the Insurance Quote exchange platform for a percentage of annual profit as described below:
- First Year, post milestone (PM): 50% ERT / 50% TU
- Second Year (PM): 40% ERT / 60% TU
- Third Year (PM): 30% ERT / 70% TU
- Fourth Year (PM): 25% ERT / 75% TU
- Fifth Year (PM): 20% ERT / 80% TU
- Sixth Year + (PM): Ongoing 1% tax-deductible donation to Trinity Rose Foundation.

During any period once the Quote Exchange cumulative profits (revenue, less direct expenses) exceed $3,000,000 in which TU elects not to exercise its' buyout rights the revenue distribution outlined in Phase IV above shall continue.

Increased Royalty Trigger: During Phase V, if revenue exceeds the pro forma projections in the revenue plan by 25% or more, then ERT's royalty for that year will be increased by 5 percentage points, e.g. Third Year royalty would increase from 30% to 35%. This calculation will be made within 60 days after the end of each such year and the additional payment shall be paid within 90 days after the end of each such year.

The buyout shall come in the following form:

- ERT shall establish a new subsidiary Company (NEWCO) for the purposes of the buyout.
- During each year of the buyout in return for the payment to ERT outlined above ERT shall transfer 20% of the ownership rights in NEWCO to TU.
- At the conclusion of the buyout period, TU shall own 100% of NEWCO and ERT shall transfer all intellectual property rights in the Quote Exchange platform to Newco immediately following the final buyout payment, as outlined above.

At the end of Phase V, TU will assume all intellectual property and application rights in the Quote Exchange. In the event that TU abandons or substantially curtails operations of the Quote Exchange prior to the conclusion of Phase V, all intellectual property and application rights shall revert to ERT.

- ERT shall be available to consult, as needed, at a then agreed upon consulting fee mutually agreed by the parties at the conclusion of a Phase V should one occur.

Notwithstanding anything to the contrary contained herein, Mr. Bonitz, Mr. Wintering and Mr. Somich are considered Key Personnel and necessary to the performance of ERT's obligations hereunder ("Key Personel").

- In the event any Key Personnel are unable to perform their duties under this contract due to illness, injury or death, ERT shall make best efforts to provide comparable personnel to fulfill the duties outlined herein, until such time as the key personnel can return.
- In the event any of the Key Personnel voluntarily chooses to not perform their obligations under this agreement for a period of 30 days or more, TransUnion may immediately terminate this Agreement and shall be entitled to a refund of the portion of the fees under this Agreement paid to that individual.
- In the event any of the Key Personnel does not perform to the satisfaction of TransUnion, TransUnion may notify ERT of the specific details of non-performance, with specific remedies in performance going forward. ERT shall have 90 days to satisfactorily address the issue of non-performance. If ERT fails to adequately correct the issues of non-performance, TransUnion may immediately terminate this Agreement.
- Notwithstanding anything to the contrary, intellectual property rights that are described in the paragraph below shall apply after any termination except with respect to a TransUnion buyout of the QE as described herein.

In the event the Quote Exchange does not meet expectations at any time in TransUnion's sole discretion. TransUnion may terminate the Contract upon 180 days prior written notice to ERT. TU's obligation to pay consulting fees shall survive during the notice period, but thereafter cease. In that case, ERT will retain intellectual property rights to the Quote Exchange concept as originally presented to TransUnion by ERT, but nothing herein shall prevent TU from developing its own solutions using its residual knowledge, provided TransUnion does not use any information originally presented to TransUnion by ERT.