IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| ENDLESS RIVER TECHNOLOGIES LLC, | ) |
| Plaintiff, | ) CASE NO. 1:18-CV-00936 |
| | ) |
| v. | ) JUDGE DONALD C. NUGENT |
| | ) |
| TRANSUNION LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT TRANSUNION LLC'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**  (REDACTED)

Pursuant to Federal Rule of Civil Procedure 56, Defendant TransUnion LLC moves for

summary judgment on Counts II through VIII of Plaintiff's Amended Complaint; partial summary

judgment on Endless River's breach of contract claim (Count I) and Count II of TransUnion's

Counterclaim, to the extent that TransUnion seeks a declaratory judgment that TransUnion owns

the QE Code; and seeks an order limiting the damages ERT might recover, if any, to actual

damages; and requests that this Court grant such other relief as the Court deems equitable and just.

Respectfully submitted,

By: */s/Courtenay Y. Jalics* _____

Tonya G. Newman
(Ill. ARDC No. 6286958)
*Admitted Pro Hac Vice*
Olivia Luk Bedi
(Ill. ARDC No. 6288365)
*Admitted Pro Hac Vice*
NEAL, GERBER & EISENBERG LLP
Two N. LaSalle Street, Suite 1700
Chicago, Illinois  60602-3801
Tel:  (312) 269-8000
Fax:  (312) 269-1747
Email:  tnewman@nge.com
         obedi@nge.com

Courtenay Y. Jalics (0077507)
Chelsea C. Smith (0091011)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: 216.592.5000
Facsimile:  216.592.5009
Email:  courtenay.jalics@tuckerellis.com
         chelsea.smith@tuckerellis.com

*Attorneys for Defendant TransUnion LLC*

# TABLE OF CONTENTS

I.  SUMMARY OF ISSUES PRESENTED AND SUMMARY OF ARGUMENT ............. 1

II.  STATEMENT OF FACTS ............................................................................ 2

    A.  Endless River Shares Its QE "Trade Secrets" And Other Confidential
        Information With Third Parties .............................................................. 3

    B.  ERT Pitches The QE Concept And The Parties Enter Into An Agreement .......... 4

    C.  The Parties Developed and Marketed The Exchange. ........................... 6

    D.  ERT Publishes The QE "Trade Secrets" By Filing A Patent Application
        and Ensures That the Concept Remains Available to the Public. ......... 8

    E.  TU Elects To Terminate The Agreement .............................................. 8

    F.  Endless River Allegedly Continued To Market The QE Concept. ....... 9

        1.  TU's Communications with LeadCloud ................................. 10

        2.  TU's Communications with ▮ ........................................ 11

III.  ARGUMENT ....................................................................................... 13

    A.  Standard of Review .............................................................................. 13

    B.  TU is entitled to Summary Judgment on ERT's Defamation Claim. ... 13

        1.  The Allegedly Defamatory Statements and Claimed Damages .............. 15

        2.  TU Did Not Make a False and Defamatory Statement. ........... 16

        3.  TU's Statements Were Qualifiedly Privileged. ...................... 17

        4.  ERT Cannot Demonstrate Special Damages. .......................... 19

    C.  TU is Entitled to Summary Judgment on Plaintiff's Slander of Title Claim ....... 21

    D.  TU is Entitled to Partial Summary Judgment on ERT's Breach of Contract
        Claim. .................................................................................................. 22

    E.  TU is Entitled to Summary Judgment on ERT's Tortious Interference with
        a Business Expectancy Claim .............................................................. 23

        1.  TU Did Not Induce ▮ or LeadCloud To Not Do Business With
            ERT…………… ................................................................ 24

i

2.      TU Was Privileged in Making Any Statements About ERT or the Quote Exchange to Third Parties ............................................... 25

3.      ERT Cannot Demonstrate Damages as Required to Support a Claim for Tortious Interference .............................................. 26

F.      TU is entitled to Summary Judgment on ERT's Conversion Claim ................... 26

1.      ERT's Conversion Claim Cannot Stand because it is Duplicative of its Breach of Contract Claim .................................................. 27

G.      ERT's Unjust Enrichment Claim and Breach of Contract Claims are the Same ............................................................................................... 28

H.      TU is Entitled to Summary Judgment on ERT's IDTPA Claim ......................... 29

1.      The Alleged Misrepresentations or Omissions and Claimed Damages .................................................................... 29

2.      The IDTPA Claim Has No Nexus to Illinois. ........................................... 30

3.      Neither LeadCloud Nor ▮ Was Confused or Misunderstood Anything. ......................................................... 31

4.      ERT Cannot Seek Monetary Damages and Cannot Demonstrate Future Harm ......................................................... 32

I.      ERT Has Failed To Prove A Valid Claim Under the Defend Trade Secrets Act. .............................................................................................. 33

1.      Neither the "ERT Information" nor the QE Concept are Protectable Trade Secrets. ...................................................... 34

a.      ERT Has Failed to Safeguard Its Purported Trade Secrets .......... 34

b.      ERT Cannot Derive Economic Value from Information that is Widely Known. ...................................................... 37

c.      Anyone may acquire and duplicate the Quote Exchange System with little time or expense. ............................................. 38

2.      Even If ERT Had Protectable Trade Secrets, There Has Been No Unauthorized Use That Constitutes A Misappropriation ......................... 39

J.      ERT's Damages Are Limited by the Limitation of Liability Clause. .................. 41

IV.      CONCLUSION .................................................................... 44

Certificate of Compliance With Local Rule 7.1(f) ...................................................... 45

ii

## TABLE OF AUTHORITIES

### CASES

*A & B-Abell Elev. Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*,
    651 N.E.2d 1283 (Ohio 1995).................................................................... 15, 17, 23, 24, 25, 26

*Acad. Imaging, LLC v. Soterion Corp.*,
    352 Fed. Appx. 59 (6th Cir. 2009) ......................................................................... 26

*Aday v. Westfield Ins. Co.*,
    486 F. Supp. 3d 1153 (S.D. Ohio 2020) ........................................................... 33, 39

*ATC Healthcare Serv., Inc. v. RCM Techs., Inc.*,
    192 F. Supp. 3d 943 (N.D. Ill. 2016) ..................................................................... 31

*Babcock & Wilcox Power Generation Group, Inc. v. R.T. Patterson Co ., Inc.*,
    5:13-CV-2071, 2015 WL 631189 (N.D. Ohio Feb. 12, 2015)................................. 40

*Boyd v. Allied Home Mortg. Capital Corp.*,
    523 F. Supp. 2d 650 (2007) .............................................................................. 41, 42

*Champion Foodservice, LLC v. Vista Food Exch., Inc.*,
    No. 1:13-cv-1195, 2016 WL 4468001 (N.D. Ohio Aug. 24, 2016)................ 34, 35, 36, 38, 39

*Chrvala v. Borden*,
    14 F. Supp. 2d 1013 (S.D. Ohio 1998) ...................................................... 23, 24, 25

*D.H. Overmyer Co., Inc. v. Frick Co.*,
    405 U.S. 174, 92 S.Ct. 775 (1972) ....................................................................... 42

*Deckers Outdoor Corp. v. Australian Leather Pty. Ltd., et al.*,
    340 F. Supp. 3d 706 (N.D. Ill. 2018) .................................................................... 32

*DMK Dev. Group, LLC v. Cole + Russell Architects, Inc.*,
    480 F. Supp. 3d 837 (S.D. Ohio 2020) ................................................................. 43

*Dudee v. Philpot*,
    2019-Ohio-3939, 133 N.E.3d 590 (1st Dist. 2019)................................................ 14

*Dupler v. Mansfield J. Co., Inc.*,
    413 N.E.2d 1187 (Ohio 1980)............................................................................... 26

*Drone Consultants, L.L.C. v. Armstrong*,
    CA2015–11–107, 2016 WL 3057969 (Ohio App. 12th 2016). ............................... 17

*Feisley Farms Family, LP v. Hess Ohio Resources, LLC*,

No. 2:14-cv-146, 2015 WL 5793936 (S.D. Ohio Sept. 30, 2015) ........................................... 13

*Gerber v. Riordan*,
   535 F. Supp. 2d 860 (N.D. Ohio 2008) .................................................................................... 43

*Global Indus., Inc. v. Harris*,
   376 F. Supp. 1379 (N.D. Ga. 1974) ......................................................................................... 42

*Green v. Lemarr*,
   744 N.E.2d 212 (Ohio App. 2d Dist. 2000) ............................................................................. 21

*Hahn v. Kotten*,
   331 N.E.2d 713 (Ohio 1975) ............................................................................................... 17, 18

*In re Sears Roebuck & Co. Tools Mkt. and Sales Prac. Lit.*,
   No. MDL-1703, 05 C 4742, 05 C 2623, 2005 WL 3077606 (N.D. Ill. Nov. 14, 2005) .......... 31

*John Eastman Dev. Co. v. Harvest Dev. Co.*,
   No. 1146, 1982 WL 2737 (Ohio App. 9th Dist. Sept. 1, 1982) ............................................... 22

*Kand Med., Inc. v. Freund Med. Prods., Inc.*,
   963 F.2d 125 (6th Cir. 1992) (Ohio law) ................................................................................. 24

*Kensington Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*,
   392 Ill. App. 3d 1 (1st Dist. 2009) ........................................................................................... 29

*Konica Minolta Bus. Sols., USA, Inc. v. Allied Office Prods., Inc.*,
   724 F. Supp. 2d 861, 868 (S.D. Ohio 2010) ................................................................. 14, 19, 21

*Maddox Defense, Inc. v. GeoData Sys. Mgmt., Inc.*,
   2019-Ohio-1778, 135 N.E.2d 1212, 1224 (8th Dist. 2019) ............................................... 14, 16

*Maui Jim, Inc. v. SmartBuy Guru Enters.*,
   No. 1:16 CV 9788, 2018 WL 509960 (N.D. Ill. Jan. 23, 2018) ......................................... 30, 31

*Microbilt Corp. v. Bail Integrity Sols., Inc.*,
   No. CV19637MASLHG, 2019 WL 6310202 (D.N.J. Nov. 25, 2019) ..................................... 40

*Murray Energy Holdings, Co. v. Bloomberg, L.P.*,
   No. 2:15-cv-2845, 2016 WL 3355456 (S.D. Ohio June 17, 2016) ....................... 34, 36, 37, 38

*N. Feldman & Son, Ltd. v. Checker Motors Corp.*,
   572 F. Supp. 310 (S.D.N.Y. 1983) ........................................................................................... 42

*Ne. Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*,
   916 N.E.2d 484 (Ohio App. 9th Dist. 2009) ...................................................................... 19, 20

*Noticxe, Inc. v. Oakley, Inc.*,
  No. 3:18-cv-00056, 2018 WL 6573714 (S.D. Ohio Dec. 13, 2018)........................................ 27

*Oro BRC4, LLC v. Silvertree Apts., Inc.*,
  No. 19-cv-04907, 2021 WL 184686 (S.D. Ohio Jan. 19, 2021)............................................... 28

*Osborn v. Knights of Columbus*,
  401 F. Supp. 2d 822 (N.D. Ohio  2005)................................................................................ 14

*Pavlovich v. Nat'l City Bank*,
  435 F.3d 560 (6th Cir. 2006) ................................................................................................ 23

*PPS Serv. Grp., LLC v. Eckert*,
  No. 1:18-cv-727, 2019 WL 3927232 (S.D. Ohio Aug. 20, 2019) .................................... 33, 38

*Reali, Giampetro & Scott v. Nat'l Soc'y Bank*,
  729 N.E.2d 1259 (Ohio App. 7th Dist. 1999)........................................................................ 24

*Reg'l Imaging Consultants Corp. v. Computer Billing Servs., Inc.*,
  No. 00-CA-79, 2001 WL 1539261 (Ohio App. Nov. 30, 2001).............................................. 14

*Ryan v. Rival Mfg. Co.*,
  No. C-810032, 1981 WL 10160 (1st Dist. Ohio Dec. 16, 1981) ............................................ 28

*SG Blocks, Inc. v. Hola Cmty. Partners*,
  No. 220CV03432ODWRAOX, 2021 WL 736440 (C.D. Cal. Feb. 25, 2021) ........................ 40

*Smith v. Ameriflora 1992, Inc.*,
  644 N.E.2d 1038 (10th Dist. 1994)........................................................................................ 15

*Smith v. Nat'l W. Life*,
  92 N.E.3d 169 (Ohio App. 8th Dist. 2017)............................................................................ 23

*Smith v. Sandusky Newspapers, Inc.*,
  No. 3:17CV1135, 2018 WL 3046537 (N.D. Ohio June 20, 2018) .......................................... 14

*Spitzer v. Knapp*,
  No. 19 CAE 01 0006, 2019 WL 2764071 (Ohio Ct. App. 5th Dist. 2019) ............................ 19

*Sylvania Bank v. Trala*,
  No. C.A. L-86-283, 1987 WL 8024 (Ohio Ct. App. Mar. 20, 1987)...................................... 22

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  437 Fed. Appx. 381 (6th Cir. 2011)...................................................................................... 27

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ................................................................. 35

*United States v. Mountain Village Co.*,
    424 F. Supp. 822 (D. Mass. 1976) ........................................................... 42

*Universal Gaming Grp. v. Taft Stettinius & Hollister LLP*,
    2017 IL App (1st) 150878-U, 2017 WL 1240860 (Ill. App. 1st Dist. Mar. 31, 2017) ........... 29

*Walter v. ADT Sec. Sys., Inc.*,
    No 06AP-115, 2007 WL 1874247 (Ohio App. 10th Dist. 2007) ................................ 25

*Webber v. Ohio Dep't of Pub. Safety*,
    103 N.E.3d 283 (Ohio Ct. App. 10th 2017) ................................................. 14

*Xylem Dewatering Sols., Inc. v. Szablewski*,
    2014 IL App (5th) 140080-U, 2014 WL 4443445 (Ill. App. 5th Dist. Sept. 8, 2014) ............ 33

*Yeager v. Innovus Pharma., Inc.*,
    No. 18-cv-397, 2019 WL 447743 (N.D. Ill. Feb. 5, 2019) ................................ 32, 33

## STATUTES

18 U.S.C. § 1839(3) ......................................................................... 38
18 U.S.C.A. § 1836 .......................................................................... 33
815 ILCS § 510/2(a)(2), (8) ................................................................. 29
815 ILCS § 510/3 ........................................................................... 29
Fed. R. Civ. P. 56(c) (2021) ............................................................... 13
H.R. REP. 114-529 .......................................................................... 33

## I.  <u>SUMMARY OF ISSUES PRESENTED AND SUMMARY OF ARGUMENT</u>

This is a straightforward breach of contract case. Endless River Technologies LLC ("ERT") had an idea for the Quote Exchange – a proposed online platform to market insurance products. ERT did not, however, have the technical capability, the equipment, the manpower or the money to turn its concept into a viable product.  TransUnion LLC ("TU") had what that ERT lacked, so they worked together to develop the Quote Exchange (the "QE" or the "Exchange.") TU invested millions of dollars, thousands of hours and goodwill developing the Exchange. ERT not only invested no money, TU paid ERT for its time throughout the development process. Ultimately, TU concluded the QE was not viable and terminated the parties' Agreement.

Thereafter, like any sensible business, TU informed the companies with which it had entered into contracts that it had stopped production of the Exchange and shut down the platform. One party inquired about purchasing the source code (the "QE Code"), and TU responded that ERT had the first right to purchase it – which was true under the Agreement.

ERT demanded that TU turn over everything actually or potentially associated with the Exchange, including the QE Code that TU paid to develop and information and materials that were jointly developed. ERT claims that TU breached the Agreement by failing to do so. When the parties were unable to resolve their differences, ERT initiated this litigation, asserting a host of claims in addition to breach of contract, many of which are indistinguishable from the breach of contract claim and all of which arise out of the Agreement.

***First***, ERT claims that TU is liable for defamation, tortious interference with a business relationship and slander of title as a result of TU's statements about shutting down the Exchange and ownership of the QE Code.  Because those statements were true or substantially true, were qualifiedly privileged and did not cause any party to decline to do business with ERT, the claims fail as a matter of law.

1

**Second**, ERT's claim for violation of the Deceptive Trade Practices Act fails for similar reasons, because it is based upon the same **true** statements and, regardless, there is no evidence that the statements created any misunderstanding, nor did any potential customer or partner rely on any misunderstanding.  Also, ERT cannot seek monetary damages or prove future harm.

**Third**, because TU owns the QE Code, it is entitled to partial summary judgment on ERT's breach of contract claim to the extent it is premised on TU's failure to turn over the QE Code.

**Fourth**, ERT's unjust enrichment and conversion claims fail because they are indistinguishable from its breach of contract claim.  As to the former, ERT cannot recover in equity where a contract governs.  As to the latter, there is no separate duty giving rise to a tort claim, and in any event the claim is barred by the economic loss doctrine.

**Fifth**, ERT's trade secrets misappropriation claim also fails because the alleged trade secrets already are in the public domain or in TU's rightful possession. ERT itself published all of the purported confidential information in a patent application filed in May 2016 and published in November 2016. All of that information lost any trade secret protection once it became public. The same goes for the Endless River Information ("ERT Information"). Although ERT can scarcely describe or recall the specific information that comprises the categories of ERT Information, it does recall that **both** ERT and TU contributed to it and that, like the QE concept itself, ERT had presented much of that information to third parties **years** prior to entering into any agreement with TU. Much of the ERT Information remains with TU, pursuant to the terms of the Agreement; not because of any theft or unauthorized taking.

**Last**, because all of the claims arise out of the Agreement, ERT's recovery is limited by the Agreement, including its request for punitive damages.  TU is entitled to summary judgment.

## II.  STATEMENT OF FACTS

TU is a global information and insights company that uses data to serve insurance and other

2

markets. ERT is a small consulting firm formed by Richard Bonitz, Phil Wintering, and Ron Somich in 2008. (ECF No. 43, TU's Countercl., ¶ 5; ECF No. 50, ERT's Countercl. Ans., ¶ 5; *see also* Dep. of Rich Bonitz ("Bonitz Dep."), 18:25-19:6, attached as <u>Ex. 1</u>.[1]) ERT has no business operations separate from the QE; it does not currently, nor has it ever had, clients other than TU. (<u>Ex. 1</u>, Bonitz Dep., 24:6-8, 25:12-16.)

> ### A.    <u>Endless River Shares Its QE "Trade Secrets" And Other Confidential Information With Third Parties.</u>

In late 2008, ERT began presenting the concept of an online insurance lead marketplace to venture capital firms. (*See* ERT Interrog. Resp., Nos. 1 and 8, attached as <u>Ex. 2</u>.) The concept, which ultimately became known as the "Quote Exchange," was intended to be an online platform that would assist auto insurance carriers and customers alike by providing potential customers with quotes from several auto insurance carriers at once. (ECF No. 20, Pl.'s Am. Compl., ¶19; ECF No. 26, Def.'s Ans. Am. Compl., ¶19; 10/20/2020 Dep. of ERT's Rule 30(b)(6) Witness ("ERT 30(b)(6) Dep."), 70:1-12, Dep. Ex. 9 at p. 6, attached as <u>Ex. 4</u>.) It would allow carriers to sell leads for those customers who did not meet the carriers' underwriting criteria to other carriers who might want to purchase the leads, allowing them to quote to a large pool of customers that fit a desired demographic. (ECF No. 20, ¶ 2; ECF No. 26, ¶ 2.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[1] For the Court's convenience, and to avoid any confusion that might be caused by citing exhibits to this memorandum that are also exhibits to deposition transcripts, the numbers for exhibits to this brief are underlined.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  In each instance, ERT:

- Did not produce written records of all persons and/or companies who received copies of its original, and purportedly confidential, QE Concept presentation. (Ex. 3, ERT 30(b)(6) Dep., 26:20-27:8.)

- Has been unable to produce any signed confidentiality agreement or non-disclosure agreement ERT would have provided to and obtained from the recipients of its QE Concept and other presentations before it entered into the Agreement. (*Id.* at 126:11-25.)

- Does not have and has not produced any written record(s) evidencing that ERT either requested that the recipients of its presentations (that purportedly contained ERT trade secrets) destroyed the same at any point after they received and viewed them, or returned them to ERT. (*Id.* at 26:4-27:1.)

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

**B.**    **ERT Pitches The QE Concept And The Parties Enter Into An Agreement.**

In January 2013, ERT approached TU with the concept, pitching it as a product that TU would pay for and build, and the parties would sell together. (Dep. of Geoff Hakel ("Hakel Dep."), 24:7-17, attached as Ex. 9; Hakel Dep., 25:7-19, Dep. Ex. 119, attached as Ex. 10.) Mr. Wintering met with Geoff Hakel, then Group Vice President of TU's insurance division, to pitch the concept, which ultimately became known as the "Quote Exchange."  (*Id.*; *see also* Dep. of Philip Wintering ("Wintering Dep."), 43:23-44:16, attached as Ex. 11; Ex. 4, ERT 30(b)(6) Dep., 70:1-12, Dep. Ex.

---

2    That same information comprises, in part, what ERT defines in this case as "Endless River Information" and claims to have treated as trade secrets, from the time it was created to the present. (Ex. 3, ERT 30(b)(6) Dep., 81:23-82:6, 130:20-131:25.)

9; ECF No. 20, ¶19; ECF No. 26, ¶19.) Mr. Hakel was interested and, over several months, the parties negotiated an agreement to develop the QE. (Ex. 9, Hakel Dep., ██████, 94:3-12.)

Those negotiations culminated in a Development Agreement and Contract for Services, pursuant to which the parties would develop the QE. (1/1/2014 Dev. Agr. and Contract for Servs., TU0218946-953; 4/1/2014 First Amd. to Dev. Agr., TU0086779; 6/20/2014 Second Amd. to Dev. Agr., TU0284635 (collectively, "Agreement"), attached as Ex. 13.) For its part, TU would be responsible for, among other things, paying to develop and developing the software code for the platform, and ERT would provide business development services, technical operations support and technical project services. (*Id.* at TU0218950.) In exchange, TU agreed to pay to ERT $300,000 per year, which later increased to $450,000 per year. (*Id.* at TU0218950, TU0284635.)

The Agreement outlined five phases through which the project would proceed. (*Id.* at TU0218950-953.) In pertinent part, Phase I included initial business development and due diligence. (*Id.* at TU0218950.) Phase III – building the QE platform – would begin once the parties had received commitments from four insurance carriers to participate in the Exchange. (*Id.* at TU0218951.) The Agreement also set forth which party owned the Work Product[3] and Intellectual Property Rights at any given time once the parties began building the platform, including if the Agreement was terminated. (*Id.* at TU0218950-53.)

TU could terminate the Agreement during any phase; if TU did so during Phase III or at any time through 2018, and if ERT intended to market and monetize the code that TU developed for the project, then ERT was required to repay TU's development fees from revenues ERT

---

[3]     The Agreement determines the parties' rights to and defines "Work Product" as "all copyrights, patents, trade secrets, trademarks, trade names, and all other intellectual property right associated with any and all ideas, concepts, techniques, inventions, processes, or works of authorship including, but not limited to, all materials in written or other tangible form developed or created by [ERT] during the course of performing the Work for TU under this Contract." (*Id.* at TU0218947.)

generated from the QE: "In [that] instance, the [QE] platform source code developed [under the Agreement would] revert to [ERT] ownership." (*Id.* at TU0218951.)[4]

Additionally, the Agreement includes the following broad waiver of liability:

> <u>Waiver of Liability</u>. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, AND BOTH TU AND PROVIDER HERBY WAIVE AS TO THE OTHER PARTY, ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTY ARISING OUT OF THE PERFORMANCE OF THIS CONTRACT, INCLUDING BUT NOT LIMITED TO LOSS OF GOODWILL AND LOST PROFITS OR REVENUE, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. …

(*Id.* at TU0218947.)[5]

## C.    <u>The Parties Developed and Marketed The Exchange.</u>

The Agreement was executed in March, 2014 and, once ERT and TU obtained the requisite letters of intent from insurers, they began developing the Exchange.[6] (4/26/2014 Email from Wintering to Drotos and Bonitz, TU0088952, attached as <u>Ex. 14</u>.)

As they did so, they encountered the usual technical difficulties to be expected in building an online platform from the ground up while also selling it to market participants. Despite their best efforts, the parties were unable to engage a sufficient mix of selling and quoting carriers in enough states to create a viable marketplace. (Dep. of Emily Lebowitz ("Lebowitz Dep."), 122:18-

---

[4]    If TU terminated the Agreement because, in its sole discretion, the Quote Exchange was not meeting expectation, TU would pay consulting fees during that 180-day period. (*Id.* at TU0218953.) Thereafter, ERT would "retain intellectual property rights to the Quote Exchange concept as originally presented to TU by ERT, but nothing [would] prevent TU from developing its own solutions using its residual knowledge, provided TU [did] not use any information originally presented to TransUnion by ERT." (*Id.*)

[5]    The Agreement also contained a standard confidentiality provision and an integration clause, providing that it constituted the entire agreement between the parties and superseded all prior agreements, whether written or oral, regarding the Quote Exchange. (*Id.* at TU0218946, TU0218948-49.)

[6]    Because they did not receive the requisite letters of intent as the deadline to do so approached, ERT and TU amended the Agreement to allow until June 1, 2014 to receive five letters of intent rather than the originally required four.  (*Id.* at TU0218949, TU0086779.)

123:1, attached as Ex. 15; Dep. of Kevin Coghill ("Coghill Dep."), 231:22-233:1, attached as Ex. 16; Ex. 9, Hakel Dep., 157:5-24; Ex. 1, Bonitz Dep, 45:14-46:4.) Without sufficient carriers to sell a good mix of leads, there was not sufficient competition on the price of those leads.  (Ex. 9, Hakel Dep. 132:18-133:4.) Having the right mix of carriers also was important on the consumer side – that is, having enough carriers to purchase the leads and offer quotes for policies to allow the consumer to choose from several options ensured that the consumer felt he or she had done her diligence in pricing insurance before selecting a policy.  (Ex. 15, Lebowitz Dep. 122:5-17.) In any event, the platform officially launched on March 7, 2016 in Florida with one referring carrier (selling a lead) and two quoting carriers (purchasing a lead). (3/9/2016 Email from Drotos to Bonitz, *et al*., TU0204840-841, attached as Ex. 17.)

The QE was plagued by a more significant problem.  ███████████████████

████████████████████████████████████████████████████████████

████████████████████ (Ex. 4, ERT 30(b)(6) Dep., 70:1-12, Dep. Ex. 9 at p. 13;

████████████████████████████████████████████████████████████.) For example, in November 2015, just before the March 7, 2016 launch date, the QE was projected to generate $5.4 million in revenue for 2016; yet by August of 2016, it was only projected to generate $486,000 for the year. (Dep. of Ron Somich ("Somich Dep."), 94:25-95:5, attached as Ex. 30; ███████████████████; *see also* Coghill Dep., 119:24-12, Dep. Ex. 9, attached as Ex. 21.) In February 2017, the QE earned a meager $21,313.18 in revenue, compared to $110,701.00 in carrier expenses. (Coghill Dep., 143:10-144:19, Dep. Ex. 13, attached as Ex. 22.) By September 2017, the QE had two quoting carriers under contract, seven referring carriers, and 20 carriers that had either expressed interest or were in the process of onboarding to the platform. (Dep. of David Drotos ("Drotos Dep."), 217:13-218:7, Dep. Ex. 73 at p. 2-3, attached as Ex. 24.)

**D.      ERT Publishes The QE "Trade Secrets" By Filing A Patent Application and Ensures That the Concept Remains Available to the Public.**

On May 12, 2016, ERT filed U.S. Application No. 15/153,130 (the "Patent Application" or the "Application") with the United States Patent and Trademark Office ("USPTO"), titled "Quote Exchange System and Method for Offering Comparative Rates for an Insurance Product." (*See* Ex. 2, ERT Interrog. Resp., No. 9; *see also* U.S. Patent Application 15/153,130, attached as Ex. 25.)[7] The Application was published on November 17, 2016 as U.S. Patent Application No. 2016/0335726 – i.e., making it and everything in it available to the public. (*See* 11/17/2016 Notice of Publication of Application ("Notice of Publication"), attached as Ex. 26.)

Since filing the Application in May 2016, ERT has never attempted to abandon or prevent its publication. (*See* Public Patent Application Information Retrieval ("PAIR") for the Application, https://portal.uspto.gov/pair/PublicPair (last visited on 5/19/2021), attached as Ex. 27.)   In fact, ERT has spent the last five years filing amendments and requests for the USPTO to re-examine the multiple non-final rejections and final rejections (collectively, the "Rejections") issued against its Application. (*Id.*) Each time, the Patent Examiner detailed multiple reasons that Mr. Bonitz's and Mr. Wintering's Quote Exchange System was unpatentable.  (*See* 3/18/2021 Final Rejection, attached as Ex. 28.)  ERT has responded to each rejection (*see* 10/6/2020 Resp. to Final Rejection, attached as Ex. 29), and all the while, the Patent and the details of the Quote Exchange System remain in the public domain. (*See* Ex. 27.)

**E.      TU Elects To Terminate The Agreement.**

In October 2017, TU elected to terminate the Agreement, "due to the [QE] not meeting

---

[7]      This Court may take judicial notice of all documents filed with the USPTO. *See OurPet's Co. v. IRIS USA, Inc.*, No. 1:14 CV 1642, 2015 WL 12780599, *2 (N.D. Ohio Mar. 23, 2015) (Court may take judicial notice of the patent because, "[p]ursuant to Federal Rule of Evidence 201(b)(2), judicially noticeable facts are those not subject to reasonable dispute because they 'can accurately and readily determine from sources whose accuracy cannot reasonably be questioned.'")

expectations." (ECF No. 20, Ex. B; Ex. 9, Hakel Dep., 156:18-157:24.)  TU paid ERT's consulting

fees for 180 days thereafter, and the termination became effective on April 2, 2018. (Ex. 1, Bonitz

Dep., 113:1-5; Ex. 30, Somich Dep., 120:10-122:3, Dep. Ex. 28, attached as Ex. 20.) In connection

with the termination, TU notified its insurance customers and vendors that its participation in the

QE had come to an end. (*See e.g.*, 10/3/2017 Email from Drotos to Lebowitz, TU0284772-775,

attached as Ex. 31; 10/23/2017 Email from Lebowitz, to Rixford, Costa, TU0285650, attached as

Ex. 32; 10/23/2017 Email from Lebowitz to Ocheltree and Wooton, LeadCloud000076, attached

as Ex. 33.) In doing so, TU simply stated that as of October 17, 2017, TU stopped production of

the QE and there would be no further activity on the platform going forward. (*Id.*) ███████

███████████████████████ and LeadCloud were among the vendors that TU contacted to

inform them that it was no longer participating in the QE. (████████████████████████████

███████████████ ; 1/17/2020 Dep. of Brian Ocheltree ("Ocheltree Dep."), 28:9-29:6,

attached as Ex. 35.)

### F.   Endless River Allegedly Continued To Market The QE Concept.

In the following months, ERT met with TU to discuss and negotiate next steps. (Ex. 9,

Hakel Dep., 193:9-19.) ERT maintained that it owned the QE Code that TU paid to develop, as

well as other intellectual property and work product. (Ex. 3, ERT 30(b)(6) Dep., 118:1-119:19.)

TU maintained that it owned the QE Code and that ERT owned the Exchange concept as Mr.

Wintering presented it to TU in January 2013. (Ex. 9, Hakel Dep., 135:10-137:4; 172:11-173:10.)

ERT also met with other potential "partners," including LeadCloud and ███ , to explore how to

move forward with QE without TU. (Ex. 35, Ocheltree Dep., 29:19-30:22; ████████████████

███████ ) ERT alleges that while it was trying to do so, TU defamed ERT by stating that TU,

rather than ERT, owned the ERT Information, including the QE Code. (ECF No. 20, ¶ 98.)  ERT

further contends by so stating, TU tortiously interfered with ERT's potential relationships with

LeadCloud and ██, and slandered ERT's title to some or all of the ERT Information. (Ex. 3, ERT 30(b)(6) Dep., 179:12-180:11; ECF No. 20, ¶¶ 118, 107.)

### 1.  TU's Communications with LeadCloud

LeadCloud is a Maryland based company that uses cloud-based data integration (i.e., integrating data used across different systems) to connect insurance carriers and other, large consumer-facing marketers to their digital partners. (Ocheltree Dep., 45:25-46:5, Dep. Ex. 9, attached as Ex. 36; Ex. 35, Ocheltree Dep., 16:4-12.) TU is a member of LeadCloud's data portal, and the two companies have a business relationship that goes beyond the QE. (Ex. 35, Ocheltree Dep., 90:3-9, 101:13-16.) As to the Quote Exchange, TU contracted with LeadCloud to provide an additional way to connect insurance carriers to the platform. (*Id*. at 23:14-24:4.) When LeadCloud CEO Brian Ocheltree initially learned that TU was terminating its involvement with the QE, he was interested in purchasing some or all of the "assets" of the QE. (*Id*. at 39:21-40:22.) Mr. Ocheltree saw Ms. Lebowitz at a conference in March 2018, and she informed him that ERT had the right of first refusal with respect to purchasing the code. (████████████████████████ ████████████████████████; Ex. 15, Lebowitz Dep., 232:4-22; Ex. 9, Hakel Dep., 233:23-234:16.) Once he learned of the dispute between ERT and TU, Mr. Ocheltree stopped communicating with either side about the QE because he was concerned about getting caught up in the dispute. (Ex. 35, Ocheltree Dep., 47:5-16.) However, despite ERT's contentions, LeadCloud's decision not to pursue a business relationship with ERT was not related to anything someone from TU communicated to LeadCloud regarding the QE, ERT or any of its principals. (*Id*. at 67:14-68:17; Ex. 2, ERT Interrog. Resp., No. 14.)  LeadCloud simply did not want to pursue business with ERT until ERT and TU finalized or resolved their dispute, but invited ERT to follow up. (*See* Ocheltree Dep., 55:1-16, Dep. Ex. 11, attached as Ex. 38.) ERT never did. (Ex. 3, ERT 30(b)(6), 187:24-188:10; Ex. 35, Ocheltree Dep., 59:16-24.)

10

**2. TU's Communications with** ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Like

LeadCloud, ██ received an email from TU confirming that it had stopped production of the QE

and that there would be no further activity on the platform going forward. (Ex. 32, TU0285650.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ERT

also sought another partner to potentially rebuild the platform, and wanted ██ to invest in that

endeavor.  (Ex. 3, ERT 30(b)(6) Dep., 176:3-21.) ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



---

[8] ETR0014243 is a recording of a March 2018 phone call between members of ERT and ███. The specific citation refers to the timestamp on the recording.

[9]     It is worth noting that Endless River filed its Complaint on April 24, 2018, alleging that then-unidentified third parties (██████████████████████) had declined to do business with ERT as a result of TU's conduct and statements, ████████████████████████████████████████████. (ECF No. 1, Plaintiff's Complaint ("Pl.'s Compl."), ¶35; ████████████████████████████████████████

████████████████████████████████████████████████████████

████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ As will be shown below, nothing TU said or did rises to the level of defamation, tortious interference, slander of title, conversion, trade secrets misappropriation or a violation of the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), nor has TU been unjustly enriched.  Each and every one of these claims seeks to turn ERT's breach of contract claim into something that it is not, perhaps in an attempt to avoid the implications of the Agreement's limitation of liability clause. Whatever the reason, each of the claims fails as a matter of law and TU is entitled to summary judgment.

## III.    ARGUMENT

### A.    Standard of Review

Summary judgment should be entered in favor of TU because there is no "genuine issue as to any material fact" and TU is therefore entitled to judgment as a matter of law on ERT's claims. *See* Fed. R. Civ. P. 56(c) (2021). This Court is familiar with the standards on summary judgment. *See id.; Feisley Farms Family, LP v. Hess Ohio Resources, LLC*, No. 2:14-cv-146, 2015 WL 5793936, *3 (S.D. Ohio Sept. 30, 2015). "The burden is on the non-moving party to 'present affirmative evidence to defeat a properly supported motion for summary judgment and to designate specific facts in dispute." *Id.* (citations omitted). "The non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.*[10]

### B.    TU is entitled to Summary Judgment on ERT's Defamation Claim.

---

[10]    The Court's standard of review remains the same when the parties file cross-motions for summary judgment. *See Feisley Farms*, 2015 WL 5793936 at *3. In that instance, "the Court must still 'evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party.'" *Id.*, quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

No reasonable jury could find TU liable for defamation. "Defamation is a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." *Konica Minolta Bus. Sols., USA, Inc. v. Allied Office Prods., Inc.*, 724 F. Supp. 2d 861, 868 (S.D. Ohio 2010). To prevail on its defamation claim, ERT must prove that TU: (1) made a false and defamatory statement about ERT to a third party; (2) without privilege; (3) with fault amounting at least to negligence; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *See, e.g., Osborn v. Knights of Columbus*, 401 F. Supp. 2d 822, 827 (N.D. Ohio 2005); *Webber v. Ohio Dep't of Pub. Safety*, 103 N.E.3d 283, 296 (Ohio Ct. App. 10th 2017). The element of "'fault' is determined by whether the alleged defamer acted reasonably in attempting to discover the truth or falsity of the defamatory character of the publication." *Konica Minolta*, 724 F. Supp. 2d at 868 (quoting *Franks v. Lima News*, 672 N.E.2d 245, 248 (1996)).

Ohio recognizes two categories of defamation – defamation *per se* and defamation *per quod*. A statement is defamatory *per se* if its defamatory character is apparent from the statement itself. *Konica Minolta*, 724 F. Supp. 2d at 868. A statement that makes no reference to the plaintiff cannot be defamatory *per se*. *Reg'l Imaging Consultants Corp. v. Computer Billing Servs., Inc.*, No. 00-CA-79, 2001 WL 1539261, *9 (Ohio App. Nov. 30, 2001). Statements that are defamatory *per quod* are those whose defamatory meaning is apparent only "through interpretation or innuendo." *Konica Minolta.*, 724 F. Supp. 2d at 870. Whether a statement is defamatory is a question of law, requiring courts to consider whether, under all of the circumstances and in the context of the entire publication, a reasonable person would consider it to be defamatory. *Smith v. Sandusky Newspapers, Inc.*, No. 3:17CV1135, 2018 WL 3046537, *5-6 (N.D. Ohio June 20, 2018).

14

Truth is an absolute defense to a defamation claim. *Maddox Defense, Inc. v. GeoData Sys. Mgmt., Inc.*, 2019-Ohio-1778, ¶ 53, 135 N.E.2d 1212, 1224 (8th Dist.); *Dudee v. Philpot*, 2019-Ohio-3939, ¶ 11, 133 N.E.3d 590, 596 (1st Dist. 2019) (noting that "substantial truth is a complete defense to defamation."). Additionally, there are qualified privileges to a defamation claim, including where the speaker and listener share a common interest in the statement made "and the communication is of a kind reasonably calculated to protect or further it." *Smith v. Ameriflora 1992, Inc.*, 644 N.E.2d 1038, 1041-42 (10th Dist. 1994). If a defendant establishes a qualified privilege, the plaintiff must prove by clear and convincing evidence that the qualified privilege was abused, *i.e.*, that the statements were made with actual malice – with knowledge of their falsity or reckless disregard of the truth or falsity. *Id*. at 1042; *A & B-Abell Elev. Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1292 (Ohio 1995). Actual malice may not "be inferred from evidence of ill-will, personal spite or ulterior motive," or based on "the characterization of such conduct as being malicious." *Smith* at 1042.

The next section discusses the allegedly defamatory statements made by representatives of TU, which are not defamatory on their face. Moreover, they were true and subject to a qualified privilege based on the common interest between TU and the recipients. ERT also cannot prove any special damages, which it must do given that it alleges defamation *per quod*.

### 1.  The Allegedly Defamatory Statements and Claimed Damages.

ERT contends that TU made two allegedly defamatory statements to ITC and LeadCloud: "(i) that the [QE] Program does not belong to ERT but to TU, and (ii) that the [QE] Program has been terminated."  (Ex. 2, ERT Answer to Interrog. No. 14.) More specifically, ERT claims that TU "informed ITC that the [QE]  had been cancelled and that TU owns the [QE] code." (*Id*.) As a result, ERT claims it suffered a "loss of its valuable intellectual property assets and loss of customers and other damages." (ECF No. 20, ¶ 103.)

15

## 2.   **TU Did Not Make a False and Defamatory Statement.**

*First*, TU's statements that it had terminated the Exchange were true. In October 2017 TU

terminated the Agreement and shut down the Exchange. (ECF No. 20, Ex. B; Ex. 9, Hakel Dep.,

156:18-157:24.) TU had entered into agreements with third parties, including ▮▮▮ and LeadCloud,

in connection with the operation of the Quote Exchange, and, because it was terminating those

agreements, informed ▮▮▮ and LeadCloud:

> [T]he TransUnion Quote Exchange stopped production as of Wednesday, October
> 18, 2017. There will not be any further quoting activity within the platform from
> this point forward.

(*See e.g.*, Ex. 31, TU0284772-775; Ex. 32, TU0285650; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

Ex. 35, Ocheltree Dep., 23:14-24:4, 28:9-29:6; Ex. 33, LeadCloud000076.) The statement was

indisputably true, and truth is an absolute defense to a defamation claim. *See Maddox Defense,*

*Inc.*, 2019-Ohio-1778 at ¶ 53.

The second statement attributed to TU, that it owned the QE Code, also was true. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The closest TU came to informing LeadCloud that TU, rather than ERT, owned the QE

Code was in Ms. Lebowitz's response to Mr. Ocheltree's inquiry about purchasing the code. (*See*

Ex. 35, Ocheltree Dep., 39:21-40:22.) After speaking with him at a conference, Ms. Lebowitz told

Ocheltree that ERT had the right of first refusal with respect to purchasing the code. (▮▮▮▮

16

███████████████████████; Ex. 15, Lebowitz Dep., 232:4-22; Ex. 9, Hakel Dep., 233:24-234:16.) Because the termination of the Agreement took effect in April 2018, TU owned the QE Code unless and until ERT repaid the development costs. (Ex. 13, Agreement, at TU0218951.) Thus, Ms. Lebowitz's statement was true and not actionable defamation. *See Maddox Defense, Inc.*, 2019-Ohio-1778 at ¶ 53.

Even assuming the statement was misleading or not completely true (a point TU does not concede), it merely reiterated what the Agreement provided and was consistent with TU's position in this litigation, and therefore was not actionable. *See Drone Consultants, L.L.C. v. Armstrong*, CA2015–11–107, 2016 WL 3057969, at *7 (Ohio App. 12th 2016). The analysis of the *Drone Consultants* court is instructive.  In that case, an employer sent an email to employees, informing them that it believed former employees had breached their contract and explaining its interpretation of the contract. *Id*. at *2, 6. Affirming the trial court's grant of summary judgment to the employer on the claim that the email was defamatory, the court reasoned that the email was not actionable defamation, even if misleading and subject to interpretation, because it had some truth to it and was consistent with the position the employer had taken in the litigation: "Simply, the allegedly defamatory language contained in the email was a matter of contractual interpretation that was subject to reasonable dispute between the parties."  *Id.* at *7.  Like the employer in *Drone Consultants*, any statement that TU owned the QE Code was "a matter of contractual interpretation that was subject to reasonable dispute between the parties," and "[did] not rise to a claim for actionable defamation."  *See id.*

### 3.  TU's Statements Were Qualifiedly Privileged.

Setting aside that TU's statements were true, TU was qualifiedly privileged in making them. Whether a qualified privilege exists is a question of law. *A & B-Abell Elev. Co.*, 651 N.E.2d at 1290. "A qualified privilege is recognized . . . where the publisher and the recipient have a

common interest, and the communication is of a kind reasonably calculated to protect or further it." *Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975). The essential elements of a privileged communication are: (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only. *Id.* at 719. The existence of a "common interest" is "most obvious" between "those who have entered upon or are considering business dealings with one another." *Id*. at 718.

The analysis of the *Hahn* court illustrates the point. In that case, an insurance company communicated to its policyholders that it had terminated the employment of the agent who dealt specifically with those policyholders. *Id*. at 717. The company told its policyholders only that it terminated the agent for cause, unless the policyholders asked for more information, in which case the company provided its contractual definition of "for cause." *Id*. at 717-18. The court held that the policyholders, who had transferred their businesses to the plaintiff agent's new company, had a common interest with the insurance company, and the communications were "reasonably calculated to protect or further it." *Id*. at 719.

Similarly, here, TU entered into contracts with LeadCloud and ██, both with respect to the QE and otherwise. (Ex. 35, Ocheltree Dep., 23:14-24:4, 90:3-9, 101:13-16; ██████████ ██████████████.) In light of the existing business relationships, particularly with respect to the QE, TU on the one hand and LeadCloud and ██ on the other, each had an interest in communicating information regarding the fact that the QE had stopped production and quoting activity would cease. (*See e.g.*, Ex. 31, TU0284772; Ex. 32, TU0285650; Ex. 33, LeadCloud000076.) Additionally, to the extent TU informed LeadCloud that ERT had the first right to purchase the code (suggesting that TransUnion owned the QE Code), it did so *when asked* about a potential business opportunity. *See Hahn*, 331 N.E.2d at 720 (noting that when a defendant

publishes allegedly defamatory words in response to request from interested person, the relationship justifies the communication). And, as set forth in Section III(B)(2), *supra*, the statements were true when made and were limited in scope, and therefore TU did not abuse its qualified privilege. *See Smith*, 644 N.E.2d at 1042.

### 4.  **ERT Cannot Demonstrate Special Damages.**

Finally, even assuming TU's statements about the termination of the Exchange and ownership of the QE Code were false and actionable (they were not), and assuming TU was not privileged in making the statements (it was), TU still is entitled to judgment as a matter of law because ERT did not sustain any special damages. The statements that the QE had been terminated or that TransUnion owned the QE Code also were not defamatory on their face, and thus ERT can only prevail on a defamation claim if the statements were defamatory "through interpretation or innuendo (defamation *per quod*)."  *See Konica Minolta*, 724 F. Supp. 2d at 870. To prevail on a claim for defamation *per quod*, ERT must "prove special damages, which are 'damages of such a nature that they do not follow as a necessary consequence of the [complained injury].'" *Id. See also, Ne. Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*, 916 N.E.2d 484, 488 (Ohio App. 9th Dist. 2009) ("special damages are damages that result from conduct of a person other than the defamer or the one defamed"); *Spitzer v. Knapp*, No. 19 CAE 01 0006, 2019 WL 2764071 at *10, (Ohio Ct. App. 5th Dist. 2019) ("Special damages are those direct financial losses resulting from the plaintiff's impaired reputation.")

The *Konica Minolta* court's analysis of special damages is instructive. In that case, Konica and Allied both sold and distributed office equipment, and Allied was one of Konica's authorized dealers pursuant to a "dealer agreement," which Konica terminated. 724 F. Supp. 2d at 864-65. Allied's CEO, McCarthy, alleged that prior to the termination of the dealer agreement, a Konica employee must have told a third party during a meeting that Allied was no longer an authorized

19

dealer. *Id*. at 869. Because McCarthy was not in the meeting, however, he only assumed that the employee "lied to the customer … and told them that we were no longer an authorized dealer." *Id*. In reality, the only evidence of any statement made to the customer was that Konica would no longer be supporting Allied as a national account representative, because Konica had already decided to pull Allied's national accounts and had informed Allied and McCarthy of that fact. *Id*. at 869-860.

In addition to concluding that the statement was not false and therefore not actionable, the court reasoned that the defamation claim failed because McCarthy could not prove special damages. McCarthy argued that he sustained special damages when the customer declined to renew its contract. *Id*. at 870.  However, there was no evidence that the contract was not renewed "***because*** of the alleged defamatory statement."  *Id*. (emphasis added). *See also, e.g., Ne. Ohio Elite Gymnastics*, 916 N.E.2d at 488, 490; *Spitzer*, 2019 WL 2764071 at *10.

Here, ERT complains that it incurred special damages because neither ▮ nor LeadCloud entered into a relationship with ERT. (ECF No. 20, ¶101.)  According to ERT, LeadCloud declined to pursue a business relationship ***because*** of allegedly defamatory comments TU made. (ECF No. 20,  ¶95; Ex. 2, ERT Interrog. Resp., No. 14.)  Not so. Ocheltree simply did not want his company caught up in the parties' dispute, but invited ERT to follow up. (*See* Ex. 38, Ocheltree Dep., 55:1-16, Dep. Ex. 11.) ERT never did. (Ex. 3, ERT 30(b)(6), 187:24-188:10; Ex. 35, Ocheltree Dep., 59:16-24.)

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

ERT sustained no damages as a "necessary consequence" of any statement made by or on behalf of TU. *See Konica Minolta*, 724 F. Supp. 2d at 870. TU is entitled to summary judgment.

### C.    TU is Entitled to Summary Judgment on Plaintiff's Slander of Title Claim

For the largely the same reasons, TU is entitled to judgment on ERT's claim for slander of title – TU did not make any false statements about ownership of the QE Code. Slander of title is "a tort action which may be brought against anyone who falsely and maliciously defames the property, either real or personal, of another, and thereby causes some special pecuniary damage or loss." *Green v. Lemarr*, 744 N.E.2d 212, 224 (Ohio App. 2d Dist. 2000). To prevail, ERT must prove: (1) publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with actual malice or reckless disregard of its falsity; and (4) that the statement caused actual or special damages. *See id.*

The gravamen of ERT's slander of title claim is that TU allegedly misrepresented who owned the QE Code. (ECF No. 20, ¶¶ 7, 105, 106, 107.) ERT claims that it suffered special damages as a result of those allegedly slanderous statements, in that they allegedly caused potential partners to decline to pursue a business relationship with ERT. (*Id*. at ¶ 108.)  TU made only one statement regarding ownership of the QE Code, which was not false, slanderous or made with actual malice, and which did not cause anyone to decline to do business with ERT.

***First***, as explained in Section III(B)(2), *supra*, to the extent that Ms. Lebowitz's statement that ERT had the first right of refusal with respect to the QE Code is construed as a statement that

TU owned the QE Code, the statement was true. However, even assuming it was not, the statement was privileged because it was made in good faith. A good faith dispute as to ownership of the property at issue does not give rise to actual malice to support a slander of title claim. *See, e.g.*, *Sylvania Bank v. Trala*, No. C.A. L-86-283, 1987 WL 8024, at *4 (Ohio Ct. App. Mar. 20, 1987).

*Second*, Ms. Lebowitz's statements on behalf of TU were privileged based on the genuine belief that TU owned the QE Code and that ERT had the first right to purchase it. Ohio courts recognize the conditional privilege to disparage another's right to property requiring only that a rival claimant's assertion of an interest in property be an "honest assertion of his own claim, even [if] he has no reasonable ground for believing his claim to be valid." *Sylvania Bank*, No. C.A. L-86-283, 1987 WL 8024, at *4. Because the Agreement was terminated before the end of 2018, TU owned the QE Code unless and until ERT repaid the development costs. (Ex. 13, Agreement, at TU0218951.) Because "[a]n action for slander of title will not lie where the statement made… was uttered in good faith with probable cause for believing it," ERT's slander of title claim fails as a matter of law. *See John Eastman Dev. Co. v. Harvest Dev. Co.*, C.A. No. 1146, 1982 WL 2737, at *6-7 (Ohio App. 9th Dist. Sept. 1, 1982).

*Finally*, even assuming Ms. Lebowitz's statement was false (again, it was not) and TU was not privileged in making the statement (it was), ERT did not sustain special damages. *See Green*, 744 N.E.2d at 224 (noting that special damages are an element of a slander of title claim). As explained in Section  II(F)(2), *supra*, neither LeadCloud nor ITC declined to do business with ERT because of a statement that TU made regarding ownership of the QE Code.  ERT's slander of title claim fails as a matter of law and TU is entitled to summary judgment.

### D. TU is Entitled to Partial Summary Judgment on ERT's Breach of Contract Claim.

ERT contends that TU breached the Agreement by, among other things, failing to turn over to ERT the QE Code, which ERT includes in the ERT Information. (ECF No. 20, ¶ 31.) Of course, to prevail on its claim for breach of the Agreement, ERT must prove the existence of a valid contract, that ERT performed, that TU breached and caused ERT's damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). Because TU owns the QE Code, it **cannot** have breached the Agreement by failing to turn over the QE Code when the Agreement plainly provides that TU owned the QE Code when it terminated the Agreement by its October 2017 letter and when the termination became effective in April 2018. (Ex. 13, Agreement at TU0218951.) TU is entitled to partial summary judgment on ERT's breach of contract claim and on TU's declaratory judgment counterclaim.

### E. TU is Entitled to Summary Judgment on ERT's Tortious Interference with a Business Expectancy Claim

ERT's claim for tortious interference also fails because ERT did not lose any potential business opportunities as a result of any statement made by TU. To prevail on this claim, ERT must prove (1) a business relationship that (2) TU knew about; (3) TU's "intentional or improper action taken to prevent a contract formation ….; (4) a lack of privilege; and (5) resulting damages." *See Smith v. Nat'l W. Life*, 92 N.E.3d 169, 175 (Ohio App. 8th Dist. 2017); *see also, e.g., Chrvala v. Borden,* 14 F. Supp. 2d 1013, 1023 (S.D. Ohio 1998). Tortious interference with a prospective business relationship occurs "when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into ... a business relation with another ..." *A & B-Abell Elevator Co.*, 651 N.E.2d at 1295. Therefore, if ERT cannot prove either that TU intentionally interfered with a prospective contract without justification, or that TU caused ERT to suffer damages, then TU is entitled to summary judgment. *See Chrvala*, 14 F. Supp. 2d at 1023.

The causation element of tortious interference requires proof that "'but for' the alleged

23

interference the prospective relationship would have been consummated." *Chrvala*, 14 F. Supp. 2d at 1023. TU's allegedly tortious conduct must have done more than merely "play a role" in a third party's decision not to do business with ERT in order to establish that TU was the "but for" cause of ERT's failure to enter into a prospective business relationship. *See id.* If a third party decides "of its own free will" not to enter into a business relationship with ERT, then ERT cannot prove that TU was the "but for" cause of the failure to enter into a relationship. *See Reali, Giampetro & Scott v. Nat'l Soc'y Bank,* 729 N.E.2d 1259, 1266 (Ohio App. 7th Dist. 1999). Thus, if anything other than TU's conduct motivated the decision not to enter into a business relationship, the tortious interference claim must fail. *See Chvrala*, 14 F. Supp. 2d at 1023.

Importantly, where tortious interference and defamation claims both are based on qualifiedly privileged statements, the plaintiff must prove by clear and convincing evidence that the statements were made with actual malice. *A & B-Abell Elev. Co.*, 651 N.E.2d at 1295.

### 1.    TU Did Not Induce ▮ or LeadCloud To Not Do Business With ERT.

ERT's claim cannot succeed because TU did not induce or cause any third party not to enter into a business relationship with ERT. *See id.* at 1294. Courts consider seven factors in evaluating improper interference with a business relationship:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the party with whom the actor has interfered, (4) the interests sought to be advanced by the actor, (5) the social interests of protecting the freedom of contracting and the interference with such, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

*Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 128 (6th Cir. 1992) (Ohio law). Each of these factors weighs in favor of TU:

- TU had business relationships with ▮ and LeadCloud, both with respect to the Exchange and otherwise. (Ex. 35, Ocheltree Dep., 23:14-24:4, 90:3-9, 101:13-16; ▮ ▮ ▮ ; Ex. 9, Hakel Dep., 237:11-238:6.)

- TU, LeadCloud, and ▮ had separate, legitimate interests in communicating and

24

receiving information regarding the fact that TU had stopped production of the QE, and TU's communications to LeadCloud and ITC were straightforward, factual and true. (*See e.g.*, Ex. 31, TU0284772; Ex. 32, TU0285650; Ex. 13, Agreement, at TU0218951.)

- There is nothing tortious in informing parties with which TU had contracts that TU was terminating those contracts and stopping work on the subject of the contracts.

- Each party had legitimate interests in the communication, and TU had a legitimate motive in informing its vendors that it had stopped work on the QE.

Neither ITC nor LeadCloud declined to do business with ERT, let alone based on something that TU said or did. To the contrary, LeadCloud elected to wait until ERT and TU resolved the intellectual property dispute and suggested that ERT follow up, yet ERT never did. (*See* Ex. 38, Ocheltree Dep., 55:1-16, Dep. Ex. 11; Ex. 3, ERT 30(b)(6), 187:24-188:10; Ex. 1, Bonitz Dep., 106:16-107:17.) ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ *See Chrvala* 14 F. Supp. 2d at 1023 (alleged improper interference must be the "but for" cause of the failure to do business).

### 2.  TU Was Privileged in Making Any Statements About ERT or the Quote Exchange to Third Parties

Further, any statements made by a representative of TU to LeadCloud or ███ were privileged. TU had an ongoing business relationship with both, and "acts performed within a business relationship are considered subject to a qualified privilege." *See Walter v. ADT Sec. Sys., Inc.*, No 06AP-115, 2007 WL 1874247, at *8 (Ohio App. 10th Dist. 2007).  (Ex. 35, Ocheltree Dep., 23:14-24:4, 90:3-9, 101:13-16; ████████████████████████; Ex. 9, Hakel Dep., 237:11-238:6.)  Where the parties' relationship gives rise to a qualified privilege, the plaintiff must prove actual malice, which requires that statements were made "with knowledge that the

statements are false or with reckless disregard as to their truth or falsity." *A & B-Abell Elev. Co.*, 651 N.E.2d at 1295.

For the same reasons set forth in section III(B)(2), *supra*, TU did not act with actual malice.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  With LeadCloud, TU consistently represented its position – based on a reasonable reading of the Agreement – that TU was the rightful owner of the code, and that ERT was required to repay the development costs of the code; purchasing the code outright being one means of doing so. (Hakel Dep., 69:6-70:13, Ex. 130, attached as <u>Ex. 46</u>.) However, a reasonable reading of the agreement is not even required to disprove actual malice. *Dupler v. Mansfield J. Co., Inc.*, 413 N.E.2d 1187, 1191 (Ohio 1980). Without actual malice, ERT's claim for tortious interference fails.

**3.   <u>ERT Cannot Demonstrate Damages as Required to Support a Claim for Tortious Interference</u>**

Finally, for the same reasons as set forth above, ERT cannot show that TU's statements or conduct were the "but for" cause of █████ or LeadCloud's failure to enter into a business relationship with ERT.  *See A & B-Abell Elev. Co.*, 651 N.E.2d at 1294.

**F.   <u>TU is entitled to Summary Judgment on ERT's Conversion Claim</u>**

To prevail on its conversion claim, ERT must show "(1) [ERT's] ownership or right to possession of the property at the time of conversion; (2) [TU's] conversion by a wrongful act or disposition of [ERT's] property rights; and (3) damages." *See Acad. Imaging, LLC v. Soterion Corp.*, 352 Fed. Appx. 59, 67 (6th Cir. 2009). However, ERT's conversion claim fails at the outset,

because it amounts to nothing more than a breach of contract claim cloaked as a tort.

### 1.     ERT's Conversion Claim Cannot Stand because it is Duplicative of its Breach of Contract Claim

"[T]he existence of a contract action ... excludes the opportunity to present the same case as a tort claim. A tort claim based upon the same actions [as the contract claim] ... will exist ... only if the breaching party also breaches a duty owed separately from that created by the contract." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 437 Fed. Appx. 381, 385 (6th Cir. 2011). The basis for ERT's conversion claim is that TU "wrongly assumed unauthorized control or dominion over the [ERT] Information" by restricting ERT's access to TU-owned computers that allegedly house the ERT Information. (ECF No. 20, ¶ 82.) These allegations are indistinguishable from ERT's claim that TU breached the Agreement by "possessing and controlling the [ERT] Information without ERT's permission or consent and by failing to promptly return all [ERT] Information to ERT."  (*Id*. at ¶ 63.)

ERT also does not allege a breach of any duty separate from the contractual duty TU allegedly breached. For example, in *Toledo Mack*, the underlying transaction that gave rise to the conduct forming the basis for the alleged conversion only "took place because the contract required that it take place." *Id*. In that case, the plaintiff was a franchise dealer for Mack Trucks under a distributor agreement. *Id*. at 382. After terminating the agreement, Mack Trucks repurchased the dealer's parts inventory. *Id*. at 385. Rejecting the dealer's conversion claim as duplicative of its breach of contract claim, the court reasoned that "[b]ecause the parts transaction took place because the contract required it to take place, [the dealer] cannot argue that [Mack Trucks] had a duty separate from the contract." *Id. See also Noticxe, Inc. v. Oakley, Inc.*, No. 3:18-cv-00056, 2018 WL 6573714, at *2 (S.D. Ohio Dec. 13, 2018) (conversion claim fails without separate duty).

Here, ERT contends that TU breached the Agreement by failing to turn over the ERT

Information.  (ECF No. 20, ¶ 63.)  Any obligation to give ERT any component or portion of the ERT Information, to the extent any such obligation exists, is governed by the parties' contractual relationship. (Ex. 13, Agreement at TU0218947.) There is no independent duty that TU could have breached by retaining the ERT Information, which was created in the course of the relationship and which is housed on TU's own computers. ERT's conversion claim fails as impermissibly duplicative of the breach of contract claim.

### G. ERT's Unjust Enrichment Claim and Breach of Contract Claims are the Same

ERT's unjust enrichment claim also fails because the parties' relationship is governed by the Agreement. Unjust enrichment is a "quasicontractual theory of recovery," meant to compensate a party for a benefit conferred upon another, not for a contractual loss that party has suffered. *Oro BRC4, LLC v. Silvertree Apts., Inc.*, No. 19-cv-04907, 2021 WL 184686 *11 (S.D. Ohio Jan. 19, 2021).  To prove unjust enrichment, ERT must show (1) that it conferred a benefit on TU; (2) TU had knowledge of the benefit; and (3) TU retains that benefit "under circumstances  where it would be unjust to do so without payment." *See id.* ERT "may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." *See id.*

As with its conversion claim, the crux of the unjust enrichment claim is ERT's contention that TU wrongfully retains the ERT Information, which ERT claims it owns under the Agreement. (ECF No. 20, ¶ 129.) The claim is virtually identical to ERT's claim that TU breached the Agreement by "possessing and controlling the [ERT] Information without ERT's permission or consent and by failing to promptly return all [ERT] Information to ERT."  (*Id.* at ¶ 63.) ERT cannot prevail on this equitable, quasi-contractual claim because the subject matter of that claim is wholly covered by the Agreement. *See Ryan v. Rival Mfg. Co.*, No. C-810032, 1981 WL 10160 at *1 (1st Dist. Ohio Dec. 16, 1981) (summary judgment was properly granted where "essence" of plaintiff's

28

unjust enrichment was the same as breach of contract claim).

### H. TU is Entitled to Summary Judgment on ERT's IDTPA Claim

No reasonable jury could find TU liable for a violation of IDTPA, which requires ERT to prove that TU, "in the course of [its] business … cause[d] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … disparage[d] the goods, services or business of another by false or misleading representation of fact; … or engage[d] in any other conduct which similarly create[d] a likelihood of confusion or misunderstanding." *See* 815 ILCS § 510/2(a)(2), (8) and (12); *see also, e.g., Microsoft Corp. v. Logical Choice Computers, Inc.*, Case No. 99 C 1300, 2001 WL 58950, at *9 (N.D. Ill. Jan. 22, 2001). "When determining whether a statement is deceptive or misleading, a court considers the statement in context, viewing the product [or service] as a whole." *Deckers Outdoor Corp. v. Australian Leather Pty., Ltd.*, 340 F. Supp. 3d 706, 719 (N.D. Ill. 2018). ERT also must demonstrate a likelihood of future harm to obtain injunctive relief under the statute, which does not provide for the recovery of monetary damages. *See* 815 ILCS § 510/3; *Universal Gaming Grp. v. Taft Stettinius & Hollister LLP*, 2017 IL App (1st) 150878-U, ¶ 58, 2017 WL 1240860 (Ill. App. 1st Dist. Mar. 31, 2017) (damages not available); *Kensington Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 9 (1st Dist. 2009) (future harm required). ERT cannot meet its burden.

#### 1. The Alleged Misrepresentations or Omissions and Claimed Damages

ERT contends that "Trans Union's misrepresentations, concealments, suppressions and omissions have caused a likelihood of confusion or a misunderstanding as to the source, sponsorship, approval, certification, affiliation, connection, or association of the" QE or ERT. (ECF No. 20, ¶¶ 122, 124). The alleged misrepresentations were statements to ERT's potential customers, "including but not limited to LeadCloud and █," who allegedly would have acted

differently had they known the "actual status" of the QE when ERT approached them.  (*Id*. at ¶¶ 123, 125).

The following discussion demonstrates that the alleged misrepresentations were true; but regardless, there is no evidence that the statements created any misunderstanding, nor did any potential customer or partner rely on the misunderstanding.  Moreover, ERT cannot seek monetary damages and cannot prove future harm.  TU is entitled to judgment as a matter of law.

### 2.  The IDTPA Claim Has No Nexus to Illinois.

As a threshold matter, ERT's IDTPA claim fails because the alleged misrepresentations and concealment occurred outside of Illinois. *See Maui Jim, Inc. v. SmartBuy Guru Enters.*, No. 1:16 CV 9788, 2018 WL 509960, *5 (N.D. Ill. Jan. 23, 2018) (IDTPA claim requires that "the circumstances that relate to the disputed transaction must occur primarily and substantially in Illinois.").  To determine whether the transaction occurred primarily and substantially in Illinois, courts consider "(1) the plaintiff's residence, (2) where the misrepresentation was made, (3) where the damage to the plaintiff occurred, and (4) whether the plaintiff communicated with the defendant in Illinois."  *Id*.  The crux of ERT's IDTPA claim is TU's statement that development and operation of the Quote Exchange had ceased, and its alleged statement that TU owned the QE Code.  (ECF No. 20, ¶¶ 121-126.)

As to the first statement, on October 23, 2017, Ms. Lebowitz sent the same email communication to ▓ (a Texas company) and LeadCloud (based in Maryland), informing them that TU had stopped production of the Quote Exchange and that there would be no further quoting activity on the platform. (Ex. 32, TU0285650; Ex. 33, LeadCloud000076.) Ms. Lebowitz resided and worked, and sent the email to ITC and LeadCloud from, Cleveland, Ohio. (4/2/2021 Decl. of Emily Lebowitz, attached as Ex. 51.) Ms. Lebowitz made the second statement in Las Vegas, Nevada, where she was attending a conference and Mr. Ocheltree inquired about purchasing the

QE Code.  Ms. Lebowitz responded that ERT had the  right to purchase the code. (█████████

█████████████, Dep. Ex. 16.) LeadCloud is located in Maryland, and ███████████████

████. (Ex. 36, Ocheltree Dep., 45:25-46:5, Ex. 9 at p. 6; ████████████████████████████

████████.) ERT is an Ohio limited liability company. (ECF No. 20, ¶ 9.)  The *only* connection

between ERT's claim and Illinois is the fact that TU's headquarters is located in Chicago,

Illinois.  That is not a sufficient nexus to support ERT's IDTPA claim. *See Maui Jim, Inc.*, 2008

WL 509960 at *5; *see also In re Sears Roebuck & Co. Tools Mkt. and Sales Prac. Lit.*, No. MDL-

1703, 05 C 4742, 05 C 2623, 2005 WL 3077606, at *2 (N.D. Ill. Nov. 14, 2005) (dismissing DTPA

claim where the sole nexus with Illinois was the location of Sears' principal place of business).

### 3.   Neither LeadCloud Nor ████ Was Confused or Misunderstood Anything.

ERT points to the same alleged misrepresentations that underlie its defamation, slander of

title and tortious interference claims to support its IDTPA claim, which fares no better. (ECF No.

20, ¶¶ 90-120.)  In particular, ERT alleges that TU misrepresented the ownership of the Quote

Exchange and ERT's plan to continue its development and commercialization. (*Id.* at ¶¶ 123-125.)

Just as ERT's tort claims fail because ERT cannot prove that TU made any material

misrepresentations or improperly interfered with ERT's potential business relationships, or that

████ or LeadCloud declined to do business with ERT as a result of anything that TU said or did,

ERT's IDTPA claim fails for the same reasons.

To prove a violation of the IDTPA, ERT must prove that TU made a false, misleading or

deceptive communication regarding its services, which created a likelihood of confusion. *See ATC

Healthcare Serv., Inc. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 953 (N.D. Ill. 2016).  "Likelihood

of confusion" has the same meaning as it does in trademark infringement cases and requires that

consumers are misled "as to the source or origin of the product or service."  *Id.*  To avoid that

confusion, a company "need only identify [its] product or service in such a way that purchasers

exercising ordinary care to discovery show products they are buying will know the truth and not become confused or mistaken."  *Id,*  ERT cannot meet its burden on either element.

TU's statements to LeadCloud and ▮ regarding the status of the QE were true, as was TU's statement regarding ownership of the QE Code.  (*See* § III(B)(2), *supra*.)  Not only were TU's statements true, no reasonable jury could conclude that they were misleading. *Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*, 340 F. Supp. 3d 706, 719 (N.D. Ill. 2018) ("When determining whether a statement is deceptive or misleading, a court considers the statement in context, viewing the product [or service] as a whole.")

Further, there is no evidence that LeadCloud or ▮ were confused or misunderstood anything related to the Exchange.  To the contrary, the companies simply declined to enter into a relationship with ERT until ERT and TU resolved their dispute so as to avoid being caught up in this litigation.  (Ex. 35, Ocheltree Dep., 47:5-16; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

### 4.  ERT Cannot Seek Monetary Damages and Cannot Demonstrate Future Harm

Even assuming ERT could prove confusion or misunderstanding by LeadCloud or ▮ (it cannot), TU still is entitled to judgment because ERT cannot obtain monetary damages under the IDTPA and it failed to prove it will suffer future harm.  Where a defendant is no longer making allegedly misleading or confusing statements, there is no threat of future harm warranting injunctive relief under the IDTPA. *E.g., Yeager v. Innovus Pharma., Inc.*, No. 18-cv-397, 2019 WL 447743, *7 (N.D. Ill. Feb. 5, 2019).

ERT cannot demonstrate that it will sustain harm in the future based on statements that TU has made in the past, and any suggestion to the contrary is pure speculation.  There is no evidence that TU has made any statements to any third party about the Exchange since well before this litigation was filed, nor would it do so.  (Deposition of TU's 30(b)(6) Witness ("TU 30(b)(6)

32

Dep."), 175:22-176:9, attached as Ex. 12.) Moreover, ERT does not have an active website and is not actively promoting or marketing the QE Program. (Ex. 1, Bonitz Dep., 61:21-22, 109:7-11.) Thus, any statement about the termination of the Quote Exchange or ownership of the QE Code would have no impact on ERT's non-existent marketing or promotion of the Exchange. There is no future harm to ERT. Because ERT cannot prove any confusion or misunderstanding by ███, LeadCloud or anyone else, nor that it will sustain future harm, its IDTPA claim fails as a matter of law and TU is entitled to summary judgment. *See Xylem Dewatering Sols., Inc. v. Szablewski,* 2014 IL App (5th) 140080-U, 2014 WL 4443445 (5th Dist. Sept. 8, 2014) (no likelihood of future harm where defendants stopped making allegedly misleading statements); *Yeager,* 2019 WL 447743 at *7 (no likelihood of future harm when misleading advertisements had ceased).

## I.     **ERT Has Failed To Prove A Valid Claim Under the Defend Trade Secrets Act.**

The Defend Trade Secrets Act (DTSA) is a federal statute that allows private civil actions for misappropriation of a trade secret. 18 U.S.C.A. § 1836. To prevail on its DTSA claim, ERT must prove (1) the existence of a protectable trade secret and (2) misappropriation of the trade secret by TU. *PPS Serv. Grp., LLC v. Eckert,* No. 1:18-cv-727, 2019 WL 3927232 *3 (S.D. Ohio Aug. 20, 2019). ERT's claim for trade secret misappropriation cannot survive because nothing described in the "ERT Information,"[11] nor the Quote Exchange concept itself, constitute protectable trade secrets; and even if those were deemed protectable trade secrets, ERT has not shown that TU has misappropriated them.

---

[11]     According to ERT, the "Endless River Information" is comprised of all of the documents and information ERT describes in Paragraph 31 of Plaintiff's Amended Complaint: [C]onfidential materials that Trans Union has withheld and failed to return [including but not limited to] source code for the QE Program, customer lists, customer targets, communications, pricing information such as pricing formulas, profit margins, product drawings, schematics, specifications, blueprints, processes, product models, product designs, compilations of business and financial information, emails, design documents, presentations, letters, notes, and other documents relating to the QE Program and Endless River's business plans.

1.      **Neither the "ERT Information" nor the QE Concept are Protectable Trade Secrets.**

The Ohio Supreme Court[12] considers six factors to determine whether information constitutes a trade secret: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *Id.*  Although ordinarily a fact-specific inquiry, it may be decided as a matter of law if "reasonable efforts to maintain secrecy could not conceivably support a judgment in favor of the plaintiff." *Murray Energy Holdings, Co. v. Bloomberg, L.P.*, No. 2:15-cv-2845, 2016 WL 3355456, *9 (S.D. Ohio June 17, 2016). None of the categories of information comprising the ERT Information satisfy any of the above factors; nor can ERT claim trade secret status for information it knowingly and willingly published in a patent application

a.      **ERT Has Failed to Safeguard Its Purported Trade Secrets**

Most importantly, ERT cannot satisfy the first, second or third factors of the trade secret analysis: ERT has willingly placed the information in the public domain, ERT has shared the information with third parties, and the information is known within both ERT and TU. While no single factor is dispositive, "a possessor of a potential trade secret must take some active steps to

---

[12]      "[T]he requirements for establishing misappropriation of trade secrets are largely the same under Ohio and federal law," and courts typically analyze them together. *Aday v. Westfield Ins. Co.*, 486 F. Supp. 3d 1153, 1160 (S.D. Ohio 2020) ("The requirements for establishing misappropriation of a trade secret are largely the same under the DTSA and the Uniform Act."); *see also* H.R. REP. 114-529 ("While other minor differences between the UTSA and Federal definition of a trade secret remain, the Committee does not intend for the definition of a trade secret to be meaningfully different from the scope of that definition as understood by courts in States that have adopted the UTSA.")

34

maintain its secrecy … to enjoy presumptive trade secret status." *Champion Foodservice, LLC v. Vista Food Exch., Inc.*, No. 1:13-cv-1195, 2016 WL 4468001 *7 (N.D. Ohio Aug. 24, 2016).

**First,** ERT knowingly placed the entire Quote Exchange concept in the public domain. In May 2016, ERT filed US Patent Application 15/153,130, titled "Quote Exchange System and Method for Offering Comparative Rates for an Insurance Product;" and in November 2016, the Patent Application was published. (*See* <u>Ex. 2</u>, ERT Interrog. Resp., No. 9; ███████████; Ex. 3, ERT Rule 30(b)(6) Dep., 82:7-22.; <u>Ex. 26</u>, Notice of Publication.) Publication of ERT's purported trade secrets destroyed the "secret" nature of the information – i.e., the Quote Exchange system. The essence of trade secret law is protecting something that is not in the public domain. "Public disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009). "Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law." *Champion Foodservice*, 2016 WL 4468001 at *7. The filing and publication of the Patent Application stripped it – and all of the information contained therein – of any trade secret protection.

**Second,** ERT openly and without evidence of confidentiality protection shared the alleged trade secrets - the Quote Exchange and ERT Information - with multiple investors and third parties for more than five years before presenting it to TU, and before ERT and TU entered into the Agreement. (<u>Ex. 1</u>, Bonitz Dep., 37:12-18; <u>Ex. 5</u>, ERT0000592.)  The ERT Information ERT claims TU "has withheld and failed to return," largely comprises all of the information ERT has been sharing with potential business partners and investors since 2008 and 2009.[13] (ECF No. 20, ¶ 31.) ███████████████████████████████████████████

---

[13]     See *supra* fn. 11 regarding definition of Endless River Information.

35

█████████████████████████████████████████████

████████████████████████████ The presentations described the concept that would later become the QE, and contained detailed insurance market analyses, financial models and staffing projections pertaining to the concept. (*Id.*) The communications with The Hartford, for example, included sharing materials and a spreadsheet detailing financial projections, anticipated revenue growth, and market share projections; none of it was marked "Confidential." (*Id.*) Furthermore, although Mr. Wintering claimed that an NDA would have been signed by any third party who would have received or viewed the QE presentation, ERT has not produced any such NDA or confidentiality agreement (Ex. 3, ERT Rule 30(b)(6) Dep., 126:16-25); nor can Mr. Wintering even recall who within ERT would have ensured those presentations were returned pursuant to the purported NDAs. (*Id.* at 125:16-127:23.)

However, even presentations marked "Confidential" are not automatically afforded trade secret status. In *Champion Foodservice*, the defendant argued that a 2012 project proposal that Champion claimed to be a protectable trade secret was, in fact, public record and therefore was not a protectable trade secret. 2016 WL 4468001 at *7. Champion "vigorously dispute[d]" defendant's claim, pointing to the "confidential" legend on the proposal. *Id.* The court acknowledged that while trade secret protection is not automatically lost by including protectable information in a project proposal made public, stamping it "confidential" does not automatically assign trade secret protection to the information. *Id.* In addition, the majority of the information contained in Champion's project proposals was public record or information known in the industry. *See id.* at *8-9. "[T]rade secret status is defined by law in Ohio; a confidentiality label alone does not make information a secret." *Id.* at *7. Therefore, "no reasonable jury could conclude that [the proposal] is a trade secret and not public record." *Id.* at *9. ERT's repeated disclosure of

the information contained in its presentations to third parties "demonstrates that [ERT] cannot satisfy [the secrecy factor] because the information was widely known outside the company," and ERT failed to take steps to ensure its secrecy. *See Murray Energy Holdings*, 2016 WL 3355456 at *9.

**Third**, the ERT Information was not kept secret by and within ERT only, it was well-known within both companies. TU is a global information company: it is in the business of collecting and processing information across multiple industries, including the insurance industry. ERT sought to partner with TU to develop the QE precisely because of TU's insurance industry knowledge and the relationships it had with its own customers. The "customer lists" and "customer profiles" ERT alleges to be part of the ERT Information, and which TU has purportedly withheld from ERT, actually comprise information collected and developed by **both** ERT and TU and was known to TU employees. (Ex. 3, ERT Rule 30(b)(6) Dep., 133:14-134:3.) In fact, Mr. Wintering testified that it would not "even be possible" to keep portions of these customer lists and customer profiles secret from TU employees, and that some of the customers on those lists were TU customers related to other products. (Ex. 11, 135:12-25, 136:6-16.)

**b.**     **ERT Cannot Derive Economic Value from Information that is Widely Known.**

The Quote Exchange System has no independent economic value because it became widely known with the filing and publication of the Patent Application. In order to satisfy statutory requirements under patent law, Endless River intentionally disclosed the concept of the Quote Exchange Program. (*See* ERT Interrog. Resp., No. 1, Ex. 2; *see* 10/6/2020 Resp. to Non-Final Rejection, p. 11, Ex.29.)

Furthermore, the ERT Information is specifically derived from and related to the Quote Exchange System: the product models, product designs, design documents, presentations, letters,

notes, "and other documents relating to the QE Program." (*See* ECF No. 20, ¶ 31). The "insurance scoring model" component of the QE Program was provided by insurance companies, rather than ERT, and the model was known. (10/6/2020 Response to Non-Final Office Action, p. 11, Ex. 29.) ERT cannot derive "independent economic value" from a concept that is actually comprised of multiple concepts, created by multiple persons outside of ERT and TU, which is already generally known to other persons who can obtain economic value from its disclosure or use. *See Murray Energy Holdings*, 2016 WL 3355456 at *7. "Information can be characterized as a 'trade secret' only when it 'derives independent economic value … from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from it'." 18 U.S.C. § 1839(3); *PPS Serv. Grp.*, 2019 WL 3927232 at *3.

### c. Anyone may acquire and duplicate the Quote Exchange System with little time or expense.

The Patent Application has been in the public domain since at least November 2016. (*See* Notice of Publication, Ex. 26.) Notably, Endless River confirms the concept of the Quote Exchange Program is described in the published application. (*See* ERT Interrog. Resp., No. 1, Ex. 2.) Anyone seeking to develop a similar online exchange system for insurance quotes need only to review the relevant prior art patents cited by the Patent Examiner and the Patent Application itself. (*See* Final Rejection, Ex. 28; *see* the Patent Application, Ex. 25.) The Quote Exchange concept and its predecessors are known to the public; it would take little time or expense for someone to review the cited relevant prior art and the Patent Application to acquire the knowledge to create a similar system. *See Murray Energy Holdings*, 2016 WL 3365422 at *6.

Similarly, the ERT Information, both as a whole and in its individual parts, does not meet the "trade secrets" test. There is no evidence to support ERT's claim that any of the two dozen items constitute "information not readily available to the public or within the industry" or how this

38

compilation of information provides TU with some competitive advantage within the industry. *See Champion Foodservice*, 2016 WL 4468001 at *12. In *Champion*, one of the alleged trade secrets was a combination of database files that Champion argued, taken as a whole, constituted information not readily available to the public. *Id.* However, Champion simply described the nature of the files in the database, averred that some of the files in the database were trade secrets and some were not, and stated that Champion had compiled them over the years. *Id.* The court determined the defendants were entitled to summary judgment because Champion could not establish that compilation of information constituted trade secrets. "Plaintiff's conclusory averments regarding the database are insufficient to establish trade secret status under Ohio law, and do not form a basis upon which a reasonably jury could conclude that the database constitutes a trade secret under Ohio law." *Id.* at *13. ERT similarly pled and described the categories of information comprising the ERT Information. (*See e.g.,* ECF No. 20, ¶ 31.)

### 2. Even If ERT Had Protectable Trade Secrets, There Has Been No Unauthorized Use That Constitutes A Misappropriation.

Under the six factor Ohio test, ERT has not, and cannot, prove that the ERT Information or the Exchange contain any protectable trade secrets. Without the existence of a protectable trade secret, ERT cannot prove a claim for misappropriation. *See Champion Foodservice*, 2016 WL 4468001 at *7. Assuming, however, that this Court does find that one of the numerous, vague components of the ERT Information constitutes a "trade secret," ERT has not shown that TU (i) acquired the information improperly and (ii) has ever actually used or disseminated the information. *See Aday v. Westfield Ins. Co.*, 486 F. Supp. 3d 1153 at 1169.

ERT alleges that TU has "used" the ERT Information without ERT's express or implied consent (implying that ERT rightfully owns the Endless River Information, which TU disputes). (ECF No. 20, ¶ 72.) That "use," however, is described only as "refusing to return the [ERT]

Information to Endless River." (*Id.*) Neither Mr. Bonitz nor Mr. Wintering were able to testify to any use of the ERT Information by TU. However, "mere possession of an otherwise protected trade secret without any use does not constitute misappropriation within the meaning" of the Trade Secrets Act. *See Aday*, 486 F. Supp. 3d at 1169 (No misappropriation where defendant who acquired alleged trade secrets in course of employment and forwarded them to personal email account, because there was no evidence that the acquisition was improper and possession therefore was not "unauthorized").

The crux of ERT's misappropriation claim is that TU did not return the categories of information that ERT shared with TU.  (Ex. 3, ERT Rule 30(b)(6) Dep., 112:3-113:21, 128:15-129:10.) Even if ERT could prove the existence of a protectable trade secret (it cannot), it cannot prove that TU's mere possession of the ERT Information is "unauthorized" nor that TU has "used" the information in any way. It is undisputed that TU's programmers built the QE source code at TU's expense. (*Id.* at 68:16-69:9.) It is also undisputed that TU created or contributed to every category defined as ERT Information except the original concept, oral communications between February and September 2013, and ERT's business plans. (ERT Resp. to Req. to Admit Nos. 7-26, attached as Ex. 47.) According to the terms of the Agreement, TU is in rightful possession of these categories of information and any other Work Product defined under the Agreement – and has not used them since TU terminated the Agreement. (*See* Section III(H)(2), *supra*.)

In addition, ERT's trade secret misappropriation claim also is barred by the economic loss rule, which forbids recovery in tort for a purely economic loss where the tort claim is merely a recapitulation of a breach-of-contract claim, unless the plaintiff demonstrates both that the tort alleges breach of an independent duty separate from any duty owed under the contract and damages distinct from those allegedly incurred by the breach of contract. *See Babcock & Wilcox Power*

*Generation Group, Inc. v. R.T. Patterson Co ., Inc.*, 5:13-CV-2071, 2015 WL 631189, at *4 (N.D. Ohio Feb. 12, 2015).  The economic loss rule applies to trade secrets misappropriation claims brought under the DTSA.  *See, e.g., SG Blocks, Inc. v. Hola Cmty. Partners*, No. 220CV03432ODWRAOX, 2021 WL 736440, at *7 (C.D. Cal. Feb. 25, 2021) (economic loss rule precluded DTSA claim seeking "to redress via tort law … the same harm alleged" in breach of contract claim); *Microbilt Corp. v. Bail Integrity Sols., Inc.*, No. CV19637MASLHG, 2019 WL 6310202, at *6 (D.N.J. Nov. 25, 2019) (economic loss rule barred trade secrets misappropriation claim premised on agreements between the parties).  TU is entitled to judgment as a matter of law.

### J.  ERT's Damages Are Limited by the Limitation of Liability Clause.

Finally, ERT's claimed damages are limited by Section 8.2 of the Agreement, which provides, in pertinent part:

> Waiver of Liability.  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, AND BOTH TU AND PROVIDER HERBY WAIVE AS TO THE OTHER PARTY, ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTY ARISING OUT OF THE PERFORMANCE OF THIS CONTRACT, INCLUDING BUT NOT LIMITED TO LOSS OF GOODWILL AND LOST PROFITS OR REVENUE, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. THE FOREGOING NOTWITHSTANDING, AS TO SUCH DAMAGES INCURRED BY TU AS A RESULT OF THIRD PARTY CLAIMS, NOTHING IN THIS CONTRACT SHALL BE CONSTRUED AS LIMITED PROVIDER'S OBLIGATIONS UNDER SECTION 8.1 ABOVE.

(Ex. 13, Agreement, at TU0218947; ECF No. 26, ¶ 29.)  Section 8.2 is valid unless it is unconscionable, which requires ERT to prove that it is both (1) substantively unconscionable, by showing that the contract terms are so unfair to one party that their enforcement would be unreasonable, and (2) procedurally unconscionable, by showing that there was an absence of meaningful choice or understanding of the terms on the part of one party.  *Boyd v. Allied Home*

*Mortg. Capital Corp.*, 523 F. Supp. 2d 650 (2007).  Courts considering the validity of a contractual waiver consider factors such as the clarity of the language, the parties' relative bargaining power and the parties' ability to understand the provision at issue.  *Id*. at 653.

Applying these factors to Section 8.2 yields only one result – the provision is valid.  The language is clear and unambiguous, and the parties spent months and months negotiating the language of the Agreement.  (*E.g.* Ex. 3, ERT 30(b)(6) Dep., 74:16-18; 105:22-106:6, 138:10-14; ERT 30(b)(6) Dep., 103:2-16, Dep. Ex. 13, attached as Ex. 48; ███████████████████ ████████████; Ex. 11, Wintering Dep., 72:4-23, 73:13-21; Wintering Dep., 85:2-86:5, Dep. Ex. 11, attached as Ex. 50.) Mr. Wintering and Mr. Bonitz indisputably understood the contract language and the parties' relative bargaining power was equal.  (*See id.*)

Nor has ERT produced any evidence of fraud, such that an intentional act or misrepresentation made by TU precluded a "meeting of the minds concerning the nature or character of the purported agreement." *See Boyd*, 523 F. Supp. 2d at 655. "There cannot be fraud in the factum where the complaining party had an opportunity to read the document." *Id.*  For example, the *Boyd* court held the arbitration agreement (contained in a mortgage contract) in that case valid for all of these reasons, as well as the fact that plaintiff had ample time to review the document and object to that specific statement. Plaintiff did not do so there, nor did ERT raise any objection to the limitation of liability provision.  As a result, ERT may not now "dispute the terms" of Section 8.2.  *See id.; see also, e.g., D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 186-87, 92 S.Ct. 775 (1972) (valid waiver where sophisticated parties, equal bargaining power, and consideration exchanged for waiver); *N. Feldman & Son, Ltd. v. Checker Motors Corp.*, 572 F. Supp. 310, 313 (S.D.N.Y. 1983) (valid waiver where provision clearly visible and agreement bargained over); *United States v. Mountain Village Co.*, 424 F. Supp. 822, 825 (D. Mass. 1976)

(valid waiver where sophisticated parties, consideration exchanged for waiver); and *Global Indus., Inc. v. Harris*, 376 F. Supp. 1379, 1382 (N.D. Ga. 1974) (valid waiver where equal bargaining power, contract prepared by party seeking to avoid waiver).

All of ERT's claims "arise out of" the performance of the Agreement.  Ohio courts interpret the phrase "arise out of" to have "very broad—indeed, extraordinarily broad—meaning" in that the phrase is "is not limited simply to disagreements about the meaning of a particular phrase in a contract" but includes all "tort claims arising out of the agreement's execution [or non-execution]." *Gerber v. Riordan*, 535 F. Supp. 2d 860, 861 (N.D. Ohio 2008).  Here, ERT's claims each "sound in contract, not tort." *See DMK Dev. Group, LLC v. Cole + Russell Architects, Inc.*, 480 F. Supp. 3d 837, 843 (S.D. Ohio 2020).  In Ohio, to allege a cognizable tort claim, the claim must allege "a breach of some positive duty imposed by law because of the relationship of the parties, rather than…a mere omission to perform a contract obligation" and damages attributable to the tortfeasor that are distinct from the damages alleged under the breach of contract claim. *Id.* (citations omitted).  ERT's claims each allege that TU breached some duty owed under the terms of the contract, not a duty independently imposed by law.  In fact, ERT's trade secret misappropriation, conversion, and unjust enrichment claims allege identical conduct as alleged in the breach of contract claim.  (ECF No. 20, ¶¶ 63, 72, 82, 129.)  To the extent ERT alleges the breach of any duties that exist independent of the agreement, the duties founded in tort and the contractually obligated duties are "no longer independent of one another" when the contract obligates the same standard of care as required by law.  *DMK Dev. Group*, 480 F. Supp. 3d at 844. Such is the case here.  In particular, its defamation, tortious interference and slander of title claim all arise out of what it claims to be TU's interference with ERT's attempts to continue marketing the Quote Exchange which, if ERT succeeded, would require ERT to repay TU's costs incurred in

43

developing the QE Code.  (Ex. 13, Agreement, at TU0218951.)

## IV.    **CONCLUSION**

As noted at the outset of this memorandum, this is a breach of contract case.  That is all. TransUnion respectfully urges this Court to grant its motion, and enter summary judgment on Counts II through VIII of the Amended Complaint; partial summary judgment on Endless River's breach of contract claim (Count I) and Count II of TransUnion's Counterclaim, to the extent that TransUnion seeks a declaratory judgment that TransUnion owns the QE Code; enter an order limiting the damages ERT might recover, if any, to actual damages; and grant such other relief as the Court deems equitable and just.

Dated: May 24, 2021

Respectfully submitted,

By: */s/Courtenay Y. Jalics* _____

Tonya G. Newman                                    Courtenay Y. Jalics (0077507)
(Ill. ARDC No. 6286958)                         Chelsea C. Smith (0091011)
*Admitted Pro Hac Vice*                           TUCKER ELLIS LLP
Olivia Luk Bedi                                          950 Main Avenue, Suite 1100
(Ill. ARDC No. 6288365)                         Cleveland, OH 44113
*Admitted Pro Hac Vice*                           Telephone:  216.592.5000
NEAL, GERBER & EISENBERG LLP    Facsimile:   216.592.5009
Two N. LaSalle Street, Suite 1700            Email:  courtenay.jalics@tuckerellis.com
Chicago, Illinois  60602-3801                            chelsea.smith@tuckerellis.com
Tel:   (312) 269-8000
Fax:  (312) 269-1747
Email:   tnewman@nge.com
          obedi@nge.com                               *Attorneys for Defendant TransUnion LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that the above-captioned case has been assigned to a Standard Track (*see* ECF No. 13).

I further certify that, in compliance with Local Rule 7.1(f), Defendant TransUnion LLC was granted leave to file in excess of the page limit, and that its Memorandum in Support of its Motion for Partial Summary Judgment, excluding the preamble motion, Table of Contents, and Table of Authorities, complies with that order (*see* ECF No. 75).

Respectfully submitted,

By: */s/Courtenay Y. Jalics* _____

Tonya G. Newman
(Ill. ARDC No. 6286958)
*Admitted Pro Hac Vice*
Olivia Luk Bedi
(Ill. ARDC No. 6288365)
*Admitted Pro Hac Vice*
NEAL, GERBER & EISENBERG LLP
Two N. LaSalle Street, Suite 1700
Chicago, Illinois  60602-3801
Tel:  (312) 269-8000
Fax:  (312) 269-1747
Email:  tnewman@nge.com
            obedi@nge.com

Courtenay Y. Jalics (0077507)
Chelsea C. Smith (0091011)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: 216.592.5000
Facsimile:  216.592.5009
Email:  courtenay.jalics@tuckerellis.com
            chelsea.smith@tuckerellis.com

*Attorneys for Defendant TransUnion LLC*

## <u>CERTIFICATE OF SERVICE</u>

Courtenay Youngblood Jalics, an attorney, states that on May 24, 2021, she caused a copy of the foregoing **Defendant TransUnion LLC's Motion for and Memorandum in Support of Partial Summary Judgment** to be filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by the Court's electronic filing system.  Parties may access this filing through the Court's system.


<u>*/s/ Courtenay Youngblood Jalics*</u>
One of the Attorneys for Defendant
TransUnion LLC

46