**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ENDLESS RIVER TECHNOLOGIES LLC, | ) | CASE NO.: 1:18-CV-00936 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | |
| TRANS UNION LLC, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

This matter is before the Court on the Motion for Partial Summary Judgment of Defendant, Trans Union LLC ("Trans Union" or "Defendant") (ECF #84, #85), the Motion for Partial Summary Judgment of Plaintiff, Endless River Technologies LLC ("Endless River" or "Plaintiff") (ECF #87, #88), and Defendant's Amended Motion for Partial Summary Judgment. (ECF #117, #118).[1] Also before the Court are Defendant's Motions to Strike the May 24, 2021 and June 25, 2021 Declarations of Richard Bonitz. (ECF #91, #92; #126, #127).

## I.    SUMMARY OF FACTS[2]

Endless River brings this suit alleging that Trans Union used its influence and market power to convert and misappropriate ERT's intellectual property, disparage its reputation, and tortiously interfere with prospective business partnerships. (ECF #87). The underlying dispute stems from the alleged breach of an agreement made in 2014 between Endless River and Trans

---

[1] The parties' docket filings in this matter are made pursuant to a Stipulated Protective Order (ECF #38). The Court's citations in this Memorandum Opinion and Order make reference to both the redacted, publicly available and sealed versions of the filings, where applicable.

[2] The facts as stated in this Memorandum Opinion and Order are taken from the Parties' submissions. Those material facts that are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving Party.

Union to collaborate on the development and commercialization of the "Quote Exchange," a novel method for insurers to provide competitive pricing to consumers online. (*Id.*).

Endless River argues the agreed upon terms are clear: the Quote Exchange intellectual property was to remain in ERT's ownership unless and until Trans Union elected to buy out Endless River at the project's completion, and if TU chose to terminate its involvement prior to the end of 2018, Plaintiff would maintain ownership of the QE source code and repay TU for development costs as specified by the terms. (ECF #97).

### A.  <u>Quote Exchange Development</u>

Endless River is a small consulting firm that provides business development, technical operations support, and project services related to software development of products in the e-commerce space. (ECF #114, ¶ 15). Endless River was formed in 2009 by Richard Bonitz, a former Insurance.com executive, who sought to develop an idea he had to "streamline comparative insurance price-quoting online," and collaborated with two former colleagues, Phil Wintering and Ron Somich, to pursue his idea. (ECF #97; 5/27/2021 Decl. of R. Bonitz ECF #87-1).

After internal development, ERT began presenting the concept of an online insurance-lead marketplace to larger companies, a concept which eventually became the Quote Exchange Program (the "QE Program" or "QE"), a platform designed to provide potential customers with comparative quotes for insurance and financial services products, including auto insurance, from a number of different carriers. (ECF #114, ¶ 19). In January 2013, Endless River pitched the QE Program to Mr. Geoff Hakel, then Group Vice President of Trans Union's insurance division. (G. Hakel Dep., pp. 24:7-17). Mr. Hakel expressed interest in the project, and the parties spent several months negotiating an agreement to develop and commercialize the QE. (Hakel Dep., pp. 26:12-20; 94:3-12).

**B.  Development Agreement and Contract for Services (the "Agreement")**

On March 31, 2014, Endless River and Trans Union executed a Development Agreement and Contract for Services (the "Agreement") pursuant to which the parties would develop the QE Program. (ECF #113-1). Under the terms, TU would be responsible for funding development of the source code for the platform and ERT would provide business development services, technical operations support, and technical project services. In exchange, TU agreed to pay ERT $300,000 per year, which later increased to $450,000 per year. (*Id.*).

Section 2 of the Agreement, "Terms of Contract," provides:

> The Period of Performance of this Contract shall be from January 1, 2014 to December 31, 2018, inclusive. The foregoing notwithstanding, TU shall have the right to terminate this Contract at any time upon 180 days prior written notice to Provider. TU's obligation to pay consulting fees shall survive during the notice period. In the event of termination of this Agreement, intellectual property rights to the Quote Exchange concept/platform shall revert to ERT as outlined in Exhibit A. (*Id.* at ¶ 2).

Exhibit A of the Agreement outlines the parties' five phases of development for the QE Program and defines obligations regarding Work Product[3] and Intellectual Property[4] during the various stages, culminating in Phase V, where: "[Endless River] agrees to transfer all intellectual property and application rights to [Trans Union] at the conclusion of the buyout schedule set forth herein." (ECF #113-1, Ex. A).

---

[3] The Agreement defines "Ownership of Work Product," in pertinent part: "the entire right, title and interest in and to all copyrights, patents, trade secrets, trademarks, trade names, and all other intellectual property rights associated with any and all ideas, concepts, techniques, inventions, processes, or works of authorship including, but not limited to, all materials in written or other tangible form developed or created by Provider during the course of performing the Work for TU under this contract (collectively, the "Work Product") shall be determined pursuant to the terms set forth in Exhibit A. (ECF #113-1, ¶ 6).

[4] The Agreement defines "Intellectual Property Rights," in pertinent part: Except as otherwise described in Exhibit A, nothing in this Contract shall be construed, by implication or otherwise, to grant any right or license to the other party under any patent, invention, copyright, or any other intellectual property right, now or hereafter owned or controlled by each party." (ECF #113-1, ¶ 6.2).

3

The parties completed Phase I, the Initial Business Development/Due Diligence, from August 1, 2013 through January 31, 2014, and Phase II, which governed continued business development through 2018, during which time ERT would be compensated an annual flat consulting fee. Product Build, or Phase III, was triggered upon commitment from four insurance carriers executing letters of intent to participate in the QE Program build. During Phase III, the parties would continue to market the QE to insurance carriers while completing the build of the platform. (*Id.*, Ex. A, Phase III).

Phase III addresses ownership of the Quote Exchange upon termination of the Agreement, providing:

> Also, during Phase III and through 2018, should TU choose to terminate the Contract and should ERT continue to market and monetize the TU developed code, repayment of TU incurred development fees shall be paid to TU from future ERT revenues generated over a time period not to exceed 36 months. *In this instance, the Quote Exchange platform source code developed hereunder will revert to ERT ownership.*

(*Id.*, Ex. A, Phase III, emphasis added).

Phase IV governed Product Launch, during which time ERT would continue to assist with business development and serve in an account management role to assist with attracting insurance carriers to the platform. After the QE achieved cumulative net profitability, the terms specified TU would receive 60% of revenue and ERT would receive 40% net of direct expenses contributed by the parties. (*Id.*, Ex. A, Phase IV).

Phase V, titled Full Transition to TU, was contingent on achieving cumulative profits, requiring the QE Program reach profits in excess of $3 million. If this figure was achieved, the Agreement allowed for TU to purchase ERT's interest in the QE over a five-year-period, during which time ERT would transfer ownership to TU in increments of 20% ownership interest in a subsidiary company formed for the purpose of the buyout. (*Id.*, Ex. A., Part V).

4

At the end of this transfer, if applicable, Phase V provides: "TU will assume all intellectual property and application rights in the Quote Exchange. In the event that TU abandons or substantially curtails operations of the Quote Exchange prior to the conclusion of Phase V, all intellectual property and application rights shall revert to ERT. (*Id.*).[5]

After executing the Agreement, the parties obtained the requisite letters of intent from insurers and moved forward with QE Program development.[6] During this time, Endless River alleges difficulties with Defendant's management style, and Trans Union cites technical difficulties and challenges engaging selling and quoting carriers in order to ensure a competitive marketplace. Despite these challenges, Endless River and Trans Union launched the Quote Exchange in the Florida market in May 2016.[7]

### C. Termination and Post-Termination Communications

In September 2017, Trans Union raised concerns regarding the QE's underperformance of original revenue projections, and on October 4, 2017, Defendant elected to terminate the

---

[5] The Agreement also provides that if TU terminated the Agreement because, in its sole discretion, the Quote Exchange was not meeting expectations, TU would pay consulting fees during that 180-day period. Thereafter, ERT would "retain intellectual property rights to the Quote Exchange concept as originally presented to TU by ERT, but nothing [would] prevent TU from developing its own solutions using its residual knowledge, provided TU [did] not use any information originally presented to Trans Union by ERT." (ECF #113-1).

[6] Because the parties did not receive the requisite letters of intent as the deadline to do so approached, ERT and TU amended the Agreement to allow until June 1, 2014 to receive five letters of intent, rather than four, as originally required under the terms.

[7] Also in May 2016, Endless River filed U.S. Application No. 15/153,130 with the United States Patent and Trademark Office ("USPTO") titled "Quote Exchange System and Method for Offering Comparative Rates for an Insurance Product." (ECF #84, Ex. 25).

Agreement by formal letter, citing unmet project expectations. (ECF #97, Ex. 19).[8] In its formal

communication, TU asked ERT to sign a termination agreement, which Plaintiff declined.[9]

At this juncture, the parties' dispute regarding QE ownership took form; ERT alleges Trans

Union prohibited Plaintiff's access to the QE contained on TU's laptops and subsequent, alleged

misrepresentations made by TU to third-parties regarding the QE precipitated the filing of this

lawsuit. Endless River contends that while in discussions with TU regarding conditions for the

return of laptops, Defendant disabled access and its "unilateral revocation prevented Endless River

from being able to "tap into [Endless River] materials…as the accounts [we]re disabled…" (ECF

#97, Ex. 2). Endless River argues it demanded immediate access to the QE Program and source

code so it could continue to bring the product to market. ERT alleges TU refused to provide access

or copies of the QE Work Product and has not returned or otherwise made the Work Product

available to date. (ECF #97, Ex. 8, Ex. A; Ex. 20; Ex. 7, 182:12-183:12; Ex. 25).[10]

After receiving Trans Union's notice of termination, Endless River alleges that it began

contacting third-parties with "strategic market knowledge and ability to commercialize the

program and keep Quote Exchange going," including LeadCloud and ITC. (ECF #97, Ex. 3; Ex.

---

[8] TU cites, for example, that in November 2015, just before the March 2016 launch date, the QE was projected to generate $5.4 million in revenue for 2016; by August 2016, it was only projected to generate $486,000 for the year. (ECF #94; Somich Dep. 94:25-95:20). TU further explains that despite carrier interest, the QE continued to underperform, especially in light of its more than $8 million investment in the QE, and determined termination was appropriate.

[9] TU contends it paid ERT's consulting fees for 180 days afterward, per the terms of the Agreement, and the termination became effective on April 2, 2018. In the Termination Letter, Trans Union asserted that it owned "the entire right, title and interest in and to the code TU developed for the Quote Exchange, including all documentation and copies thereof[.]" The letter requested ERT execute and deliver documents evidencing assignment of its rights to the code. ERT refused to execute the assignment, and on March 26, 2018, ERT sent TU a request that TU assign all of its right, title and interest in the code to ERT. (ECF #43, ¶ 23-24)).

[10] At this time, Trans Union maintained that it owned the QE source code and that ERT owned the Exchange concept as presented by Mr. Wintering on behalf of ERT in January 2013. TU maintains that ERT never "reaffirmed" its intent to repay TU's development costs out of ERT's revenues. ERT alleges that Mr. Bonitz advised Mr. Hakel in email communication that it intended to "continue promoting the product".

27; Ex. 28). ERT claims both LeadCloud and ITC expressed interest in working with Plaintiff on the QE, and Endless River approached TU, advising of its intent to continue work on the QE, and inquired if the parties could draft a joint statement notifying carriers, a request Defendant denied. (ECF #97, Ex. 2-B; Ex. 7; Ex. 4).

Endless River alleges that Trans Union, unbeknownst to Plaintiff, communicated to prospective carrier-recipients:

> …that Trans Union was shutting down the Quote Exchange, that it apparently had the unilateral right to do so, that Quote Exchange was Trans Union's innovation, and that Trans Union was committed to continuing to develop such innovative solutions in the future. Nowhere in this email is Endless River or its right to continue the Quote Exchange ever mentioned. Indeed, Endless River did not receive this email or learn of its contents until this litigation.

(ECF #97, p. 23).[11] Plaintiff further alleges that at or around this time, TU pursued discussions with LeadCloud about the sale of the QE source code.[12] ERT maintains that TU, without justification, made misrepresentations to third-parties, including LeadCloud, regarding its ownership and right to possess the QE source code and failed to otherwise notify potential carriers of Plaintiff's rights to the QE under the terms of the Agreement.[13]

---

[11] At this point, Endless River alleges Trans Union had already taken several steps to "ensure Endless River could not exercise its right to monetize Quote Exchange," including sending stopped production notifications in October 2017 to companies actively participating the QE project, including LeadCloud and ITC, advising the recipients TU was pulling out of the Quote Exchange and no further quoting activity within the platform would take place. (ECF #97, citing "Stopped Production Notification, Ex. 32).

The email from E. Lebowitz, TU marketing executive, stated:

[T]he Trans Union Quote Exchange stopped production as of Wednesday, October 18, 2017. There will not be any further quoting activity within the platform from this point forward. As part of the sun setting process, the Quote Exchange Admin tool, IL addresses, URLs and phone numbers have all been deactivated…We are committed to developing unique and innovative solutions that leverage Trans Union data for insurance marketing. We appreciate your willingness to innovate along with us. (ECF #97, Ex. 32).

[12] Plaintiff alleges on March 9, 2018, Ms. Lebowitz emailed several senior TU employees recapping a dinner with LeadCloud's CEO and reportedly told Mr. Ocheltree that ERT "had the first right to purchase the code" and that TU "didn't have an on-going relationship" with ERT. (ECF #97, Ex. 35; Ex. 7.).

[13] ERT notes that TU has since admitted that Ms. Lebowitz statement to LeadCloud's CEO indicating "ERT has a right of first refusal" was "misrepresenting the situation." (ECF #97, 234:2-235:12).

## II.     PROCEDRAUL HISTORY

### A.     <u>Lawsuit and Counterclaims</u>

Endless River alleges that but-for Trans Union's interference and misrepresentations concerning its ownership and control of the QE, ERT would have entered into business relationships with both LeadCloud and ITC, and those alleged unjustified statements hastened the filing of this matter before the Court. On April 24, 2018, Endless River commenced its suit against Trans Union, seeking damages and injunctive relief to remedy Trans Union's alleged breach of the Agreement and resulting harm. (the "Complaint", ECF #1).

Plaintiff amended its Complaint on October 11, 2018, and amended once more on August 18, 2021. (ECF #20, #21; ECF #113, Plaintiff's Second Amended Complaint (the "Amended Complaint") ECF #113, #114).[14] On September 1, 2021, Trans Union filed its Answer to Plaintiff's Second Amended Complaint, incorporating by reference and re-asserting its Counterclaims against ERT for Breach of Contract (Count I) and Declaratory Judgment (Count II) (ECF #115, #116; ECF #43).[15]

---

[14] In its Second Amended Complaint, Plaintiff alleges seven causes of action:

> **Count I: Breach of Contract;**
> **Count II: Trade Secret Misappropriation** (Defend Trade Secrets Act 18 U.S.C. § 1836 *et seq.*)
> **Count III: Conversion;**
> **Count IV: Defamation;**
> **Count V: Slander of Title;**
> **Count VI: Tortious Interference with Business Expectancy;** and
> **Count VII: Violations of Ohio Deceptive Trade Practices Act** (ODTPA O.R.C. 4165/ *et seq.*) (ECF #113).

[15] Defendant asserts the following Counterclaims against Plaintiff:

> **Count I: Breach of Contract**: Trans Union alleges "Endless River has breached the Agreement by, among other things, refusing to execute an assignment of any rights it claims in the Work Product, including the Quote Exchange code, to Trans Union; by wrongfully asserting that it owns the Work Product developed by Trans Union under the Agreement; by refusing to pay the development costs associated with development of the Quote Exchange; and by asserting to third-parties that it owns the Work Product developed by Trans Union." (ECF #43, ¶ 33).

> **Count II: Declaratory Judgment**: Trans Union seeks declaratory judgment from this Court that it has all right, title and interest in the Work Product that Trans Union developed under the Agreement, that it can use such information in the course of its business in a manner consistent with the terms of the Agreement, and that Endless

### B. Motions for Summary Judgment

Pursuant to Fed. R. Civ. P. 56, Defendant filed its Partial Motion for Summary Judgment, moving for summary judgment on Counts II through VII of the Amended Complaint, and partial summary judgment on ERT's Breach of Contract claim (Count I) and its Counterclaim for Declaratory Judgment (Count II of the Counterclaim). (ECF #84, #85). Plaintiff filed an Opposition (ECF #95, #97) and Defendant filed a Reply in Support. (ECF #129, #130).

Plaintiff moves for partial summary judgment on its claim for Conversion (Count III of the Amended Complaint) and on Defendant's Counterclaim for Declaratory Judgment (Count II of the Counterclaim), requesting the Court find that Plaintiff has a right to use, possess, market, and monetize the QE Program. (ECF #87, #88-1). Defendant filed an Opposition (ECF #93, #94) and Plaintiff filed a Reply in Support. (ECF #131).

On September 1, 2021, Trans Union filed an Amended Motion for Partial Summary Judgment in order to address Endless River's ODTPA claim. (ECF #117, 118).[16] Endless River filed an Opposition (ECF #120, #121) and Defendant filed a Reply in Support of its Amended Motion as to Plaintiff's ODTPA claim. (ECF #128).

### C. Motions to Strike the Declarations of Richard Bonitz

On June 25, 2021, Trans Union filed a Motion to Strike the May 24, 2021 Declaration of Richard Bonitz (ECF #91, #92; 5/24/2021 *Bonitz Declaration* ECF #87-1), arguing that the Declaration, submitted in support of Plaintiff's Motion for Partial Summary Judgment, consists

---

River has no right, title or interest in the Work Product that Trans Union developed under the Agreement. (ECF #43, ¶ 39).

[16] Endless River originally filed its Deceptive Trade Practices claim under the Illinois Uniform Deceptive Trade Practices Act ("IDTPA") 815 ILCS 510/ *et seq.* Plaintiff later sought leave to amend the Complaint to assert its Deceptive Trade Practices Act claim under Ohio law (the "ODTPA") instead of Illinois law, and the Court directed Trans Union to amend its motion for partial summary judgment, if necessary, to address Plaintiff's amended claim. (ECF #112).

almost entirely of inadmissible hearsay and assertions without record support, and seeks to create a factual issue by contradicting earlier deposition testimony. ERT filed an Opposition to the Motion arguing Defendant's Motion is without merit as Mr. Bonitz, the founder of ERT, testified to admissible facts for which he had personal knowledge (ECF #105), and TU filed a Reply. (ECF #107).

On October 18, 2021, Defendant filed a Motion to Strike the June 25, 2021 Declaration of Richard Bonitz (ECF #126, #127; 6/25/2021 Declaration ECF #95-4) submitted in support of ERT's Opposition to TU's Motion for Partial Summary Judgment. (ECF #94, #95). TU argues Mr. Bonitz's June Declaration is largely inadmissible for reasons similar to its original motion, alleging inadmissible hearsay, conclusory statements with no factual support, and testimony for the sole purpose of creating the appearance of a genuine issue of material fact. (ECF #127). Defendant takes particular issue with Mr. Bonitz's statements regarding confidentiality agreements with third-parties, arguing the declarations are ERT's attempt to place impermissible conclusory and speculative statements into evidence. Plaintiff filed an Opposition (ECF #134, #135) and TU filed a Reply (ECF #136).[17]

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806 (6th Cir. 2011). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

---

[17] Fed. R. Civ. P. 56(c)(4) requires a supporting or opposing affidavit to be made on personal knowledge, set out facts that would be admissible in evidence, and show the affiant is competent to testify on the matters stated. The May 24, 2021 and June 25, 2021 declarations of Mr. Bonitz have only been considered to the extent admissible and were not dispositive on any issue before the Court.

> portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Although evidence may be presented in support of a summary judgment motion, the moving party need not support its motion with affidavits or similar materials that negate the non-mover's claim(s) if they can otherwise show an absence of evidence supporting the non-mover's case. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000). The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Much. 1996) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce

evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issue that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250.

## IV.    DISCUSSION

The Court has thoroughly and exhaustively reviewed the claims raised by Plaintiff and Defendant; the parties' Partial Motions for Summary Judgment and the briefing responsive thereto; and all supporting documentation, including deposition testimony and evidentiary materials submitted by both parties.

### A. <u>Breach of Contract (Count I) and Declaratory Judgment (Count II of Counterclaim)</u>

Trans Union seeks partial summary judgment on Plaintiff's Breach of Contract claim (Count I), which alleges that TU has and continues to breach the parties' Agreement by possessing and controlling the Endless River Information, including the QE source code, without Plaintiff's permission or consent, and further, for failing to promptly return ERT's Information, as required under the terms. (ECF #114, ¶ 61-66).[18] Trans Union argues summary judgment is appropriate because it was the rightful owner of the QE Code at the time of termination, and thus had no obligation to give the QE Code to Plaintiff. (ECF #85).

To succeed on a claim for breach of contract, a plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014); *citing Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).[19] Under Illinois law, "[t]he primary objective in construing a contract is to give effect to the parties' intent at the time the contract was made, which is best determined by the plain language of the contract." *ESP Global, LLC v. Northwest Cmty. Hosp.*, 158 N.E.3d 721, 726 (Ill. App. Ct. 2020) (citation omitted). When the contract is clear and unambiguous, "the parties' intent must be determined exclusively from the express language of the contract, giving the words employed their plain and ordinary meaning." *Id.* The interpretation of unambiguous contract terms is a question of law. *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1104 (7th Cir. 1997).

---

[18] Trans Union argues it seeks summary judgment on ERT's Breach of Contract claim only to the extent that the contract claim is based on ERT's alleged ownership of the QE Code. TU does not seek summary judgment on the breach of contract claim to the extent that it is premised on ERT's claimed right of access to the QE Code. TU insists, as argued in its Opposition to ERT's Motion for Partial Summary Judgment, that there exists a question of fact as to ERT's claimed right of access. (ECF #94, #130).

[19] The Agreement is governed by Illinois law. (ECF #113-1, ¶ 9).

Section 2 of the Agreement provides that in the event of termination, "intellectual property rights to the Quote Exchange concept/platform shall revert to ERT as outlined in Exhibit A." (ECF #113-1, ¶ 2). Exhibit A specifies, in pertinent part:

> during Phase III and through 2018, should TU choose to terminate the Contract and should ERT continue to market and monetize the TU developed code…in this instance, the Quote Exchange platform source code developed hereunder will revert to ERT ownership.

(*Id.*, Ex. A, Phase III). Exhibit A further states, "[i]n the event that TU abandons or substantially curtails operations of the Quote Exchange prior to the conclusion of Phase V, all intellectual property and applications rights shall revert to ERT." (*Id.*, Ex. A, Phase V).

The parties negotiated the terms and do not contest the validity of the Agreement. The record shows Trans Union terminated the Agreement prior to the end of 2018. Upon termination at this time, the language of the Agreement explicitly states that the Quote Exchange platform source code was to revert to ERT ownership, and any arguments by Defendant asserting ambiguity or uncertainty with respect to the mechanism for or logistics of returning the QE source code to ERT are without merit. (*Id.* at Ex. A, Phase III).

The Court finds the plain language of the Agreement is clear and unambiguous, and Trans Union's request for Summary Judgment fails as a matter of law. Any factual issues that may exist with respect to the remaining elements of Endless River's Breach of Contract claim are best reserved for resolution by a jury.

Trans Union also seeks summary judgment on its Counterclaim for Declaratory Judgment, wherein TU requests the Court find that it has all right, title, and interest in the Work Product that Trans Union developed under the Agreement and that Endless River has "no right, title or interest" in the Work Product. (ECF #43, ¶ 36-39). The terms of the Agreement define Work Product to include:

> The entire right, title and interest in and to all copyrights, patents, trade secrets, trademarks, trade names, and all other intellectual property rights associated with any and all ideas, concepts, techniques, inventions, processes, or works of authorship including, but not limited to, all materials in written or other tangible form developed or created by Provider during the course of performing the Work for TU under this Contract (collective, the "Work Product") shall be determined pursuant to the terms set forth in Exhibit A.

Endless River also moves for summary judgment on TU's request for Declaratory Judgment, arguing that, at a minimum, ERT has a clear and established right to use and possess the Quote Exchange source code, pursuant to the terms of the Agreement, and thus TU's motion is without merit.

While Trans Union indicates in its initial briefing that it seeks summary judgment on its Counterclaim for Declaratory Judgment, TU fails to separately address its argument in support, asking only that the Court issue an order finding that it owns the QE code and an order limiting Plaintiff's recovery to actual damages. (ECF #85). Defendant's request for a declaration of ownership does not comport with the clear and unambiguous language of the Agreement. Accordingly, Summary Judgment is granted as a matter of law in favor of Endless River on Defendant's counterclaim for Declaratory Judgment.

### B. Conversion (Count III)

Trans Union moves for summary judgment on Endless River's claim for Conversion (Count III) wherein ERT alleges TU wrongfully assumed unauthorized control and dominion by restricting access to TU's computer devices containing ERT Information. (ECF #114, ¶ 79-89). In order to prevail on a claim for conversion, a plaintiff must show: (1) plaintiff's ownership or right to possess the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of [p]laintiff's property; and (3) damages." *Kuvedina, LLC v. Cognizant Tech. Solutions*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013).

15

Trans Union argues summary judgment is appropriate because Endless River's claim for Conversion is duplicative of its claim for Breach of Contract, premised on the same alleged obligations and breach contemplated by the terms of the Agreement. "The existence of a claim sounding in contract generally excludes recovery under a theory of tort." *Misny & Assocs. Co., L.P.A. v. Aylstock, Witkin, Kreis & Overhotltz*, PLLC, No. 1:15-CV-681, 2016 WL 5231807, *3, 4 (N.D. Ohio Sept. 20, 2016); citing *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981).

> A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching part also breaches a duty owed separately from that created by the contract, that is, a duty owned even if no contract existed. Moreover, a tort claim must allege damages that are separate and distinct from the damages result from breach of contract.

*Misny*, *3, 4 (N.D. Ohio Sept. 2016); citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151, 684 N.E.2d 1261, 1270.

Endless River argues the Conversion claim stands on its own because it asserts non-economic damages, including reputational harm and damage to good will. However, as plead, ERT's claim is a reiteration of the same facts underlying its Breach of Contract Claim, and its alleged non-economic damages do not satisfy Plaintiff's burden to articulate a breach of duty distinct from that asserted in Count I of the Complaint. Further, the record contains no evidence at this stage amounting to more than speculative non-economic damages, nor does it allege a causal link to the alleged conversion. The Court agrees Plaintiff's claims are indistinguishable and Summary Judgment is granted in favor of Defendant on ERT's claim for Conversion.

### C. Trade Secret Misappropriation (Defend Trade Secrets Act) (Count II)

In Count II, Endless River argues that the Endless River Information, as defined by the Agreement, constitutes trade secrets under the Defend Trade Secrets Act (the "DTSA") 18 U.S.C.

¶ 1836 *et seq.* and alleges that Trans Union violated the DTSA by, among other things, using the Endless River Information for its commercial advantage and refusing to return or otherwise permit ERT access to the Information. (ECF #114, ¶ 67-78).

The DTSA provides a private claim of action for a party whose trade secrets are misappropriated if those trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To prevail on a claim under the DTSA, a plaintiff must show: (1) the existence of a protectable trade secret; (2) misappropriation of the trade secret by defendant; and (3) that the trade secret is related to a product or service used in interstate commerce. *See Noco Co. v. CTEK, Inc.*, No. 1:19-cv-00853, 2020 WL 821485, at *6 (N.D. Ohio Feb. 18, 2020).

Plaintiff contends Defendant's motion for summary judgment is premised on its evident misunderstanding of the law by alleging ERT has failed to identify any protectable trade secret in this matter. In support, ERT directs this Court to a six factor test delineated by the Ohio Supreme Court to help determine whether particular information constitutes a trade secret:

> (1) The extent to which the information is publicly known; (2) the extent to which it is known to those inside the business; (3) the precautions the holder of the trade secret takes to protect the information; (4) the value to the holder in having the information; (5) the amount of time and money expended in obtaining and developing the information; and (6) the time and expense it would take others to duplicate the information.

*See Handel's Enter's, Inc. v. Schulenberg*, 765 Fed Appx. 117, 122 (6th Cir. 2019). Trans Union argues no aspect of the QE Program, including its concept, materials, or prospective customers, constitutes a trade secret and thus summary judgment should be granted in its favor. ERT rebuts TU's position, citing Ohio courts who have found that "source codes constitute trade secrets and confidential business information." *See Ohio A. Philip Randolph Inst. V. Householder*, No. 1:18-cv-357, 2019 WL 1002978, at *2 (S.D. Ohio Mar. 2, 2019); *see also Apple, Inc. v. Samsung*

*Electronics Co.*, Ltd., No. 11-CV-01846, 2012 WL 6115623, at *2 (N.D. Cal. Dec. 10, 2012). Because the Court finds genuine issues of material fact exist as to more than one element of Plaintiff's claim under the DTSA, Defendant's Motion for Summary Judgment on Plaintiff's claim for Trade Secret Misappropriation under the DTSA is denied.

### D.  Defamation and Slander of Title (Counts IV and V)

In Counts IV and V of the Complaint, Endless River argues Trans Union is liable for a number of false, defamatory, and slanderous statements it made regarding ERT and its ownership of the Endless River Information, including the Quote Exchange source code. (ECF #114; ¶ 90-103; 104-110). Plaintiff contends that TU's statements to third-parties, in pertinent part, "falsely publicized it owned Quote Exchange, that it had the unilateral right to cease Quote Exchange's operation, that Quote Exchange was permanently terminated, and that Endless River had no right to continue Quote Exchange after Trans Union pulled out of the Agreement." (ECF #97).[20]

A claim for defamation under Ohio law requires: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (such as defamation *per se*) or the existence of special harm caused by the publication. *See Fitzgerald v. Roadway Express, Inc.*, 262 F. Supp. 2d 849, 855 (N.D. Ohio 2003) (citing

---

[20] Endless River identifies the following three specific statements as grounds for its Defamation claim:

- Trans Union's October 2017 statement in its Stopped Production Notifications to recipients, including LeadCloud and ITC, that "[t]here will not be any further quoting activity within the [Quote Exchange] platform from this point forward" (See, e.g. Ex. 32);

- Ms. Lebowtiz's March 2018 statement to the LeadCloud CEO that Endless River has a right of first refusal to buy the Quote Exchange code (Ex. 35); and

- Ms. Lebowitz's March 2018 statement to the LeadCloud CEO that Trans Union shut down the Quote Exchange and does not have an on-going relationship with Endless River. (*Id*).

*Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Servs.*, Inc., 81 Ohio App.3d 591, 601, 611 N.E.2d 955 (9th Dist. 1992).

Endless River argues its Slander of Title claim parallels its Defamation claim in that is similarly based in part on Ms. Lebowitz's asserted ownership of the Quote Exchange to LeadCloud in March 2018 and Defendant's statements regarding ERT's alleged "right of first refusal." A slander of title claim is "a defamation action in tort against one who falsely and maliciously defames the property of another." *Wolfe v. Bank of New York Mellon*, No. 2:14-CV-00366. 2015 WL 12734085, at *8 (S.D. Ohio Mar. 16, 2015) (citations omitted). To state a claim for slander of title, a plaintiff must prove: (1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard for its falsity; and (4) the statement caused actual or special damages. *Id.* (citing *Green v. Lemarr,* 139 Ohio App.3d 414 (2000)).

Trans Union moves for summary judgment on both the Defamation and Slander of Title claims, arguing that the statements are neither false nor defamatory; that TU had a qualified privilege to make the statements, even if false; and that ERT cannot prove the requisite harm and special damages to satisfy its claims. Based on its review of the record, the Court finds triable issues exist as to whether TU made unjustified and actionable statements resulting in harm under tort law, considerations most appropriate for a jury. Accordingly, TU's request for Summary Judgment on Plaintiff's claims for Defamation and Slander of Title is denied.

### E.  **Tortious Interference with Business Expectancy (Count VI)**

Plaintiff alleges Trans Union intentionally and without privilege interfered with its reasonable expectation of entering into valid business relationships with potential partners, including LeadCloud and ITC. (ECF #114, Count VI ¶ 111-120). "The tort of interference with

business relationships...generally occur[s] when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another..." *Re/Max Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 890 (N.D. Ohio 2003) (citing *A & B-Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 1995 Ohio 66, 651 N.E.2d 1283, 1294 (1995).

In order to prevail on a claim for Tortious Interference with Business Expectancy, a plaintiff must prove: (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship, and; (4) damages resulting therefrom. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App. 3d 596, 604 (3d Dist. 2002). "The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Id.*; citing *Lapping v. Hm Health Services*, Trumbull App. No. 2000-T-0061, 2001 Ohio 8723.

Here, Trans Union argues summary judgment in its favor is appropriate because at no time over the course of its relationship with ERT was Defendant the but-for cause of a failed relationship between ERT and a prospective business partner. TU further argues that any statements it made regarding the QE Program source code and ownership rights are privileged and protected as true, pursuant to the terms of the Agreement. Endless River argues TU's position ignores facts in evidence which demonstrate that LeadCloud expressed interest in the QE in January 2018 and was participating in negotiations with ERT, but ultimately was dissuaded by Trans Union's comments that the QE had been shut down and that Plaintiff had a right of first refusal.

20

The record contains evidence of Trans Union's knowledge of third-party interest in ERT and the QE Program, and evidence it made potentially misleading statements regarding ERT's rights and ownership status. Because genuine issues of material fact exist as to whether Trans Union intended interference and whether ERT suffered damages as a result, TU's Motion for Summary Judgment on ERT's claim for Tortious Interference with Business Expectancy is denied.

### F. Ohio Deceptive Trade Practices Act (the "ODTPA") (Count VII)

In Count VII of the Amended Complaint, Endless River alleges Trans Union violated the Ohio Deceptive Trade Practices Act (the "ODTPA") by falsely asserting ownership over the Quote Exchange source code and by making misleading and disparaging statements about ERT and its ownership status to third-party vendors, including LeadCloud and ITC. (ECF #114, ¶ 121-127). ERT further alleges that Trans Union's statements and omissions of material fact resulted in loss of potential business partnerships and profits. (ECF #120).

The ODTPA provides that an entity engages in deceptive trade practices when it, among other things:

> (1) Passes off goods or services as those of another; (2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; … (10) Disparages the goods, services, or business of another by false representation of fact…

Ohio Rev. Code Ann §4165.02(A)(1),(2),(3) and (10). In order to prevail on a claim under the ODTPA, a plaintiff must prove:

> (a) The defendant made a false statement or a statement which is misleading;
> (b) The statement actually deceived or has the tendency to deceive a substantial segment of the target audience;
> (c) The deception is material in that it is likely to influence a purchasing decision; and
> (d) The plaintiff has been or is likely to be injured as a result of the advertisement…

*J.P. Morgan Chase Bank, N.A. v. Safeco Ins. Co. of Am.,* No. 02-12014, 2012 U.S. Dist. LEXIS 74570, at *14 (N.D. Ohio 2012); *citing Int'l Diamond Exch. Jewelers, Inc. v. U.S. Diamond & Gold Jewelers, Inc.,* 70 Ohio App. 3d 667, 676, 591 N.E.2d 881 (2d Dist. 1991).

As previously discussed by the Court, the record contains statements made by Defendant which may reasonably be understood as suggesting, implying, or otherwise making reference to the parties' disputed ownership status and access to the QE Program source code. While Trans Union argues its statements are protected as true and Plaintiff fails to prove evidence showing it made material misrepresentations, the Court finds genuine issues of material fact exist as to whether TU's statements were of a damaging nature or otherwise constitute a violation under the ODTPA, an inquiry best suited for resolution by a jury. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's ODTPA claim is denied.

## V.   CONCLUSION

The Court has thoroughly and exhaustively reviewed the briefs submitted by the parties, along with the evidence submitted in support thereof. Genuine issues of material fact persist which may be reasonably determined in favor of either party and can only be resolved by a jury, precluding summary judgment on a number of Endless River's causes of action.

Accordingly, Trans Union's Motion for Partial Summary Judgment is hereby GRANTED IN PART and DENIED IN PART. (ECF #84, #85). The Court hereby dismisses Endless River's claim for Conversion (Count III). Trans Union's Amended Motion for Partial Summary Judgment as to Endless River's ODTPA claim is DENIED. (ECF #117, #118).

Endless River's Motion for Partial Summary Judgment is hereby GRANTED IN PART and DENIED IN PART. (ECF #87, #88-1). The Court hereby dismisses Trans Union's request for Declaratory Judgment (Count II of the Counterclaim ECF #43, #116).

Endless River's claims for Breach of Contract (Count I), Trade Secret Misappropriation (Count II), Defamation (Count IV), Slander of Title (Count V), Tortious Interference with Business Expectancy (Count VI), Violations of the Ohio Deceptive Trade Practices Act (Count VII) and Trans Union's Counterclaim for Breach of Contract (Count II) remain before the Court.

Defendant's Motions to Strike the Declarations of Richard Bonitz (ECF #91 and #127) are hereby DENIED AS MOOT.

Trial remains set for May 2, 2022 at 8:30 AM.

IT IS SO ORDERED.

DONALD C. NUGENT
Senior United States District Judge

DATED: February 1, 2022