# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| ENDLESS RIVER TECHNOLOGIES LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:18-CV-00936 |
| v. | ) |
| | ) Judge Donald C. Nugent |
| TRANSUNION LLC, | ) |
| | ) |
| Defendant. | ) |

**TRANSUNION'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. ANDREW MALEC**

**INDEX OF EXHIBITS TO TRANSUNION'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. ANDREW MALEC**

**Exhibit 1** – Excerpts from Deposition of Andrew Malec, Ph.D., dated February 25, 2022.

**Exhibit 2** – Endless River Technologies Lead Exchange Network Pitch Deck, dated January 31, 2013 (Wintering 30(b)(6) Dep Ex. 8, TU0055156).

**Exhibit 3** – Endless River Technologies Lead Exchange Network Adjusted Pitch Deck, dated February 12, 2013 (Somich Dep. Ex. 2, TU0055182).

**Exhibit 4** – Excerpt from ERT Amended Financial Projection Spreadsheet, dated February 4, 2013 (TU0055152).

**Exhibit 5** – Email exchange between R. Bonitz and G. Hakel re: Business Plan Finances - TU2-13.xlsx with attachment, dated February 4, 2019 (Hakel Dep. Ex. 121, ERT0001154).

**Exhibit 6** – Excerpt from ERT Financial Projection Spreadsheet, dated February 1, 2013 (TU0055093).

**Exhibit 7** – Email exchange re: 2013 06 12 insurance business case with attachment, dated June 17, 2013 (Hakel Dep. Ex. 125, TU0056362).

**Exhibit 8** – ERT- TransUnion Development Agreement, dated March 31, 2014.

**Exhibit 9** – Email from E. Lebowitz to D. Drotos re: QE Recommendation with attachment, dated February 31, 2014 (Lebowitz Dep. Ex. 23, TU0002536).

**Exhibit 10** – TransUnion Quote Exchange Presentation, dated July 21, 2017 (TU0277169).

**Exhibit 11** – Excerpts from Deposition of Richard Bonitz, dated March 28, 2019.

**Exhibit 12** – Excerpts from 30(b)(6) Deposition of Geoffrey Hakel, dated February 11, 2020.

**Exhibit 13** – Email exchange between D. Drotos and G. Hakel re: QE financials with attachment, dated September 1, 2017 (Drotos Dep. Ex. 74, TU0281651).

**Exhibit 14** – Excerpts from Deposition of Emily Lebowitz, dated September 22, 2020.

**Exhibit 15** – Endless River Technologies LLC's Answers and Objections to TransUnion's First Set of Interrogatories and First Request for Production of Documents, dated January 16, 2019.

**Exhibit 16** – Expert Report of Andrew Malec, Ph.D., dated December 1, 2021.

**Exhibit 17** – Email from S. VanDinther to K. Adams copying G. Hakel re: QE 2014 & 2015 with attachment, dated July 21, 2017 (Adams Dep. Ex. 112, TU0052898).

**Exhibit 18** – ERT Expert Witness Primer (Malec Dep. Ex. 3).

**Exhibit 19** – A. Malec Peer Company Notes (Malec Dep. Ex. 8).

**Exhibit 20** – Excerpt from ERT's Response to Interrogatory 20, The Damages Model, dated December 1, 2021.

Endless River's ("ERT") proffered damages expert, Dr. Andrew Malec, confirms what was already clear: disgruntled by the Quote Exchange's ("QE") lack of success in the marketplace, ERT brought this lawsuit seeking an opportunistic windfall from TransUnion ("TU"). Malec's unsupported valuation opinion is at the center of this last-ditch effort. But Malec's valuation, which posits that the "enterprise value" of the Quote Exchange is nearly $60 million, is irrelevant and unreliable.

*First*, Malec's method claims to measure one thing and one thing only: the purported value of the entire QE enterprise in 2014 before TU and ERT even built it. He calculates this value using ERT's pie-in-the-sky revenue projections from 2013—projections that ignore three years of actual, real world performance of the QE, and which **both parties** now acknowledge never came anywhere close to reality. The calculation is completely irrelevant to this case; ERT's case is premised on its claim that TU did not return the QE assets 180 days after TU's October 2017 contract termination. Moreover, Malec's speculative valuation of the lost revenues that QE could have generated is expressly barred by the parties' agreement and applicable law. Equally problematic, Malec's calculation is not connected to any alleged breach or claim brought by ERT.

*Second*, Malec's calculation of the entire enterprise value of the QE as of March 2014 (an irrelevant number to begin with) is based on a debunked method. And Malec, who has never done this type of valuation before, deviates from the method at every step. To start, Malec exclusively relies on ERT's projections from 2013. Malec did no work to determine if the 2013 projections, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were reasonable. As both TU and ERT's witnesses explained, those initial projections were way off. Then, Malec applies cherry-picked growth rates and revenue multiples taken from other, successful companies in 2018 and 2020 to further increase the QE's hypothetical growth. Next, Malec applies two discount rates chosen blindly, admitting

he had no rationale or justification. Finally, Malec's method ignores the costs ERT would have necessarily incurred to monetize the QE, giving ERT all of the upside and none of the downside.

Malec's calculation would never be accepted by any investor or financial professional, *see* A. Malec Dep. Tr. 114:17-115:4, attached as Exhibit 1; for the same reasons, it should be excluded from the courtroom. ERT and Malec's attempt to repaint the QE into a multi-million dollar success is impermissible under Rule 702 and his opinion should be excluded. Given the importance of this issue and the potential for jury confusion, TU requests a pretrial *Daubert* hearing for the Court to evaluate Malec's opinions.

## FACTUAL BACKGROUND

### A.  ERT Creates Unrealistic Projections during the QE Sales Pitch

Overwhelming record evidence explains what happened to the QE: what looked like a good idea in 2013 never managed to get off the ground. ERT pitched its QE idea to TU on January 31, 2013 and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. After TU expressed doubt about these value projections, ERT responded by adjusting its assumptions, taking the projected revenue ▮▮▮▮▮▮▮▮▮▮▮▮[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Hakel Dep. Ex. 121 at -165, 168, attached as Exhibit 5; TU0055093 2/1/2013 ERT Financial Projections, attached as Exhibit 6.  TU made its own projections in June 2013 for a much more modest but still hopeful ▮▮▮▮▮▮▮. Hakel Dep. Ex. 125, attached as Exhibit 7.

---

[1] Wintering 30(b)(6) Dep. Ex. 8 at -168, attached as Exhibit 2; Somich Dep. Ex. 2 at -194, attached as Exhibit 3; TU0055152, 2/4/2013 ERT Amended Financial Projections, attached as Exhibit 4.

### B.  ERT and TU Enter the Development Agreement

The parties' Development Agreement, finalized on March 31, 2014, recognizes the uncertainty surrounding the QE. It provides TU the right to terminate the Development Agreement and the QE project with 180 days' notice to ERT if the QE "does not meet expectations at any time in TransUnion's sole discretion." Development Agreement at 8, attached as Exhibit 8. After the notice period expired, here in April 2018, the Agreement would terminate per its terms.

Relevant to Malec's opinions, the Development Agreement bars any right to seek the damages Malec purports to calculate: "any consequential, incidental, indirect, special, or punitive damages … including but not limited to … lost profits or revenue." *Id.* at 1. The Development Agreement also makes clear an additional fact that Malec ignores: in the event the QE generated positive revenues, TU would keep most of the upside. The contract contemplates that once the QE launched, ERT and TU would receive 40 percent and 60 percent, respectively, of QE revenues net of direct expenses. *Id.* at 5. If the QE generated cumulative profits of $3 million, TU could buy out ERT. *Id.* And critically, if TU terminated "during Phase III and through 2018," and ERT opted to "continue to market and monetize the TU developed code," then ERT would be obligated to repay TU its incurred development fees from future revenues. *Id*. at 5.

### C.  The Quote Exchange Fails to Make any Money

The undisputed evidence shows what happened next: the parties struggled throughout the life of the QE because marquee carriers were not interested and more competitive products entered the space. Lebowitz Dep. Ex. 23 at -537, attached as Exhibit 9; TU0277169 at -191, attached as Exhibit 10. The ERT pitch-deck projections were way off the mark. Neither party disputes this.[2]

---

[2]  Bonitz Tr. 43:2-7, attached as Exhibit 11; *see also* Hakel 30(b)(6) Tr. 76:8-11, attached as Exhibit 12 ("I know I have actual revenue performance and that is well, well, well underperforming even our conservative estimates of revenue."); Ex. 14, Lebowitz Tr. 126:9-25 (Financial modeling "never accurately projected revenue … it never was accurate or even close to accurate.").

3

Throughout the life of the QE, both parties continually revised their initial projections downward as the QE continued to fail to get off the ground. By September 1, 2017, TU's projection of revenue for 2018 was only ■■■■. Drotos Dep. Ex. 74, attached as Exhibit 13. By the time TU terminated the parties' contract in October 2017, the QE had assisted carriers in the sale of fewer than 1,000 new policies and generated less than $250,000 in revenue, in contrast to the more than $8 million TU had spent to develop the QE. Lebowitz Tr. 31:7-18, attached as Exhibit 14; Ex. 12, Hakel 30(b)(6) Tr. 25:22-25. TU concluded that continuation of the project would not add value to the company and elected to terminate the project in October 2017, which became effective in April 2018. *Id.* at 75:10-11; 77:18-78:4; Ex. 8, Development Agreement at 7.

      **D.**      **ERT Sues and Changes its Story**

After initially bringing its lawsuit in 2018, ERT served sworn interrogatory responses in January 2019 quantifying its damages with a "Damages Model" in an amount of $21 million based on a delay to market theory. ERT Answers and Objs. to TU's First Set of Interrogatories at 19-20, attached as Exhibit 15. The approach had its own fundamental flaws, but apparently the number was not enough for ERT. Unsatisfied, ERT abandoned its earlier sworn statements and hired Malec in 2021 to conjure up a new $60 million "enterprise value" calculation.

To arrive at this fictional amount, Malec claims to use the "Venture Capital Approach," though he admits that he has never used it in court and strays from it when convenient. Ex. 1, Malec Tr. 95:10-13; 96:10-97:25. Malec claims to use this method to arrive at the value of the QE as of March 31, 2014, despite conceding that ERT claims damages arising from TU's alleged failure to return the QE code 180 days from its October 2017 notice of termination. Malec Tr. 67:21-68:14.

First, Malec estimates the value of the QE using the hypothetical revenues in the January 2013 pitch deck, to the exclusion of real evidence about actual performance of the QE. Malec

4

Report ¶ 33, attached as Exhibit 16. Malec then multiplies this 2013 projection by a 2018 revenue multiple he divined from a set of publicly-traded companies that he contends are "peers" to the QE, notwithstanding his lack of industry knowledge and these companies' stark differences from the QE. Next, Malec purports to take into account the risk of the QE failing by multiplying this value by two different discount rates, which he picked without any analysis whatsoever. Ex. 1, Malec Tr. 188:3-7. Next, Malec compounds this value forward to December 1, 2020 based on historical sales growth rates of the so-called peer companies. Finally, Malec compounds the value forward again to December 1, 2021 based on forecasts of future revenue growth for the peer companies. Ex. 16, Malec Report, ¶¶ 32-33.

Using the January 31, 2013 ERT pitch deck assumptions and the arbitrarily selected 70% discount rate, Malec concludes that the value of the QE was $59.4 million as of December 1, 2021. *Id*. at ¶¶ 33, 44-47, 54. Using the same methodology but with ERT's revised February 12, 2013 pitch deck assumptions and a discount rate of 49.2% (again, arbitrarily selected), Malec concludes that the value of the QE was $40.2 million as of December 1, 2021. *Id*.

## ARGUMENT

To be admissible, an expert's opinion must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). ERT bears the burden of establishing both elements. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). The <u>relevance</u> prong requires that the expert's opinion must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591. If there is not a "fit" between the testimony and issues to be resolved by the trial, an expert's opinions are not relevant and therefore must be excluded. *Nelson v. Tennessee Gas Pipeline Co*., 243 F.3d 244, 250

(6th Cir. 2001); *Galoski v. Stanley Black & Decker, Inc*., 2017 WL 2291431, at *2 (N.D. Ohio May 25, 2017) (Nugent, J.) (excluding expert opinion that did not "'fit' the facts of the case").

The reliability prong requires an expert's method to be scientifically valid. *In re FCA US LLC Monostable Elec. Gearshift Litig*., 2022 WL 944285, at *9 (E.D. Mich. Mar. 29, 2022) ("[A]n expert cannot 'cherry-pick' only favorable data"; that "is just as bad as [] making it up altogether"). An expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Galoski*, 2017 WL 2291431, at *4 (Nugent, J.) (excluding expert whose method "was not developed employing the same intellectual rigor that characterizes the practice in his field").

## I. MALEC'S METHOD PRODUCES A SPECULATIVE, HYPOTHETICAL VALUE DIVORCED FROM THE CONTRACT OR LEGAL REQUIREMENTS.

### A. Malec's Valuation is Contrary to the Parties' Contract and Illinois Law

Malec's method and ultimate opinion suffers from a foundational flaw: his entire damages calculation is barred by the parties' contract and wholly speculative. Expert opinions are inadmissible when they calculate damages that are not recoverable as a matter of law since such opinions provide no assistance to a jury. For example, the court in *Gonzalez Production Systems, Inc., v. Martinrea Intern. Inc.* excluded an expert's damages model that assumed the jury could "award at trial *any amount at all* for the 'lost use' of funds" when this assumption did not reflect damages available under applicable state law. 2015 WL 4771096, at *14-15 (E.D. Mich. Aug. 13, 2015). Other courts agree that such opinions are "unhelpful and speculative." *Id.*[3]

Malec purports to calculate the "enterprise value" of the entire QE had it been a wildly successful venture as was hypothesized by ERT in its January and February 2013 pitch-deck sales

---

[3] *Accord United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509, at *3 (D.D.C. Nov. 28, 2017) ("The Court concludes that [defendant] is correct that the Government is seeking to prove damages under an impermissible theory and will prohibit the expert testimony insofar as it relates to that theory…."); *Cooper v.*

6

projections, before the parties' Development Agreement was signed, and before the QE had even been built or launched in the real world. Such estimates of lost sales, however, are not recoverable—not under the parties' carefully negotiated Agreement, and not under the law that governs that contract. Section 8.2 of the Agreement provides that both parties waive:

> ANY **CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL** OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTY AND ARISING OUT OF THE PERFORMANCE OF THIS CONTRACT, **INCLUDING BUT NOT LIMITED TO** LOSS OF GOOD WILL AND **LOST PROFITS OR REVENUE**.

Malec's damages are separately disallowed under Illinois law, which governs the parties' contract. "Illinois courts consistently have rejected the use of speculative, inaccurate or false projections of income in the valuation of a business." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007). This is because "an unestablished business will be unable to provide competent proof of lost profits to a reasonable certainty." *Glen Hollow P'ship v. Wal-Mart Stores, Inc.*, 139 F.3d 901 (7th Cir. 1998). Malec's valuation is exactly the type of speculative and untethered valuation that Illinois law and the parties' contract are designed to prevent.

### B. Malec's Damage Calculation Is Untethered from ERT's Contract Claim.

Under Illinois law, the proper measure of damages in a breach of contract claim is determined as of the time of the breach that is alleged to have resulted in damages. *See Santorini Cab Corp. v. Banco Popular N. Am.*, 999 N.E.2d 46, 52 (Ill. App. Ct. 2013). ERT's entire case is premised on the claim that the code related to the QE Program should have reverted to ERT upon TU's termination of the parties' Agreement by April 2018, and that TransUnion's refusal to turn over the QE code was in violation of that Agreement. Second Am. Compl. ¶ 63. As a result,

---

*Meritor, Inc.*, 2019 WL 545263, at *4 (N.D. Miss. Feb. 11, 2019) (excluding expert testimony where expert's "methodology would produce a measure of damages unrecoverable under Mississippi law"); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, 2009 WL 10670877, at *2 (C.D. Cal. Aug. 18, 2009) (excluding expert testimony regarding lost profits where such damages were not recoverable as a matter of law under plaintiff's case theory).

7

damages must be determined as a result of the alleged breach and must be connected to the harm claimed to have been suffered. *PSI Res., LLC v. Lyster*, 2019 IL App (1st) 180025-U, ¶ 51 ("[B]reach of contract damages are limited to actual, measurable damages proximately resulting from the breach ….").

Malec's "enterprise value" calculation of the QE based on 2013 projections says absolutely nothing about the value of the QE program's code in 2017, 2018, 2019, or today. Malec openly concedes that he "did not compute" damages as of October 2017 when TU gave notice of termination, or April 2018 when the agreement terminated pursuant to its terms. Malec Tr. 68:11-14. Malec's decision to use 2013 projections to calculate a value as of 2014 without any attempt to connect the valuation to the alleged breach is fatal. *Gold v. Ziff Commc'ns Co.*, 322 Ill. App. 3d 32, 56-57 (Ill. App. Ct. 2001) (reversing damages verdict where expert "inappropriately valued [the company] on December 31, 1992, though there was no alleged breach on this date"); *see also Haddad v. Rav Bahamas, Ltd.*, 589 F. Supp. 2d 1302, 1307 (S.D. Fla. 2008) (similar).

### C. Malec Failed to Calculate Damage for Any Non-Contract Claims.

Malec also conceded that he calculated no value or damage that could be applicable to ERT's trade secret, defamation, slander of title, tortious interference, or deceptive trade practices claims. Because his hypothetical "enterprise value" is irrelevant to and disconnected from those tort claims, Malec's testimony cannot be used to prove any harm.

- **Trade Secret.** The terms of the Defend Trade Secrets Act permit recovery of monetary damages only where damages are "caused by the misappropriation of the trade secret." 18 U.S.C. § 1836(b)(3). Malec does not attempt to identify or value any trade secret, Malec Tr. 56:25-57:4, let alone calculate damages attributable to misappropriation. *See, e.g.*, *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 403 (6th Cir. 2013) (Plaintiff must "provide some demonstrable link between [alleged] misappropriation and [its] loss."); *Brightview Grp., LP v. Teeters*, 2021 WL 1238501, at *16-17 (D. Md. Mar. 29, 2021) (finding no evidence in support of an award of damages where plaintiff was unable to show monetary damages "caused by misappropriation" especially where the investment was "unprofitable" and rejecting valuation based on the "initial capital investment").

8

- ***Defamation and Slander of Title.*** Malec fails to identify any damages that result from any defamatory or slanderous statement by TU. Malec Tr. 57:5-19. This is fatal. *Ne. Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*, 916 N.E.2d 484, 488 (Ohio Ct. App. 2009) (holding plaintiff must quantify only damages that "***result from*** conduct of a person other than the defamer or the one defamed") (emphasis added); *Green v. Lemarr*, 744 N.E.2d 212, 224 (Ohio Ct. App. 2000) ("Slander of title is a tort action which may be 'brought against any one who falsely and maliciously defames the property … and thereby causes him some special pecuniary damage or loss.'").

- ***Tortious Interference.*** Malec makes no effort to connect his calculation of damages to any conduct purportedly relating to a breach or termination of a business relationship. *Chrvala v. Borden, Inc.*, 14 F. Supp. 2d 1013, 1023 (S.D. Ohio 1998). To the contrary, Malec testified he "didn't separately quantify any damages for tortious interference." Malec Tr. 57:20-22.

- ***Deceptive Trade Practices***. To prevail on an Ohio Deceptive Trade Practices Act claim, a plaintiff must prove "injur[y] ***as a result of*** the advertisement" that was purportedly false or misleading. Summ. J. Order at 21 (emphasis added); *see also Strama v. Allstate Ins.*, 2015-Ohio-2590, ¶ 53-55 (requiring "evidence in the record that [plaintiff] suffered actual damages as a result of the mailings"). There is no way to draw any connection between statements made by TU and Malec's calculation of damages. Malec Tr. 57:23-58:2.

Moreover, even if Malec *could* fabricate some link between his valuation and these claims, his damages method is independently inadmissible because it is unreliable, as discussed below.

## II.     EVERY STEP OF MALEC'S METHOD IS FLAWED AND UNRELIABLE.

Malec's damage model relies on a method that has been debunked in his field. Worse, Malec deviates from the method at every step. While each failure independently requires striking his opinions, in combination they reveal the utter emptiness of his analysis. *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 976 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) ("Like a house of cards, once those foundations are disproved, the whole analysis collapses.").

### A.     Malec's Venture Capital Approach is Pure Speculation.

The Venture Capital Approach ("VC Approach") on which Malec purports to rely is speculative and has already been rejected. Professor Damodaran, the only source Malec credits for the method, warns that the method "is ***flawed and should be replaced***"; its techniques "***do not work [and] yield unrealistic numbers***." Aswath Damodaran, *Valuing Young, Start-Up and Growth*

9

*Companies: Estimation Issues and Valuation Changes* (May 2009), at 2, https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/younggrowth.pdf (emphasis added). Malec does not dispute any of this. He even agrees with Damodaran's warning that the method encourages game playing. Malec Tr. 249:13-16. *Daubert* requires such speculative and unreliable opinions be excluded, and exclusion is particularly appropriate where the author of the expert's method concedes the method is speculative. *E.g.*, *MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 293 (S.D.N.Y. 2001) (excluding expert where article providing expert's methodology "recognize[d] the speculative nature of telecommunications company valuations").

### B. Malec Cherry-Picks Revenue Projections and Ignores Reality

Malec relies on the earliest, most unrealistic, and highest financial projections by ERT as the foundation for his analysis. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To be clear: these early 2013 projections are the only two pieces of record evidence on which Malec relies for his valuation. Strikingly, Malec admitted that ***nothing that happened with the QE after March 2014 factored into his method***. Malec Tr. 111:23-112:2. In doing so, Malec failed to consider, without any explanation, troves of evidence contradicting the early pitch-deck valuations. Specifically:

- **Actual revenues of the QE**. Malec did not consider any of the evidence about actual performance of the QE. Malec Tr. 111:23-112:2. The difference between Malec's valuation and actual revenues generated by the QE is off by a factor of almost two-thousand ($240,000 in actual revenue compared to nearly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮):

|  | *2015* | *2016* | *2017* | *2018* |
|---|---|---|---|---|
| *Actual Revenues[4]* | 0 | $80,000 | $160,000 | - |

---

[4]  Adams Dep. Ex. 112, attached as Exhibit 17.

| *Malec's Projected Revenues (Schedule 1)* | ███ | ███ | ███ | ███ |

- **Post January/February 2013 Projections**. Malec also did not consider any of the more recent value projections by TU or ERT, which were much closer in time to the breach for which he is purporting to measure damages.

- **Evidence of the QE's Failure**. Nor did he consider any evidence where both ERT and TU deponents discussed the failure of the QE to ever get off the ground, or its failure to come anywhere near the performance projected in those 2013 projections. These facts were not hard to come by; they were discussed repeatedly and at length in depositions Malec reviewed.

*Daubert* requires that expert valuations correspond to actual data. For example, in *MTX*, 132 F. Supp. 2d at 292, the court excluded an expert's valuation of a start-up company where the expert failed to incorporate "how much actual money was taken in [] via a true-up, [since it] renders his valuation unreliable and unfit for the jury's consideration."

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence" based only on the "*ipse dixit* of the expert" where there is "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In fact, the issue here is not whether the leap between Malec's reliance on projections from 2013 and the controverting actual revenues from 2017 is "too great"; the issue here is that Malec offers absolutely nothing to bridge that gap. This calls for exclusion. *See In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 738 (N.D. Ohio 2011), *aff'd sub nom. Rodrigues v. Baxter Healthcare Corp.*, 567 F. App'x 359, 361-362 (6th Cir. 2014) (excluding expert opinion based on "too great an analytical gap"); *Neal v. Second Sole of Youngstown, Inc.*, 2018 WL 1740140, at *4 n.50 (N.D. Ohio Apr. 11, 2018) (same).

Courts routinely exclude expert opinions that "demonstrate cherry-picking an isolated and self-serving data point rather than responding to the reality of the case." *Sheffield v. Int'l Paper*

11

*Co.*, 2020 WL 1882906, at *2 (W.D. Tenn. Feb. 26, 2020).[5] Failure to address contrary evidence while relying on cherry-picked projections requires exclusion. *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 533-36 (6th Cir. 2010) (excluding expert whose opinion was "unreliable" because it was "contradicted by evidence in the record" and based on expert's own assumptions); *Ok Yeon Yoon v. K-Ltd. Carrier, Ltd.*, 2020 WL 1031486, at *5 (N.D. Ohio Mar. 3, 2020) (excluding expert opinion where bases for the opinion "contradict the evidence" and were based on the expert's own assumptions). The law prevents such one-sided analyses from going to the jury because they would not hold up in the real world, outside the courtroom. *Kumho Tire Co.*, 526 U.S. at 152; *Galoski*, 2017 WL 2291431, at *2 (Nugent, J.). Malec's failure to confront the actual evidence requires exclusion here.

### C. Malec Uses a Growth Multiple Based on Irrelevant "Peer Companies"

Malec inflated his damage calculation by applying a growth multiple derived from supposed "peer companies." Malec makes this step up. Malec does not even have a need for the comparators' growth rates because he has no "specific citation" and cannot identify any textbooks that call for the use of these rates. Malec Tr. 227:23-228:10. Even if the VC approach required peer comparators' growth rates, the so-called "peer comparators" Malec used to project his estimated 2014 QE revenue to 2021 are nowhere close to peers of the QE. In reality, the QE had almost no growth during the four years the parties attempted to get it off the ground. Yet each of

---

[5] *Accord In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (expert opinion is unreliable if it "does not acknowledge or account for" contrary evidence and "ignore[s] a large amount of information that calls many aspects of the [plaintiffs'] theory into question"); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D.N.J. 2004) (expert opinion is "unacceptable" when it is based on a "highly filtered version of events"); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 142 (M.D. Pa. 2015) (excluding expert testimony where "the evidence suggests that Plaintiffs' experts actually chose certain of the highest data points that were available to them, regardless of their disjunction with reality").

12

Malec's comparator companies is more successful, publicly traded, acquired other businesses along the way, and offers more product lines or has business outside of insurance altogether.[6]

Malec also chose to measure these winning "peer companies" and their real-world growth in 2018, then apply that back to the hypothetical projections for the QE from 2014, while inexplicably ignoring the real world 2014-2018 performance of the QE. Such an "apples and oranges comparison simply cannot withstand scrutiny" under Rule 702. *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984); *Selectica, Inc. v. Novatus, Inc.*, 2015 WL 12843840, at *6 (M.D. Fla. Sept. 30, 2015) (excluding expert who included "larger, better-performing companies in its peer group" because such a "comparison is not apples to apples").

It is no surprise the peer comparators are self-serving and unrealistic. Malec admits he is not an expert in the insurance industry, or any market that is relevant here. Malec Tr. 249:22-250:2; 251:13-15. Instead, Malec relied on a document called "Expert Witness Primer" that was provided by ERT's counsel. *Id.* at 35:12-13. This document identified the relevant peer companies for Malec to use. *See* Malec Dep. Ex. 3, attached as Exhibit 18. Malec's notes show he adopted Plaintiff's handpicked comparators without any analysis. Malec Dep. Ex. 8, attached as Exhibit 19 (explaining MediaAlpha, QuinStreet, and EverQuote were simply "[s]elected as a comparable" with no explanation). This evinces zero criteria that Malec applied in selecting these "peer companies" and requires exclusion. *MTX*, 132 F. Supp. 2d at 292-93 (excluding valuation expert who relied, in part, on a list of comparator companies from counsel when there was "no indication that [counsel] was a source of accurate or reliable expert information"); *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) ("[Where] proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded ….").

---

[6] Malec Tr. 220:19-22; 213:4-15; 219:12-16; 221:7-14.

13

### D. Malec Has No Method or Basis for Selecting His Discount Rates.

Malec applies a "discount rate" which he uses to purport to account for the risk of failure of the QE. But neither the 70% rate that Malec applies to ERT's January 2013 projection, nor the 49.2% rate that he applies to ERT's February 2013 projection are grounded in any analysis. Malec readily conceded as much. Malec Tr. 188:3-7; 196:3-12. He also conceded that his made-up percentages have no bearing on what discount rates a venture capitalist might actually use. *Id*. at 189:2-7. Where an expert simply relies on valuation multiples "with no independent diligence as to the reasonableness of the numbers or their applicability to the circumstances of this case, this is disqualifying." *In re Corp. Res. Servs., Inc.*, 603 B.R. 888, 896–97 (Bankr. S.D.N.Y. 2019). Such baseless numbers "without any explanation or support for their calculation" constitute inadmissible "fudge factors." *Dow Corning Corp. v. Jie Xiao*, 2013 WL 992773, at *8 (E.D. Mich. Mar. 13, 2013).

### E. Malec Ignores Costs Required for the QE to Have any Value.

Malec's valuation also ignores that generating revenue with the QE would have required ERT to satisfy numerous obligations and costs, all of which Malec fails to account for. The Development Agreement was clear: if ERT ever monetized the QE after termination, ERT was obligated to pay back all development costs to TU. Ex. 8 at 7. Malec makes no attempt to account for these necessary costs. This artificially inflates Malec's calculation, which must be limited to "the amount needed to put the parties in the same position they would have been had the contract been performed" according to its terms. *Laff v. John O. Butler Co.*, 64 Ill. App. 3d 603, 619-20 (1978); *see also Rabideau v. Jessica's Corner 230, LLC*, 2017 IL App (3d) 160234-U, ¶ 34 ("Damages for breach of contract should not provide the aggrieved party with a windfall.").

Additionally, Malec assumes that ERT would capture the full value of the QE had it later monetized the code. The Development Agreement demonstrates why this assumption is

14

unreasonable: ERT depended on other parties to implement the QE, and thus instituted a profit-splitting and buyout structure that shared the upside liberally with its partners. Ex. 8 at 5-6. Malec makes no adjustments to account for this, inappropriately assuming that ERT would have retained the full value of the QE for itself, even though this was ***never contemplated by ERT at any time*** under the Development Agreement. *Id*. This, too, significantly inflates his damages estimates.

Finally, Malec's method also improperly assumes ERT would have earned the full value of the QE with no delay. In its sworn Interrogatory Responses, however, ERT acknowledged that ███████████████████████████████████████████████████████████████████████

███████████████████. 12/1/2021 ERT Interrogatory Responses No. 20 at Case B, attached as Exhibit 20. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████—that Malec nowhere accounts for in his enterprise valuation model. *Id.* at Cases A-B. Malec's failure to account for these necessary facts undermines the reliability of his opinion and fails to meet the requirements of *Daubert*. *See In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 2010 WL 1796334, at *29 (N.D. Ohio May 4, 2010).

## CONCLUSION

The numerous flaws described above go to the heart of Malec's method and analysis. The *Daubert* standard requires exclusion; cross-examination is insufficient. To the extent the Court is considering permitting Malec to testify at trial, at the very least, the Court should hold a pretrial *Daubert* hearing before allowing ERT to present the jury with his unreliable and irrelevant calculations.

| | |
|---|---|
| DATED:  June 7, 2022 | /s/ *Mark Premo-Hopkins* |
| | Mark Premo-Hopkins (IL ARDC No. 6293574) |
| | *Admitted Pro Hac Vice* |
| | James F. Hurst (IL ARDC No. 6202190) |
| | *Admitted Pro Hac Vice* |
| | KIRKLAND & ELLIS LLP |
| | 300 North LaSalle Street |
| | Chicago, IL 60654 |
| | Telephone:  312.862.5230 |
| | Facsmile:  312.862.2200 |
| | E-mail:  mark.premohopkins@kirkland.com |
| | james.hurst@kirkland.com |
| | |
| | Courtenay Y. Jalics (0077507) |
| | TUCKER ELLIS LLP |
| | 950 Main Avenue, Suite 1100 |
| | Cleveland, OH 44113 |
| | Telephone:  216.592.5000 |
| | Facsimile:  216.592.5009 |
| | E-mail:  courtenay.jalics@tuckerellis.com |
| | |
| | Tonya G. Newman (IL ARDC No. 6286958) |
| | *Admitted Pro Hac Vice* |
| | Kyle D. Rettberg (IL ARDC No. 6256572) |
| | *Admitted Pro Hac Vice* |
| | Lee Barrington Stark (IL ARDC No. 6336810) |
| | *Admitted Pro Hac Vice* |
| | NEAL GERBER & EISENBERG LLP |
| | 2 North LaSalle Street, Suite 1700 |
| | Chicago, IL 60602 |
| | Telephone:  312.269.2913 |
| | Facsimile:  312.429.3532 |
| | E-mail:  tnewman@nge.com |
| | krettberg@nge.com |
| | lstark@nge.com |
| | |
| | *Attorneys for Defendant TransUnion LLC* |

16

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, a copy of the foregoing *TransUnion's Memorandum in Support of Motion to Exclude Dr. Andrew Malec* was filed with the Court via the Court's electronic filing system. Notice of the court filing will be served on all counsel of record via the Court's ECF system.

/s/ Mark Premo-Hopkins
Mark Premo-Hopkins