UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DISTRICT

| | | |
|---|---|---|
| Endless River Technologies LLC, | ) | Case No. 1:18-cv-00936 |
| | ) | |
| Plaintiff, | ) | Judge Donald C. Nugent |
| | ) | |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| Trans Union LLC, | ) | |
| | ) | |
| Defendant. | ) | |

# ENDLESS RIVER TECHNOLOGIES LLC'S OPPOSITION TO MOTION TO EXCLUDE DR. ANDREW MALEC

{10474151:2 }

**INTRODUCTION**

TransUnion asks this Court to exclude the opinion of Endless River's valuation expert, Dr. Andrew Malec, Ph.D., even though he used the most commonly applied and accepted methodology for valuing startup companies. TransUnion does not come close to demonstrating that Dr. Malec's opinion is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Instead, TransUnion misstates governing law, misrepresents Dr. Malec's methodology, and misapplies the *Daubert* standard. Ultimately, its criticisms—at best—go to the weight that the jury should give Dr. Malec's opinion, not its admissibility.

To determine the value of the Quote Exchange, Dr. Malec—a valuation expert with more than two decades experience—employed the venture capital method that originated at the Harvard Business School in 1987 and continues to be the preeminent valuation methodology to assess startup ventures. In so doing, Dr. Malec reviewed hundreds of documents (including every deposition transcript and exhibit in this case), conducted comprehensive interviews of Endless River's principals (all of whom are insurance industry experts), and performed independent research of the relevant market. The result of that work was a valuation as of the date of the report that is consistent with accepted scientific principles and valuation best practices.

While TransUnion clearly does not agree with Dr. Malec's conclusions and certain of his judgment calls, it has no basis to establish that the foundation of his testimony is somehow unreliable. This Court should therefore deny the motion to exclude.

**DR. MALEC'S QUALIFICATIONS AND OPINION**

I. **DR. MALEC'S CREDENTIALS AND EXPERIENCE**

Dr. Malec is a Partner and Managing Director at O'Keefe and Associates Consulting, LLC, a financial and strategic advisory firm. (Malec Rep. ¶ 1.) He is the head of O'Keefe's Intellectual

Property Practice Group and is also O'Keefe's Chief Economist. (*Id*. ¶ 2.) Dr. Malec has over 20 years of experience providing economic damages quantification and valuation opinions across a broad range of industries. (*Id*.) He holds a Ph.D. in Economics from Wayne State University and a Bachelor of Arts degree in Economics from the University of Michigan. (*Id*. ¶ 4.) He is an editorial board member of the Value Examiner (a publication of the National Association of Certified Valuators and Analysts) and a member of several professional organizations relating to economics and valuation. (*Id*.) TransUnion does not dispute that Dr. Malec is qualified generally to serve as an expert witness or to provide a valuation of a company.

## II. DR. MALEC VALUES QUOTE EXCHANGE USING THE MOST COMMON METHOD FOR VALUING STARTUP COMPANIES

To determine Endless River's economic damages, Dr. Malec performed a valuation of Quote Exchange (Malec Rep. ¶ 9.) Before conducting that valuation of Quote Exchange, Dr. Malec reviewed and considered a variety of materials, including pleadings, every deposition transcript and exhibit in the case, academic literature regarding the valuation of startup companies, financial information for comparable companies in the industry, and business plans, projections, and financials for Quote Exchange. (*Id*., Ex. C.) Dr. Malec also conducted interviews of Endless River's principals, each of whom is an insurance expert with years of experience in the insurance technology industry. (Excerpts from Transcript of February 25, 2022 Deposition of Andrew Malec, Ph.D. ("Malec Tr."), attached as <u>Exhibit A</u>, 42:3-11; 44:18-45:14.)

Because Quote Exchange was a new company with no significant financial history, Dr. Malec valued Quote Exchange using a method known as the Venture Capital Approach ("VC Approach"). (Malec Rep. ¶ 32.) The VC Approach is the most common approach that valuators use to value young firms. (*Id*. ¶ 32 and n. 26.) The VC Approach has three steps. First, the valuator

estimates the business's expected revenues, typically over a two to five-year time horizon. (Malec Rep. ¶ 32.) Second, the valuator assesses the value of the business at the end of the forecast period by multiplying the expected revenue by the valuation multiple at which comparable, publicly traded companies trade at in the public market. (*Id.*) Finally, the valuator discounts the estimated value at the end of the forecast period back at a targeted rate of return set high enough to capture the perceived risk of the business, as well as the likelihood that the firm will not survive. (*Id.*) Because many startups fail, the discount rate is high, typically between 50% and 70%. (*Id.*)

Dr. Malec applied the generally accepted valuation practices of the VC Approach in valuing Quote Exchange. He began with the financial projections for Quote Exchange that Endless River prepared on January 31, 2013, and then revised on February 12, 2013, which were the only operative projections upon which both TransUnion and Endless River agreed, and were thus the best reflection of the parties' expectations of how Quote Exchange would perform. (*Id.* ¶ 33.) Dr. Malec calculated the expected revenue of Quote Exchange over a five-year time horizon, consistent with the term of the parties' Agreement and the proposed buyout schedule set forth in the Agreement. (Malec Rep. ¶ 33.)

Dr. Malec then determined the value of Quote Exchange in year five by multiplying its expected revenue in that year by the average revenue multiple that existed as of December 31, 2018 for comparable, publicly traded companies whose businesses were similar to Quote Exchange. (*Id.*) Dr. Malec selected the comparable companies based on both his independent analysis and his discussions with Endless River's principals, who possess a wealth of knowledge about the market. (*Id.* ¶ 39.) Those four companies were MediaAlpha, Inc., QuinStreet, Inc., EverQuote, Inc., and Digital Media Solutions, Inc. (*Id.* ¶ 40.)

Third, Dr. Malec discounted Quote Exchange's estimated value at the end of the forecast period by a targeted rate of return. (*Id*. ¶ 33.) Because Quote Exchange was pre-revenue, Dr. Malec assumed that an investor would target a rate of return at the high end of the typical range to account for the risk that Quote Exchange would not succeed or would not achieve the expected cash flows. (*Id*. ¶ 43.) Accordingly, Dr. Malec used a 70% rate of return to discount the expected value of the Quote Exchange program, the highest discount rate supported by the academic literature. (*Id*.) Finally, Dr. Malec applied a growth rate to bring the valuation current through the date of the report based on the actual, historical annual growth rates of the comparable, publicly traded companies from 2014 to 2020, as well as the median revenue analyst estimates for those companies for 2021. (*Id*. ¶ 44.) Application of the VC Approach generated a value of ▮▮▮▮▮▮ for Quote Exchange as of December 1, 2021, based on the original, January 31, 2013 projections. (*Id*.)

Dr. Malec also calculated the value of Quote Exchange based on the subsequent, February 12, 2013 projections, which were more conservative than the original projections. (*Id*. ¶ 45.) Because the revenue projections were more conservative, Dr. Malec assumed that an investor would target a lower rate of return, given the higher likelihood of hitting the forecast. (*Id*.) As a result, Dr. Malec calculated and applied a discount rate of 49.2%. (*Id*.) Dr. Malec then once again applied a growth rate based on comparable companies, resulting in a total value for Quote Exchange of ▮▮▮▮▮▮ under the revised projections. (*Id*. ¶ 46.)

## THE *DAUBERT* STANDARD

Federal Rule of Evidence 702 provides than a witness qualified as an expert "by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" so long as (1) the expert's knowledge will help the trier of fact understand the evidence or determine a fact at issue; (2) the testimony is based on sufficient facts or data; (3) the testimony

{10474151:2}  4

stems from "reliable principles and methods"; and (4) the expert has reliably applied those principles and methods to the facts of the case.

"District courts are the 'gatekeep[ers]' of expert testimony." *United States v. Mallory*, 902 F.3d 584, 592 (6th Cir. 2018) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). "To determine the testimony's reliability, the court does not 'determine whether [the opinion] is correct, but rather [determines] whether it rests upon a reliable foundation." *United States v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517,528-29 (6th Cir. 2008)). A trial court "only determines the admissibility of expert evidence; the jury determines its weight." *Id*. at 394. "The court's focus is solely on principles and methodology, not on the conclusions that they generate." *Id*. (quotations omitted).

"The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof." *United States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017). Accordingly, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530. Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[A]s long as there is a reasonable factual basis for the expert's opinion, any objections to his testimony go to its weight and not its admissibility." *Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 8 (6th Cir. 2021).

## ARGUMENT

Each of TransUnion's arguments for excluding Dr. Malec lacks merit because his methodology was appropriate and he had a reasonable factual basis for his conclusions:

- TransUnion's assertion that Endless River cannot recover lost profits is directly contrary to settled law and this Court's summary judgment ruling;

- TransUnion's argument that Dr. Malec did not calculate contract damages as of the date of TransUnion's breach fundamentally misapprehends Dr. Malec's methodology and ignores his repeated testimony to the contrary;

- TransUnion's criticism of Dr. Malec for not calculating damages on a tort-by-tort basis is irrelevant because the damages for each tort is the same: *i.e.*, the entire value of Quote Exchange;

- Contrary to TransUnion's assertions, the VC Approach has not been abandoned—it remains the single most common method for valuing startup companies;

- Dr. Malec did not cherry-pick data but rather considered a wealth of favorable and unfavorable information about Quote Exchange;

- Dr. Malec's chosen peer companies were reasonable and appropriate;

- Dr. Malec's discount rates were appropriate and based on academic literature and economic principles; and

- The costs TransUnion claims Dr. Malec should have accounted for are purely speculative.

And even if any of TransUnion's criticisms were to have merit (which they do not), those criticisms would go to weight rather than admissibility.

**I.   DR. MALEC'S VALUATION IS CONSISTENT WITH BOTH THE PARTIES' CONTRACT AND ILLINOIS LAW**

TransUnion first argues that this Court should exclude Dr. Malec's opinion because it believes the Agreement's limitation of liability provision and Illinois law preclude Endless River from recovering lost profits. Notably, TransUnion *already raised* unsuccessfully these challenges to Endless River's claimed damages in its motion for summary judgment. This Court should again reject TransUnion's arguments, which misread both the Agreement and Illinois law.

Under Illinois law, "limitation of damages clauses are not favored and must be strictly construed against the benefitting party . . . ." *Aculocity, LLC v. Force Marketing Holdings, LLC*, No. 17-CV-2868, 2019 WL 764040, at *2 (N.D. Ill. Feb. 21, 2019). Here, the limitation of liability provision provides that neither party may recover consequential damages "arising out of the

performance of this contract." (Agreement § 8.2.) So—as detailed in Endless River's opposition to TransUnion's motion for partial summary judgment—Endless River has a right to recover: (1) direct damages arising out of TransUnion's performance of the Agreement; (2) direct damages not arising out of TransUnion's performance of the Agreement; and (3) indirect damages not arising out of TransUnion's performance of the Agreement. Endless River only sought these unaffected damages in its Second Amended Complaint, and those are the only damages about which Dr. Malec opines. *See, e.g.*, *Aculocity*, 2019 WL 764040, at *2 (holding that lost profits are direct damages under Illinois law as long as they are foreseeable); *see also Westlake Fin. Group, Inc. v. CDH-Deinor Health Sys.*, 25 N.E.3d 1166, 1175 (App. Ct. Ill. 2015) (same).

TransUnion next argues that this Court should preclude Dr. Malec's opinion because Illinois law prohibits new businesses from recovering lost profits. That is wrong: "[t]here is no inviolate rule that a new business can *never* prove lost profits." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 408 (Ill. 2006) (emphasis in original). Rather, "in some cases, 'courts have found that the rule that a new business' profits are too speculative did not fit the circumstances before them.'" *Id*. (quoting *Milex Prods, Inc. v. Alra Labs, Inc*., 603 N.E.2d 1226, 1237 (App. Ct. Ill. 1992)). Where, as here, an expert bases his or her opinion about lost profits on actual marketplace conditions and "authoritative sources," the new business rule does not apply, even where the business is, in fact, new. *Milex*, 603 N.E.2d at 1236.

## II. DR. MALEC'S OPINION IS NOT "UNTETHERED" FROM ENDLESS RIVER'S CLAIMS

TransUnion next argues that this Court should exclude Dr. Malec's opinion because he supposedly calculated the value of Quote Exchange as of 2014, rather than October 2017, the date of TransUnion's breach. That is simply untrue, as Dr. Malec repeatedly testified during his deposition. Rather, he used the 2013 and 2014 projections to calculate Quote Exchange's value *as*

*of the date of the breach* (*i.e.*, October 2017), then carried that amount forward to the date of his report to determine Endless River's damages. (Malec Tr. 86:23-87:19; *see also id*. at 87:24-88:9; 179:11-20; 182:8-25.)[1] Because Dr. Malec valued Quote Exchange as of the relevant date under generally accepted economic principles, the cases TransUnion cites are inapposite. *See Gold v. Ziff Comms Co*., 748 N.E.2d 198, 56-57 (Ct. App. Ill. 2001) (applying New York law and excluding opinion where expert valued company as of date four years after alleged breach); *Haddad v. Rav Bahamas, Ltd*., 589 F. Supp. 2d 1302, 1307 (S.D. Fla. 2008) (excluding expert where opinion valued damages as of three years after breach).

### III. DR. MALEC'S OPINION IS NOT SUBJECT TO EXCLUSION BECAUSE HE DID NOT CALCULATE DAMAGES ON A TORT-BY-TORT BASIS

TransUnion also faults Dr. Malec (at 8) for supposedly "conceding" that he calculated "no value or damage" that could be attributed to Endless River's trade secret, defamation, slander of title, tortious interference, or deceptive trade practices claims. That is not what Dr. Malec said. Instead, he testified that he did not *separately* calculate damages for those claims. (Malec Tr. at 56:3-58:2.) But as TransUnion itself acknowledges, the damages for each claim is the damage that resulted from TransUnion's tortious conduct. (Memo at 8-9.) Here, the damage resulting from each tort was the same: Endless River's complete inability to monetize Quote Exchange. There was thus no reason for Dr. Malec to separately calculate damages tort-by-tort.

### IV. DR. MALEC'S OPINION IS RELIABLE, ADMISSIBLE, AND BASED ON COMMONLY ACCEPTED METHODOLOGIES FOR VALUING START-UP COMPANIES

#### A. The VC Approach is the Most Commonly Used Approach to Value Start-Ups

TransUnion confuses academic colloquy about the best approach to valuation with the

---

[1] *See also* Brigham, Eugene and Michael Ehrhardt (2008). <u>Financial Management: Theory and Practice</u>, 12th Edition, Thomson Higher Education, p. 39.

{10474151:2}                                    8

undeniable acceptance of the VC Approach as widely accepted among valuation professionals.[2] Indeed, while Professor Aswath Damodaran criticizes the VC Approach, even he concedes that the VC Approach is the most "widely used" and "the most common approach used to value young firms…."[3] And a 2020 literature review published in International Business Research (a peer-reviewed academic journal) recognized the VC Approach as the state of the art and a "commonly used method to assess a startup's value."[4] Thus, far from "already be[ing] rejected" as TransUnion claims (at 9), the VC Approach is the predominant approach in the field and is the product of reliable scientific methods. TransUnion failed to cite a single case from *any* court rejecting the VC Approach (and Endless River is aware of none)—the only federal decision discussing the VC Approach accepted it as an appropriate valuation methodology. *See In re Green Field Energy Servs., Inc*., 594 B.R. 239, 278 (Bankr. D. Del. 2018) (expert witness used a venture capital approach to value startup company for purposes of calculating damages). Accordingly, TransUnion has no basis to exclude Dr. Malec because of his use of the well-accepted and state-of-the-art VC Approach.

### B. Dr. Malec did not "Cherry-Pick" Relevant Data

TransUnion next accuses Dr. Malec (at 10) of "cherry-picking" revenue projections and "ignoring reality" because Dr. Malec used revenue projections from 2013 and 2014—when

---

[2] *See* William Sahlman (2009). "A Method for Valuing High-Risk, Long-Term Investments, The "Venture Capital Method," *Harvard Business School* (calling the VC Method a method that has proved useful in valuing investments that are characterized by negative early cash flows or earnings); Damiano Montani, Daniele Gervasio & Andrea Pulcini (2020). "Startup Company Valuation: The State of Art and Future Trends," *International Business Research*; Vol. 13, No. 9 (noting that the VC Method is a generally accepted method to value start-up companies); Sivitska, Y. (2018). "Features of Valuation of Startup Companies," DOI 10.30838/ P.ES.2224.240418.163.60 (noting that the VC Approach is widely used and calling it a useful method for establishing the valuation of a pre-revenue start-up venture).

[3] *See* Aswath Damodaran, *Valuing Young, Start-up and Growth Companies: Estimation Issues and Valuation Challenges* (May 2009), 2, 14, *available at* https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/younggrowth.pdf (last accessed June 17, 2022).

[4] Montani, *et al.*, pp. 34, 40.

{10474151:2} 9

Endless River and TransUnion agreed to enter into the Agreement—to determine the value of Quote Exchange as of the date of Dr. Malec's report. But Dr. Malec readily explained his reason for using those projections: they were the projections in place during the relevant time frame and are the best reflection of the expectations of both of the parties of the potential of Quote Exchange. (Malec Tr. 62:3-13; 80:20-81:15.)

TransUnion also accuses Dr. Malec (at 10) of "fail[ing] to consider, without any explanation" subsequent projections and Quote Exchange's revenue performance before TransUnion terminated the project. But Dr. Malec *did* consider all available data. (Malec Tr. 136:1-13.) However, as he testified, actual results "ha[ve] nothing to do with the valuation in terms of what a value of an asset is worth." (Malec Tr. 108:12-16; 108:24-109:4; *see also id*. at 142:19-143:2 ("[j]ust because an actual number doesn't equal what the projected number us, doesn't mean you should look at the actual numbers to determine value"). Rather, as Dr. Malec testified: "like Professor Damodaran even states . . .when you have an early stage company, the historics, you don't look at them, and you don't look at them because it's one where you want to know what the expectation is, because it's all about the growth at that point . . ." (Malec Tr. 109:25-110:10.) Dr. Malec's decision not to rely heavily on Quote Exchange's actual revenue performance was reasonable and consistent with accepted valuation principles.

TransUnion's case cites are inapposite. In *MTX Communications Corp. v. LDDS/WorldCom, Inc*., 132 F. Supp. 2d 289 (S.D.N.Y. 2001), the expert "candidly acknowledge[d] that he did not review MTX's profit/loss statements or balance sheets, statement of operations or whether the bills send out to MTX customers were actually paid." *Id*. 292. Similarly, in *In re Heparin Prods Liability Litig*., 803 F. Supp. 2d 712 (N.D. Ohio 2011), the expert offered a theory on the likelihood that a drug caused sepsis, but there had been "no study" looking

at that interaction, the expert had conducted no experiments, and she "present[ed] nothing that would link" her theory to real world effects. *Id*. at 738. In *Sheffield v. International Paper Co*., No. 180cv-2701, 2020 WL 1882906 (W.D. Tenn. Feb. 26, 2020), the expert "d[id] not explain why his methodology is valid or why his conclusions are neither arbitrary nor contrary to the body of data provided in this case." *Id*. at *2; *see also Rose v. Truck Centers, Inc*., 388 F. App'x 528, 533-36 (6th Cir. 2010) (expert conducted no testing to determine what caused accident and could identify no tests by anyone else demonstrating the validity of his theory); *Ok Yeon Yoon v. K-Ltd. Carrier, Ltd*., No. 17-cv-2517, 2020 WL 1031486, at *5 (N.D. Ohio Mar. 3, 2020) (doctor cherry-picked drug tests, ignoring test showing that individual did not have drug in system at time of death).

Here, Dr. Malec explained the basis for his use of the 2013 projections and how he carried those forward to the date of his report. His choice was not arbitrary, and there was no ignoring of any data. If TransUnion disagrees with Dr. Malec's approach, it can cross examine him on it—but it does not provide them with a basis to exclude the opinion.

### C. Dr. Malec Applied a Reasonable Growth Rate

TransUnion next faults Dr. Malec for applying a growth multiple derived from peer companies, claiming that Dr. Malec "makes this step up." (Memo at 12.) But it is a central tenet of economics that the value of an investment will grow based on its expected rate of return.[5] This rate, when applied to the cash flow stream of a company, will give an estimate of the company's

---

[5] Brigham, Eugene and Michael Ehrhardt (2008). *Financial Management: Theory and Practice*, 12th Edition, Thomson Higher Education, p. 39.
Jordan, Bradford D., Thomas W. Miller, and Steven D. Dolvin, CFA. *Fundamentals of Investments: Valuation and Management*, Sixth Edition, McGraw-Hill Irwin, p. 302.

{10474151:2} 11

value.[6] Further, this rate is market driven (*i.e.*, it is the competitive rate of return in the market on a comparable investment).[7]

Again, TransUnion's disagreement over the growth rate is not a basis for exclusion. "Reliability 'is primarily a question of the validity of the methodology employed by the expert, not the quality of the data used in applying the methodology or the conclusions produced.'" *Crouch v. John Jewell Aircraft, Inc.*, No. 3:07-cv-638, 2016 WL 157464, at *21 (W.D. Ky. Jan. 12, 2016) (quoting *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013)). As a result, "trial judges should not 'assess the quality of the data inputs [experts] select[] in employing the growth rate extrapolation methodology,' for such issues concern weight and are best left to the jury." *Id.* (quoting *Manpower*, 732 F.3d at 803); *see also Somotext Corp. v. Zoove, Inc.*, No. 16-cv-01370, 2020 WL 533006, at *9 (N.D. Cal. Feb. 3, 2020) ("the source of [the expert's] net growth rates goes to the weight of his testimony, not to its admissibility").

TransUnion next claims (at 13) that this Court should exclude Dr. Malec's opinion because the chosen peer companies are successful, publicly traded companies while Quote Exchange had middling revenues. But that is precisely what the VC Approach instructs a valuator to do. As Professor Damodaran notes, step two of the VC Approach involves multiplying the revenues at the end of the forecast period by "the revenue multiple at which publicly traded firms trade at to arrive at an estimate of the value of the entire business . . . ." (Damodaran at 14.)

TransUnion also tries to bolster its argument by misrepresenting Dr. Malec's work. It claims (at 13) that Dr. Malec "adopted [Endless River's] handpicked comparators without any analysis." As Dr. Malec testified, however, he did nothing of the sort. Rather, he soliticed the views

---

[6] Hitchner, James R. (2011). *Financial Valuation*, Third Edition, John Wiley & Sons, Inc., p. 183.
[7] *Id.*, p. 182.

{10474151:2} 12

of Endless River's principals—all of whom have extensive experience in the insurance industry—regarding potential comparable companies. (Malec Tr. 209:11-25.) Dr. Malec then investigated each of those companies, as well as other companies that Endless River had not identified. As a result of that process, Dr. Malec selected four comparable companies: MediaAlpha, QuinStreet, EverQuote, and Digital Media Solutions, a company that Dr. Malec identified entirely on his own. (*Id*. at 209:11-211:10.) For that reason, TransUnion's citation to *In re Corporate Resource Services, Inc.*, 603 B.R. 888 (Bankr. S.D.N.Y. 2019), is inapposite. That expert "relied exclusively on EBITDA multiples taken from an article prepared by others," with "no independent diligence as to the reasonableness of the numbers or their applicability to the circumstances of this case." *Id*. at 896.

Notably, TransUnion does not offer a *single* comparable company—either failed or successful—that it believes Dr. Malec should have included instead. Rather, it merely asserts that Dr. Malec's comparable companies set is not a perfect fit. But as the court noted in *Brown v. Brewer*, 2010 WL 2472182 (C.D. Cal. June 17, 2010), a comparable companies analysis "urges the selection of as broad a base of comparative companies *as is reasonably possible*." *Id*. at *31 (emphasis in original) (refusing to exclude a comparable companies analysis "simply because Defendants dislike [the expert's] conclusion that the only guideline companies left standing in the final analysis were Google and Yahoo!"). Ultimately, TransUnion's argument is "essentially a disagreement over how [Dr. Malec] chose [his] comparable companies." *Defrees v. Kirkland*, No. 11-cv-4272, 2016 WL 11744285, at *4 (C.D. Cal. Dec. 13, 2016). That argument "goes to the weight of [Dr. Malec's] testimony and report, not to its admissibility." *Id*.

### D. Dr. Malec Applied Reasonable and Appropriate Discount Rates

TransUnion next argues that Dr. Malec's opinion is fundamentally flawed because the discount rate he chose is purportedly insufficient to account for the risk that Quote Exchange would fail. "The choice of a discount rate is not a purely mechanical calculation, but rather is a decision that requires a number of subjective judgments." *Jack Tyler Eng'g Co., Inc. v. Colfax*, No. 10-02373, 2013 WL 1500510, at *3 (W.D. Tenn. Apr. 10, 2013) (citation and quotations omitted).

Here, Dr. Malec applied a 70% discount rate. That discount rate comes directly from the VC Approach. Indeed, it is the *highest* discount rate that the VC Approach contemplates. (*See* Damodaran at 15) (noting that the VC Approach calls for discount rates between 50% and 70%.) TransUnion nonetheless argues (at 14) that Dr. Malec's discount rate is not grounded in any analysis. That argument appears to be nothing but a rehash of TransUnion's argument that the VC Approach is not reliable, which this Court should reject for the reasons discussed above.

This Court should also reject TransUnion's argument that its disagreement with Dr. Malec's discount rate is a basis for excluding his opinion. To the contrary, courts have consistently held that disagreements over discount rates go to weight, not admissibility. *See Colfax*, 2013 WL 1500510, at *3 ("Whether [the expert's] discount factor analysis incorrectly excludes additional considerations bears on the weight of his analysis, but not its admissibility"); *Swierczynski v. Arnold Foods Co., Inc.*, 265 F. Supp. 2d 802, 809-10 (E.D. Mich. 2003) (holding that challenge to appropriateness of discount rate went to weight, rather than admissibility); *Lary v. Boston Sci. Corp.*, No. 11-cv-23820, 2014 WL 7152769, at *13 (S.D. Fla. Dec. 15, 2014) (same); *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019) (holding that expert's "application of the discount rate is . . . an issue of weight, not admissibility") TransUnion is free to cross-examine Dr. Malec on the appropriateness of his discount rate.

E. **Any Future Expenses Related to Quote Exchange are Highly Speculative**

Finally, TransUnion argues (at 14) that Dr. Malec ignores costs that it believes Endless River would have needed to incur before Quote Exchange had value. First, TransUnion claims that Dr. Malec disregarded Endless River's obligation to repay TransUnion's development costs from future Quote Exchange revenues over a three-year period. (Agreement, Phase III.) That three-year period has already passed, so Dr. Malec properly excluded any repayment of development costs in his analysis.

TransUnion also argues that Dr. Malec should have assumed Endless River would not have captured all the value of Quote Exchange if TransUnion had turned over the source code as the Agreement required it to do. (Memo at 14-15.) But the terms of any arrangement Endless River may have struck with a potential partner are wholly unclear, as TransUnion made sure to shut those discussions down before they got anywhere. Similarly, any other future development costs Endless River may incur are pure speculation. Regardless, as with TransUnion's other challenges, these criticisms do not go to the question of whether Dr. Malec applied techniques that are accepted in the scientific community. They go to whether Dr. Malec's ultimate damages number is correct. That is an issue for the trier of fact, not a basis to exclude Dr. Malec's opinion in its entirety.

## CONCLUSION

For the foregoing reasons, this Court should deny TransUnion's motion to exclude the opinion and testimony of Dr. Malec.

Dated: June 21, 2022              /s/ Stephen J. Rosenfeld
                                                   Stephen J. Rosenfeld (IL 6216769)
                                                   *srosenfeld@mcdonaldhopkins.com*
                                                   MCDONALD HOPKINS LLC
                                                   300 North LaSalle, Suite 1400
                                                   Chicago, IL 60654
                                                   Telephone: (312) 280-0111

                                                   David B. Cupar (OH 0071622)
                                                   *dcupar@mcdonaldhopkins.com*
                                                   Mark J. Masterson (OH 0086395)
                                                   *mmasterson@mcdonaldhopkins.com*
                                                   MCDONALD HOPKINS LLC
                                                   600 Superior Avenue, East, Ste. 2100
                                                   Cleveland, Ohio 44114
                                                   t 216.348.5400 │ f 216.348.5474

                                                   *Counsel for Endless River Technologies LLC*

{10474151:2 }