UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DISTRICT

| | | |
|---|---|---|
| Endless River Technologies LLC, | ) | Case No. 1:18-cv-00936 |
| | ) | |
| Plaintiff, | ) | Judge Donald C. Nugent |
| | ) | |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| Trans Union LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ENDLESS RIVER TECHNOLOGIES LLC'S MOTION TO STRIKE OPINIONS OF THOMAS C. SHRIVER

Plaintiff Endless River Technologies LLC ("Endless River") hereby moves to strike certain portions of the expert report of Defendant Trans Union LLC's ("Trans Union") insurance industry expert, Thomas C. Shriver, and to preclude Shriver from offering certain opinions at trial. A memorandum in support follows.

{10571755: }

## <u>MEMORANDUM OF LAW IN SUPPORT OF ENDLESS RIVER TECHNOLOGIES LLC'S MOTION TO STRIKE OPINIONS OF THOMAS C. SHRIVER</u>

This Court should exercise its essential gatekeeping function under *Daubert v. Merrell Dow Pharmaceuticals, Inc*. to exclude much of the testimony of Trans Union's insurance industry expert, Thomas C. Shriver. Expert testimony is admissible only if, among other things, the expert testifies on matters within the scope of his or her expertise, explains how that expertise informs the expert's opinion, and refrains from simply echoing his or her client's view of events. Shriver fails on all three counts.

Shriver testified that Trans Union retained him as an expert witness to "explain the market factors and competitive landscape" surrounding Quote Exchange and "contextualize" the events and issues that occurred "from an industry perspective." If Shriver had actually fulfilled that assignment, it might serve as the proper basis for expert testimony. But, with limited exceptions, that is *not* what Shriver did. Instead, his report primarily serves to parrot Trans Union's version of events dressed up as an expert opinion. He supports his "opinion" with nearly 90 cites to the factual record in fewer than 50 paragraphs. By contrast, he references outside sources on only a handful of occasions and freely admits that one of those sources does not support the proposition for which he has cited it. Under settled law, a purported opinion should be excluded where, as here, it is merely a vehicle for a party to give factual testimony the imprimatur of an expert.

Most of Shriver's opinions should also be excluded for the related reason that Shriver has not explained how his experience in the industry informed the opinions he is offering. Experts, even ones qualified by experience rather than scientific knowledge, must link their conclusions to their expertise. Shriver instead asks this Court to accept his *ipse dixit*—in reality, the views of Trans Union's witnesses—on a variety of topics, including why large carriers were not interested

in Quote Exchange, why Quote Exchange experienced development issues, and why Quote Exchange's revenue performance was disappointing.

Finally, Shriver offers a rebuttal opinion that he is, by his own admission, not qualified to give. He purports to critique the opinion of Endless River's damages expert, Dr. Andrew Malec. But Shriver is not a valuation expert, has no training in valuation methodology, and is not even familiar with the valuation methodology that Dr. Malec employed. While Shriver is free to address Dr. Malec's factual assumptions, he has no basis to criticize Dr. Malec's methodology or conclusions.

That said, in isolated instances Shriver does arguably adhere to the requirements governing expert testimony, including his belief that the market had become competitive and that large carriers were more focused on other concerns than unsold web-based leads. While Endless River strongly disagrees with Shriver's opinions on those issues and will be prepared to cross-examine him vigorously at trial, it does not seek to exclude them through this motion. But the remainder of Shriver's report simply does not pass *Daubert*'s muster. This Court should thus exercise its crucial gatekeeping function and preclude Shriver from offering the opinions expressed in paragraphs 41-44, 46, 48-64, and 69-98 of his report. This Court should also preclude Shriver from offering any testimony regarding the reasonableness of Dr. Malec's valuation or valuation methodology.

<u>**SHRIVER'S QUALIFICATIONS AND REPORT**</u>

I.  **SHRIVER'S BACKGROUND AND EXPEIENCE**

Shriver is a long-time insurance executive who also runs a consulting company, Par 5 Strategic Consulting, LLC. (Expert Report of Thomas C. Shriver ("Shriver Rep.") attached hereto as Exhibit A, ¶¶ 1-7.) Shriver is not a valuation expert and has never held himself out as a valuation expert. (Transcript of Deposition of Thomas C. Shriver ("Shriver Tr."), attached hereto as Exhibit

B, 10:16-21.) He has never been qualified in any court as a market valuation expert, and he has never taught a course in valuation. (Shriver Tr. 149:5-14.)

There are different types of online insurance businesses. One type of business is a lead generation business, which sells packages of leads to insurance companies. (Shriver Tr. 13:23-14:6.) Shriver's experience is primarily in lead generation companies and lead analysis companies. (*Id*. at 13:23-14:6; 15:4-16:1; 19:12-25; 21:13-22:13; 24:12-19.). Quote Exchange, by contrast, is an enhanced data marketplace. (*Id*. at 14:15-23.). Shriver acknowledges that there is a distinction between a data marketplace like Quote Exchange and a lead generation company. (Shriver Tr. 14:25-15:3.)

Shriver testified that "for the most part," he was not familiar with Quote Exchange until Trans Union's lawyers contacted him to give an opinion in this matter. (*Id*. at 95:12-17.) He is also not familiar with the "actual functionality" of Quote Exchange. (Shriver Tr. 42:18-22.) He similarly is not familiar with the "day-to-day workings" of the Quote Exchange development process and did not do any analysis of whether Trans Union or Endless River executed on their duties with respect to Quote Exchange. (*Id*. at 50:11-51:5.)

## II.   SHRIVER'S EXPERT REPORT

In his report, Shriver states that Trans Union retained him to: "(1) explain the market factors and competitive landscape" at the time the Quote Exchange project began and through its life; (2) "contextualize the events and issues" surrounding Quote Exchange; and (3) review and comment on the report of Endless River's damages expert, Dr. Andrew Malec. (Shriver Rep. ¶ 9.)

Shriver purports to offer four separate opinions:

1.  Endless River and Trans Union "made several forward-looking assumptions related to the QE that did not turn out to match the reality of the industry," which allegedly "led them to overestimate the likelihood of success" of Quote Exchange. (Shriver Rep. ¶ 12);

2.  The parties' plan for Quote Exchange "incorrectly assumed that large, nationally recognized carriers would adopt [Quote Exchange]" and miscalculated the level of competitive pressure it would face, resulting in "difficulties throughout its inception, development, and launch." (Shriver Rep. ¶ 13);

3.  Given the competitive landscape and Quote Exchange's performance, it was reasonable for Trans Union to stop investing in Quote Exchang0 Shriver Rep. ¶ 14); and

4.  Dr. Malec's valuation of Quote Exchange is unreliable and inaccurate. (Shriver Rep. ¶ 15.)

Shriver expands on each of those opinions in Sections Four through Seven of his report. Sections Four through Six detail his affirmative opinions. Those sections consist primarily of extensive citations to the factual record and, in particular, citations to testimony from Trans Union's own witnesses. (Shriver Rep. ¶¶ 41-105.) Shriver cites to the record nearly 90 times in these sections. (*Id*.) By contrast, he cites to outside sources only five times. (*Id*. ¶ 45 n. 31; ¶ 47 n. 35); ¶¶ 65-66 nn. 59, 61-62.)) Shriver also generally does not provide any explanation as to how his experience or industry knowledge, as distinct from the testimony of Trans Union's witnesses, support his conclusions. Instead, he refers to his "experience" or "opinion" only four times. (Shriver Rep. ¶¶ 45, 68, 91.)

Section Seven contains Shriver's response to Dr. Malec's report. Even though Shriver is not a valuation expert, he opines that Dr. Malec's valuation is "unreliable and not based in fact," and criticizes three methodological choices Dr. Malec made: (1) using financial projections from 2013; (2) using publicly-traded companies as comparators; and (3) using a growth rate through 2020. (*Id*. ¶¶ 92-106.)

{10571755: }                                             4

## ARGUMENT

Federal Rule of Evidence 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify as to opinions so long as (1) the expert's "specialized knowledge" will assist the trier of fact; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of "reliable principles and methods"; and (4) the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702.

Under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  The purpose of this "gatekeeping" function is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The Court's gatekeeping function applies "to all expert testimony," regardless of whether that testimony is scientific or non-scientific in nature. *Id*. at 147; *see also In re Commercial Money Center, Inc*., 737 F. Supp. 2d 815, 843 (N.D. Ohio 2010) (noting that *Kuhmo* extended [*Daubert's*] standards to nonscientific testimony").

To be admissible, an expert's opinion must satisfy three requirements. "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *Riley v. Liberty Ins. Corp*., No. 3:17 CV 1595, 2019 WL 5420590, at *4 (N.D. Ohio Feb. 15, 2019)

"To determine whether expert evidence is reliable, courts consider: (1) whether the theory or technique employed by the expert 'can be (and has been) tested'; (2) whether the theory or technique has been 'subjected to peer review and publication'; (3) the 'known or potential rate of

error' of the theory or technique; and (4) whether the theory or technique has been accepted by the 'relevant scientific community.'" *Daubert*, 509 U.S. at 593-94). While the *Daubert* factors are "not a definitive checklist or test," they "guide a trial court in its gatekeeping inquiry," which must be "tied to the facts of a particular case." *Id.*; *see also Riley*, 2019 WL 5420590, at *4 ("the same criteria which are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony").

Here, this Court should largely exclude Shriver's affirmative opinions because they are not the product of a reliable method or Shriver's expertise. Instead, Shriver merely launders Trans Union's own view of the case through the guise of expert opinion. This Court should also largely exclude Shriver's affirmative opinions because he does not explain how his industry expertise informs his conclusions. Finally, this Court should exclude Shriver's rebuttal to Dr. Malec's valuation opinion to the extent that Shriver offers opinions regarding the reasonableness, validity, or methodological soundness of Dr. Malec's opinion, as Shriver is not a valuation expert and has no basis to offer any such opinion.

## III. THIS COURT SHOULD STRIKE THE NUMEROUS PARAGRAPHS OF SHRIVER'S OPINION THAT MERELY PARROT THE TESTIMONY OF FACT WITNESSES AND TRANS UNION'S VIEW OF THIS CASE

"An expert can, and often should, draw facts in the record. But the expert must add something in the nature of expertise to those facts." *Navarro v. Procter & Gamble Co.*, No. 1:17-cv-406, 2021 WL 868586, at *11 (S.D. Ohio Mar. 8, 2021) (citation omitted); *see also Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-cv-13456, 2019 WL 3334563, at *5 (E.D. Mich. July 25, 2019) Thus, "[w]here an expert merely offers his client's opinion as his own, that opinion may be excluded." *Ask Chemicals, L.P. v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (affirming exclusion of expert testimony where expert engaged in "wholesale

adoption" of client's estimates); *see also Littler v. Ohio Ass'n of Pub. Sch. Employees*, No. 2:18-cv-1745, 2020 WL 1861646, at *5 (S.D. Ohio Apr. 14, 2020). (excluding opinion where it was "100% a regurgitation of what [the expert] was told in conversation" by a lay witness and holding that "expert testimony should not be admitted where the evidence merely parrots the testimony offered by fact witnesses").

Here, Shriver claims that he is offering opinions regarding (1) the parties' "unrealistic assumptions" about Quote Exchange; (2) the lack of interest among large carriers; and (3) the supposed reasonableness of Trans Union's decision to stop investing in Quote Exchange. (Shriver Rep. ¶¶ 12-14.) But his actual opinions on those topics consist almost entirely of repeated citations to deposition transcripts and other documents from the record. The result is not an expert's opinion but rather Trans Union's version of events parroted by a purported expert. This is not surprising given that Shriver admitted that he is not familiar with the actual functionality of the Quote Exchange. (Tr. 42:18-43:7.)

A few basic numbers illustrate the point. Excluding the "background" section of Shriver's report (Paragraphs 16-40) and Shriver's criticism of Dr. Malec (Paragraphs 92-106), Shriver cites to the factual record a remarkable *89 times* in 52 paragraphs. (Shriver Rep. ¶¶ 41-91 nn. 24-108.) By contrast, Shriver cites to industry or other sources outside the record exactly *five* times on three subjects: (1) a McKinsey report for the proposition that large insurance carriers did not view unsold web-based quotes as an important issue (Shriver Rep. ¶ 45 n. 31); (2) a string cite of TCPA cases to support his claim that insurance companies were worried about class action litigation risk (*Id.* ¶ 47 n. 35); and (3) citations to articles about Toyota partnering with Insurify and Google shutting down its Google Compare platform in connection with his claim that other competitors were entering the market during the relevant time (*Id.* ¶¶ 65-66 nn. 59, 61-62.) Of those three, Shriver

admits that one—the McKinsey article—says nothing about unsold web-based quotes, the purported purpose of its citation. (Shriver Tr. 36:15-23.)

Shriver's excessive citations to the record are not peripheral to his affirmative opinions. Rather, with limited exceptions, they *are* his opinions on each of the three topics as to which he purports to be opining, as set forth below. This Court should thus exclude Shriver's testimony reflected in paragraphs 41-44, 46, 48-64, and 69-98 of his report.

A.  **Shriver's Opinion that the Parties Relied on Unrealistic Assumptions is Based Almost Exclusively on the Testimony of Two Trans Union Employees**

Shriver asserts in Section Four that the parties made a "series of unrealistic industry assumptions" about the reception that Quote Exchange would receive. This section constitutes Shriver's lengthiest opinion, spanning 27 paragraphs, including four sub-opinions. (Shriver Rep. ¶¶ 41-68.) The vast majority of those 27 paragraphs consist of a recitation of the facts of this case as Trans Union sees them, replete with repeated citations to two Trans Union witnesses: Geoffrey Hakel and Emily Lebowitz. For example, Shriver claims that "the parties' difficulty securing letters of intent to participate in the Quote Exchange demonstrates that their assumptions about carrier interest were unrealistic." (*Id*. § IV.B.) But the entirety of that section consists of nothing more than a factual recitation of the parties' attempts to sign up large carriers, with repeated citations to the deposition of Lebowitz. (*Id*. ¶¶ 49-56.) Shriver does not bring any industry knowledge, experience, or expertise to bear on the subject, and he provides nothing that a trier of fact could not already glean by reading Ms. Lebowitz's deposition. And he could not because he admitted that he does not "understand the day-to-day-workings" of the Quote Exchange project. (Tr. 50:23-51:5.) Similarly, Shriver purports to opine that "The [Quote Exchange's] projected value relied on large carrier participation that never occurred." (Ex. A § IV.C.) However, his

opinion on this point simply consists of reciting a factual history of Quote Exchange's revenue performance over time, supported by citations to the record. (*Id*. ¶¶ 57-61.) Indeed, during the relevant time frame (from 2013-2017), Shriver admits that he cannot even testify as to whether there were any other companies pursuing the "marketplace" idea as Quote Exchange envisioned it because he was not working with any. (Tr. 59:12-60:11.)

The only actual opinions Shriver offers in Section Four—beyond parroting Trans Union's existing testimony—are that (1) large carriers did not care about unsold web traffic (based on the McKinsey article that says nothing of the sort); (2) carriers were worried about TCPA litigation; and (3) several online insurance platforms emerged during the 2010s, which Shriver believes were competitors to Quote Exchange. (Ex. A ¶¶ 45, 47, 65-68.) While Endless River disagrees with each of those opinions, it is not challenging whether Shriver can testify as to them. But the remainder of Section Four impermissibly parrots the testimony of Trans Union's witnesses in the guise of expert opinion. This Court should preclude Shriver from offering the purported opinions he expresses in paragraphs 41-44, 46, and 48-64 of his report.

**B.     Section Five of Shriver's Report is Purely a Factual Summary of the Difficulties the Parties Experienced in Developing Quote Exchange**

In Section Five, Shriver offers the opinion that "difficulties common to developing new platforms and offerings eroded [Quote Exchange's] value compared to projections." (*Id*. § 5.) But Shriver does not discuss "difficulties common to new platforms" or place Quote Exchange's development in the context of common industry experience. Instead, Section Five consists entirely of a summary of the technical and operational delays Quote Exchange experienced. (*Id*. ¶¶ 69-87.) Shriver cites to the record nearly 50 times in 19 paragraphs. (*Id*. ¶¶ 69-87 nn. 63-98.) Nearly every sentence ends with a citation to the record. None of those sentences discusses Shriver's experience

with the insurance industry, and Shriver does not include a *single* citation to something other than the existing record. Indeed, Shriver admits that he did not do any analysis and has no opinion as to whether Trans Union or Endless River appropriately executed their duties or responsibilities in connection with the Quote Exchange. (Tr. 50:11-18, 52:22-53:3.) That is not expert testimony. It is simply parroting Trans Union's version of what went wrong. This Court should strike Section Five in its entirety and should preclude Shriver from offering any opinion based on the matters addressed in Section Five.

**C.    Shriver Cannot Opine as to why Trans Union Terminated Quote Exchange and that Question is not Relevant to this Case**

In Section Six, Shriver offers the opinion that "given the competitive landscape and the relative underperformance of the [Quote Exchange] project, [Trans Union] made a reasonable business decision to terminate the project." (*Id*. § VI.) Section Six consists solely of (1) a paragraph describing Trans Union's stated reasons for terminating Quote Exchange; and (2) Shriver's statement that Trans Union's decision was reasonable. (*Id*. ¶¶ 89-91.) But Shriver was not involved in Quote Exchange. He is not even sure that he had *heard* of Quote Exchange before this case. (Shriver Tr. 95:12-17.) To the extent Shriver is asserting that Trans Union's stated reasons for terminating Quote Exchange were the real reasons, he does not know that to be true, and instead is impermissibly parroting the testimony of Trans Union's witnesses. (*Id*. at 138:1-9; 111:21-112:3.) Moreover, Shriver's conclusion (Ex. A at ¶ 91) that Quote Exchange's "theoretical positives proved difficult to turn into a profitable reality; and the parties' experience with [Quote Exchange] proves as much" is simply a factual statement disguised as an expert opinion and should be excluded.

{10571755: }                                          10

IV.   **THIS COURT SHOULD EXCLUDE MANY OF SHRIVER'S AFFIRMATIVE OPINIONS BECAUSE HE DOES NOT EXPLAIN HOW HIS EXPERIENCE LEADS TO THE CONCLUSIONS HE HAS REACHED**

This Court should also exclude the vast majority of Shriver's opinions because he does not explain how his experience in the insurance industry led to his conclusions.

While a non-scientific expert is permitted to testify based on experience, the expert must "explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (quoting Fed. R. Evid. 702, advisory committee's note). "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id*.

As a result, courts regularly exclude expert opinions where the expert merely offers a conclusion as an *ipse dixit* without explaining how the expert's experience leads to the conclusions the expert has drawn. *See In re Meridia Prods. Liab. Litig*., 328 F. Supp. 2d 791, 806 (N.D. Ohio 2004) (excluding portions of expert's opinion where opinion was conclusory and expert did not explain how experience led to conclusions drawn); *Cook v. Erie Fire Ins. Co.*, 478 F. Supp. 3d 658, 668-69 (S.D. Ohio 2020) (disregarding portions of expert's testimony where expert did not "explain how [his] experiences would lead to such a result"); *Dunlap v. Choice Hotels Int'l, Inc*., No. 5:20-cv-00159, 2021 WL 6126154, at *5 (W.D. Ky. Dec. 28, 2021) (excluding expert testimony where expert "[did] not provide any explanation as to how he reached his opinions" but rather "ask[ed] the Court to accept his opinions based on his experience, which is something that the Court cannot do")

In Sections Four through Seven Shriver purports to offer opinions based on his industry experience. As noted above, however, his opinions consist almost entirely of extensive citations to the factual record regarding Quote Exchange's development, history, and performance. He does

not explain how his experience in the insurance industry—as distinct from his review of what Trans Union witnesses said—leads him to any of the conclusions that he has drawn. Notably, Shriver only uses some variation of the phrase "my experience" or "my opinion" exactly four times (Shriver Rep. ¶¶ 45, 68, 91.) This Court should exclude the opinions expressed in paragraphs 41-44, 46, 48-64, and 69-98 of Shriver's report on this basis as well.

## V.   THIS COURT SHOULD PRECLUDE SHRIVER FROM TESTIFYING REGARDING ALLEGED DEFICIENCIES IN DR. MALEC'S VALUATION METHODOLOGY BECAUSE SHRIVER ADMITS THAT HE IS NOT A VALUATION EXPERT

Finally, this Court should preclude Shriver from offering any opinion regarding the reasonableness, appropriateness, or methodological soundness of Dr. Malec's valuation opinion because Shriver has no basis to offer any such opinion.

"[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. American Honda Motor Co*., 532 F.3d 479, 478 (6th Cir. 2008) (quoting *Pride v. BIC Corp*., 218 F.3d 566, 575 (6th Cir. 2000)). Although this requirement is interpreted liberally, that "does not mean that a witness is an expert simply because he claims to be." *Pride*, 218 F.3d at 577. Instead, a court must determine whether the proposed expert's qualifications "provide a foundation for [the expert] to answer a specific question." *Lucio v. Levy Envtl. Servs. Co*., 173 F. Supp. 3d 558, 564 (N.D. Ohio 2016) (quoting *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372. 376 (6th Cir. 2014)).

In accordance with these principles, courts routinely exclude expert opinions where an expert lacks expertise in the relevant subject matter. *See Long v. Monaco Coach Corp*., No. 3:04-cv-203, 2007 WL 4613000, at *6 (E.D. Tenn. Sept. 27, 2007) (excluding testimony of purported

valuation expert where expert "testified repeatedly that he was not an expert in the field of valuation"); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 846 (N.D. Ohio 2011) (excluding expert opinion where opinion was one that expert "being neither a mechanical nor electrical engineer, is unqualified to give"); *In re Heparin Prod. Liab. Litig.*, MDL No. 1953, 2011 WL 1059660, at *10 (N.D. Ohio Mar. 21, 2011) (holding that purported expert was not qualified to offer opinions about Chinese cultural norms where expert had "no education or training as a cultural expert general, or as an expert on Chinese culture specifically"); *Thorn v. Novartis Pharms. Corp.*, No. 3:11-cv-373, 2013 WL 11451758, at *1 (E.D. Tenn. June 26. 2012) (excluding opinion where expert admitted he was "not an expert in epidemiology, pharmacology, or pathology").

By his own admission, Shriver is not a valuation expert and has never held himself out as a valuation expert. (Shriver Tr. 10:16-21.) As Shriver testified, he is "not a valuation expert that I've had schooling and training on." (Shriver Tr. 12:3-4; *see also id*. 149:5-24.).) He has never been qualified in any court as a market valuation expert, has never done academic research on the appropriate methodologies for revenue projection in early-stage enterprises, and has never taught a course in valuation. (Shriver Tr. 12:11-18; 149:5-14.) Despite lacking training or expertise in valuation, however, Shriver seeks to offer the opinion that "Dr. Malec's valuation of [Quote Exchange] is unreliable and inaccurate . . . ." (Shriver Rep. ¶ 15; *see also* ¶¶ 92-106.) In particular, Shriver asserts that (1) Dr. Malec's reliance on projections for 2013 is unreasonable; (2) Dr. Malec allegedly failed to take into account "facts and market realities"; and (3) Dr. Malec's choice of comparable companies was inappropriate. (*Id*.) Shriver is not qualified to offer those opinions and this Court should exclude them in their entirety.

Shriver first faults Dr. Malec for using projections from 2013 to determine the value of Quote Exchange. (Shriver Rep. ¶¶ 15(a), 93-95.) During his deposition, Shriver clarified that the

"only" basis for his opinion that Dr. Malec's valuation is inaccurate is his belief that Dr. Malec should have based his valuation of Quote Exchange's EBITDA for the last 12 months in which Quote Exchange was operating. (Shriver Tr. 145:1-146:9; *id*. at 148:24-149:2.) Because he is not a valuation expert, Shriver has no basis for this criticism, as he does not know what the appropriate method to value an early stage company is. Indeed, Shriver admits that he was not familiar with the VC Approach before being engaged in this matter and "couldn't recite you and tell you how to actually do it." (*Id*. at 150:6-17.) He also does not know whether the VC Approach uses actual results or projections and cannot testify as to whether it was inappropriate for Dr. Malec to use the VC Approach here. (*Id*. at 151:8-152:12.) Shriver is thus wholly unqualified to opine on whether Dr. Malec's use of projections was appropriate, and this Court should strike Paragraphs 15(a) and 93-95 of his Report and preclude Shriver from testifying as to those opinions at trial.

The same is true of Shriver's opinion that "Malec's method of using successful, publicly-traded companies as so-called peer comparators is unreasonable." (Shriver Rep. ¶ 97.) Shriver has no basis to opine on whether Dr. Malec's use of his chosen peer companies was appropriate or consistent with valuation best practices. Similarly, he does not have any expertise that would permit him to offer the opinion that "it is unreasonable to value the QE, an early-stage concept that failed on execution, by comparing it to successful, profitable companies that survived the market competition in this timeframe." (*Id*. at ¶ 98.) And, while Endless River does not dispute that Shriver is qualified generally to talk about purported differences between Quote Exchange's business model and the business model of Dr. Malec's chosen peer companies (*Id*. ¶ 99), this Court should limit Shriver's testimony to noting those alleged differences and should preclude Shriver testifying that those differences render Dr. Malec's expert opinion unreliable.

Finally, Shriver offers the opinion that "Malec's use of an outlier growth year (2020) as the foundation for his peer-company valuation artificially inflates his damages estimate." (Shriver Rep. ¶ 100.) Endless River is not challenging whether Shriver can testify generally about developments in the industry that, in his view, rendered 2020 an outlier. But given Shriver's total lack of valuation expertise, it is inappropriate for Shriver to testify as to the impact that Dr. Malec's use of 2020 numbers had on Dr. Malec's overall valuation or whether that valuation is reasonable.

In sum, this Court should strike Paragraphs 15 and 92-98 and should preclude Shriver from offering any testimony in line with those opinions. This Court should also hold that, while Shriver may testify as to his views of the insurance industry as expressed in paragraphs 99-104, he cannot opine as to whether those purported industry developments render Dr. Malec's valuation opinion unreasonable, unreliable, or inaccurate.

## CONCLUSION

For the foregoing reasons, this Court should strike paragraphs 41-44, 46, 48-64, and 69-98, and should also preclude Shriver from offering any testimony regarding the reasonableness of Dr. Malec's valuation or valuation methodology.

Dated: August 8, 2022

     /s/ Stephen J. Rosenfeld
Stephen J. Rosenfeld (IL 6216769)
 *srosenfeld@mcdonaldhopkins.com*
MCDONALD HOPKINS LLC
300 North LaSalle, Suite 1400
Chicago, IL 60654
Telephone: (312) 280-0111

David B. Cupar (OH 0071622)
 *dcupar@mcdonaldhopkins.com*
Mark J. Masterson (OH 0086395)
 *mmasterson@mcdonaldhopkins.com*
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100

{10571755: }

Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474

*Counsel for Endless River Technologies LLC*

# EXHIBIT A

# (FILED UNDER SEAL)

{10571755: }

# **EXHIBIT B**

# **(FILED UNDER SEAL)**

{10571755: }