# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ENDLESS RIVER TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18-CV-00936 |
| | ) | |
| v. | ) | Judge Donald C. Nugent |
| | ) | |
| TRANSUNION LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**TRANSUNION'S MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED AND SUMMARY OF ARGUMENT ................. 1

BACKGROUND .......................................................................................................... 3

I.      Endless River Pitches TransUnion On The Quote Exchange Concept In
        January 2013 Based On "Educated Guesswork." ......................................... 3

II.     TransUnion And Endless River Enter A Development Agreement Containing
        An Unambiguous Limitation On Liability Barring Consequential Damages. ........... 5

III.    The Quote Exchange Performs More Than 900-Times Worse Than The
        January 2013 Projections And TransUnion Terminates The Development
        Agreement. ........................................................................................................ 5

IV.     In April 2018, Endless River Brings A Single Contract Claim Related To The
        Untimely Return Of The Quote Exchange Source Code. ................................ 6

V.      Endless River Abandons Any Attempt To Mitigate And Exclusively Pursues
        Lawsuit Damages Starting In "Late 2018." ...................................................... 7

VI.     Four Years Into Litigation, Endless River Triples Its Damages Claim. ...................... 8

        A.      Endless River Instructs Malec To Rely On The Highest, Maximum
                January 2013 Projections, So He Does. ................................................. 8

        B.      Malec Adopts A Counterfactual World To Value The Quote Exchange As
                Of An Irrelevant Date: March 31, 2014. ............................................... 9

        C.      Malec Invents A "Gross Up" Step To Further Increase His Damages. ............... 11

        D.      Malec Entirely Ignores Contrary Evidence Without Analysis Or
                Explanation. ............................................................................................. 12

VII.    The Court Permits Malec To Present His Entire $55.2 Million Damages
        Estimate Despite TransUnion's Repeated Requests For Exclusion Or
        Limitation. ........................................................................................................ 13

        A.      The Court "Reserves Ruling" On TransUnion's Challenges To Malec. .............. 13

        B.      Malec And Endless River's Counsel Repeatedly Misrepresent Malec's
                Calculation And Analysis To The Court And The Jury. ...................................... 15

VIII.   After A One-Week Trial, The Jury Issues An Unsupported Verdict Of $18.3
        Million. ............................................................................................................. 20

LEGAL STANDARD ................................................................................................. 21

**ARGUMENT** ................................................................................................. **21**

**I.**     **Section 8.2 Of The Development Agreement Bars The Damage Award.** .................. **21**

**II.**    **The "New Business Rule" Bars The Damage Award.** .................................. **23**

**III.**   **The Damage Award Must Also Be Vacated Because It Is Untethered From The Claimed Breach In This Case.** .......................................................... **25**

**IV.**    **The Jury's Damage Award Is Tainted By Improper Pre-Judgment Interest.** .......... **27**

**V.**     **The Jury's Damages Award Is Unsupported By Evidence And Entirely Speculative.** ................................................................................... **30**

**VI.**    **The Damages Award Improperly Ignores Endless River's Ongoing Duty To Mitigate.** ................................................................................. **33**

**CONCLUSION** ............................................................................................. **35**

ii

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams Lab'ys, Inc. v. Jacobs Eng'g Co., Inc.*,
    761 F.2d 1218 (7th Cir. 1985) ...............................................................32

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric
    Surgery, Inc.*,
    185 F.3d 606 (6th Cir. 1999) ................................................................21

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946)...............................................................................30

*Black-Hosang v. Mendenhall*,
    2005 WL 3299070 (S.D. Ohio Dec. 5, 2005) ..................................27, 30

*Blackwell v. Kalinowski*,
    2012 WL 469962 (N.D. Ill. Feb. 13, 2012) ..........................................27

*DeMyrick v. Guest Quarters Suite Hotels*,
    944 F. Supp. 661 (N.D. Ill. 1996) .........................................................21

*Dunn v. CCH Inc.*,
    834 F. Supp. 2d 657 (E.D. Mich. 2011)................................................24

*Euroholdings Cap. & Inv. Corp. v. Harris Trust & Sav. Bank*,
    602 F. Supp. 2d 928 (N.D. Ill. 2009) ...................................................25

*Franzen v. Dunbar Builders Corp.*,
    270 N.E.2d 118 (Ill. App. Ct. 1971) .....................................................31

*Glen Hollow P'ship v. Wal-Mart Stores, Inc.*,
    139 F.3d 901 (7th Cir. 1998) ..........................................................23, 25

*Heaver v. Ward*,
    386 N.E.2d 134 (Ill. App. Ct. 1979) ................................................27, 30

*Huss v. Sessler Ford, Inc.*,
    799 N.E.2d 444 (Ill. App. Ct. 2003) .....................................................31

*Ivey v. Transunion Rental Screening Sols., Inc.*,
    186 N.E.3d 1076 (Ill. App. Ct. 2021) ...................................................25

*Kagan v. Edison Bros. Stores Inc.*,
    907 F.2d 690 (7th Cir. 1990) ................................................................25

*Katch v. Speidel, Div. of Textron, Inc.*,
   746 F.2d 1136 (6th Cir. 1984) .......................................................................34

*Kiswani v. Phoenix Sec. Agency, Inc.*,
   247 F.R.D. 554 (N.D. Ill. 2008).....................................................................25

*LinkEpic Inc. v. Vyasil, LLC*,
   2020 WL 8455109 (N.D. Ill. Oct. 2, 2020).................................................27

*M.S. Distrib. Co. v. Web Recs., Inc.*,
   2003 WL 21087961 (N.D. Ill. May 12, 2003) .........................................25

*Mayster v. Santacruz*,
   163 N.E.3d 246 (Ill. App. Ct. 2020) ...........................................................34

*Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*,
   31 N.E.3d 451 (Ill. App. Ct. 2015) .............................................................24

*Miami-Luken, Inc. v. DEA*,
   900 F.3d 738 (6th Cir. 2018) .........................................................................3

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010) ....................................................................32

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
   2021 WL 4302871 (N.D. Ill. Aug. 10, 2021), *appeal dismissed*, 2022 WL
   671458 (7th Cir. Feb. 16, 2022)..................................................................27

*ONVI, Inc. v. Radius Project Dev. Inc.*,
   2022 WL 4182433 (N.D. Ill. Sept. 13, 2022) .........................................25

*Matter of P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.*,
   140 F.3d 1111 (7th Cir. 1998) .....................................................................27

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
   499 F.3d 1151 (10th Cir. 2007) (Gorsuch, J.)...........................................23

*Pickett v. Sheridan Health Care Ctr.*,
   813 F.3d 640 (7th Cir. 2016) .......................................................................27

*Pingatore v. Montgomery Ward & Co., Inc.*,
   419 F.2d 1138 (6th Cir. 1969) .....................................................................32

*Pioneer Res. Corp. v. Nami Res. Co., LLC*,
   2006 WL 1635651 (E.D. Ky. June 8, 2006) .............................................32

*R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc.*,
   641 F. Supp. 2d 707 (N.D. Ill. 2009) ...............................................33, 34

*Rodgers v. Fisher Body Div., Gen. Motors Corp.*,
    739 F.2d 1102 (6th Cir. 1984) ...................................................................30

*Ryan M. v. Bd. of Educ. of City of Chicago, Dist. 299*,
    731 F. Supp. 2d 776 (N.D. Ill. 2010) .......................................................27

*Servbest Foods, Inc. v. Emessee Indus., Inc.*,
    403 N.E.2d 1 (Ill. App. Ct. 1980) .............................................................27

*Shaker v. Butler*,
    2020 IL App (1st) 190967-U .....................................................................31

*Smith v. Fifth Third Mortg. Co.*,
    2021 IL App (1st) 200771-U ........................................................2, 22, 31

*Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*,
    674 N.E.2d 948 (Ill. App. Ct. 1996) .........................................................29

*Strickland v. Owens Corning*,
    142 F.3d 353 (6th Cir. 1998) ....................................................................34

*Stryker Corp. v. Ridgeway*,
    2016 WL 6584657 (W.D. Mich. Jan. 25, 2016) ......................................32

*Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*,
    886 F. Supp. 2d 873 (N.D. Ill. 2012) ..................................................25, 28

*Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*,
    325 F.3d 924 (7th Cir. 2003) ....................................................................27

*TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*,
    491 F.3d 625 (7th Cir. 2007) .........................................................5, 23, 25

*Tate & Lyle Americas LLC v. Glatt Air Techniques, Inc.*,
    2016 WL 7422289 (C.D. Ill. May 20, 2016) ...........................................22

*Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*,
    25 N.E.3d 1166 (Ill. App. Ct. 2015) .............................................21, 22, 23

*Xudong Song v. Rom*,
    2018 WL 1518963 (N.D. Ohio Mar. 28, 2018) .......................................21

**Statutes**

815 ILCS 205/2........................................................................................................29

**Rules**

Fed. R. Civ. P. 46 ................................................................................................................3

Fed. R. Evid. 103 ................................................................................................................3

## <u>STATEMENT OF ISSUES PRESENTED AND SUMMARY OF ARGUMENT</u>

At trial, this Court permitted Endless River's economics expert, Dr. Andrew Malec, to present an inflated and legally improper damages estimate of $55.2 million. *See* Dkt. 218 (moving to exclude two specific aspects of Endless River's damages calculation as contrary to law); Dkts. 182, 187, 202-1 (memoranda in support of motion to exclude Malec in his entirety).

The Court cautioned Endless River during trial that its $55.2 million ask appeared to (1) consist of "classic consequential damages" expressly barred by the parties' contractual limitation of liability, Trial Tr. at 759:7-24; *see also id.* at 146:23-148:16, 748:11-750:8, 754:14-24; (2) "include[] ... legally improper … prejudgment interest," *id.* at 6:6-12, 9:15-24; and (3) ignore without explanation directly contrary evidence, including party admissions establishing that all damages could have been mitigated for only $1.75-$1.85 million, *id.* at 628:2-629:25. Nevertheless, Endless River elected to put one (and only one) damages number to the jury: the full $55.2 million. In fact, Malec—the ***sole source of evidence*** Endless River relied on for its damages, Ex. 1, 12/1/21 Amended Answer to TU's Interrog. No. 20—expressly admitted that he "offered ***no*** opinion that would allow the jury to reduce damages," and insisted that $55.2 million is the "***only***" "appropriate … damage measure in this case," Trial Tr. at 726:17-24 (Malec) (emphasis added); *accord id.* at 160:25-6 ("MR. ROSENFELD: I haven't disclosed any other damage number.").

The jury rejected Endless River's $55.2 million ask and instead awarded $18.3 million in speculative, unfounded breach of contract damages. But awarding Endless River a fraction of a phantom number is just as contrary to law as giving all of it. Indeed, a host of legal errors infect the jury's $18.3 million verdict and mandate judgment as a matter of law for TransUnion. The jury's damages award must be set aside for at least six, independent reasons:

**First**, the jury's $18.3 million verdict improperly awards Endless River "classic consequential damages" based on lost profits and revenue that are **barred** by Section 8.2 of the Development Agreement.

**Second**, the damages award violates Illinois's "New Business Rule," which precludes lost profit damages for start-up businesses like the Quote Exchange.

**Third**, the jury's verdict necessarily includes damages for a four-year period **before** any breach is even alleged to have occurred, in violation of Illinois law that mandates damages be measured as of the date of breach.

**Fourth**, the verdict includes amounts attributable to Malec's nine years' worth of "growth" from 2014 up to the date of trial in fall 2022—amounts precluded by Illinois statutory limits on the award of prejudgment interest.

**Fifth**, the jury's verdict is unsupported by competent evidence.  Endless River provided the jury one and only one way to calculate damages, giving the jury one and only one damages number: $55.2 million.  Based on the evidence presented at trial, there is no factual basis for the jury to have reached its award of $18.3 million.

**Sixth**, the verdict improperly ignores extensive, uncontroverted evidence on mitigation.

In the four-plus years that this litigation has been pending, Endless River has obstinately refused to engage in reasonable settlement discussions.  Indeed, the $18.3 million jury verdict, which itself is inflated and contrary to law, is a figure less than Endless River's **lowest** demand to date.  Instead, Endless River chose to rely solely on its speculative and unsupported consequential $55.2 million damages calculation in the hopes of obtaining a windfall.  This Court must force

Endless River to face reality. For each of the six independent reasons discussed below, this Court must vacate the jury award and enter judgment as a matter of law for TransUnion.[1]

## BACKGROUND

I. **Endless River Pitches TransUnion On The Quote Exchange Concept In January 2013 Based On "Educated Guesswork."**

At some point in the "second half of 2012," Endless River put together projections estimating the future revenue potential of the Quote Exchange, a product concept dreamed up by Rich Bonitz and Phil Wintering. Trial Tr. at 522:25-523:20 (Wintering). Endless River used those projections in a January 31, 2013 pitch deck designed to entice TransUnion to collaborate on the Quote Exchange. *Id.* at 120:4-9 (Bonitz); *id.* at 425:10-426:6, 525:24-526:1 (Wintering); *id.* at 622:10-17 (Hakel); *id.* at 681:12-15, 684:23-685:5, 688:20-22 (Malec). Relevant here, the January 2013 projection hypothesized that the Quote Exchange would make $213,332,042 in revenue—not profit—in its fifth year of business:

---

[1] Out of an abundance of caution, TransUnion expressly reserves its right to raise additional issues on appeal, including, for example, challenges to rulings on *Daubert* motions, motions *in limine*, discovery requests, evidentiary issues, and TransUnion's request for Rule 37 sanctions. *E.g.*, Fed. R. Evid. 103; Fed. R. Civ. P. 46; *Miami-Luken, Inc. v. DEA*, 900 F.3d 738, 742 (6th Cir. 2018) ("[A]ppellate review of a district court's discovery ruling is available, pursuant to § 1291, after the final judgment.").

## Financial Summary

**ENDLESS RIVER TECHNOLOGIES**
INITIAL DEVELOPMENT + FOUR YEAR PROJECTION
SUMMARY STATEMENT

| | Initial Development | Year 1 | Year 2 | Year 3 | Year 4 | Five Year Total |
|---|---|---|---|---|---|---|
| **SALES** | | | | | | |
| Lead Revenue | $ - | $ 16,754,100 | $ 54,802,372 | $ 136,992,160 | $ 213,332,042 | $ 421,880,674 |
| **COST OF SALES** | | | | | | |
| ERT Click Through Payment | - | 9,260,448 | 26,080,308 | 57,658,478 | 85,777,258 | 178,776,493 |
| CONTRIBUTION MARGIN | - | 7,493,652 | 28,722,063 | 79,333,682 | 127,554,783 | 243,104,181 |
| % of Sales | 0% | 45% | 52% | 58% | 60% | 58% |
| **OPERATING EXPENSES** | | | | | | |
| Sales & Marketing | - | - | - | - | - | - |
| Operations | 627,748 | 1,311,219 | 1,367,170 | 1,536,946 | 1,597,014 | 6,440,090 |
| IT Support | 151,811 | 568,020 | 410,711 | 429,419 | 447,013 | 1,806,773 |
| Administrative | 657,788 | 892,766 | 998,378 | 1,047,178 | 1,098,264 | 4,694,373 |
| Incentive Compensation | - | 429,240 | 575,821 | 615,389 | 633,848 | 2,254,299 |
| Other | 214,795 | 317,457 | 241,452 | 310,488 | 318,592 | 1,402,785 |
| Total Operating Expenses | 1,651,940 | 3,518,702 | 3,593,531 | 3,939,419 | 4,094,732 | 16,598,324 |
| % of Sales | 0% | 20% | 7% | 3% | 2% | 4% |
| Depreciation and Amortization Expense | 51,308 | 97,500 | 97,500 | 97,500 | 97,500 | 441,308 |
| **OPERATING INCOME** | (1,703,248) | 4,077,450 | 25,031,032 | 75,296,763 | 123,362,552 | 226,064,548 |
| % of Sales | 0% | 24% | 46% | 55% | 58% | 54% |
| Interest Income/(Expense) | - | - | - | - | - | - |
| **INCOME BEFORE TAXES** | (1,703,248) | 4,077,450 | 25,031,032 | 75,296,763 | 123,362,552 | 226,064,548 |
| Taxes - 35% | - | (830,971) | (8,760,861) | (26,353,867) | (43,176,893) | (78,122,592) |
| **NET INCOME** | (1,703,248) | 3,246,479 | 16,270,171 | 48,942,896 | 80,185,659 | 146,941,956 |

Confidential ~ Do Not Distribute w/o Permission                [DateTime]
Current forecast based upon carrier feedback as assumed carrier participation

PX2 at 13.  The presentation further assumed that "standard," national carriers—*i.e.*, Travelers, Liberty Mutual, 21st Century, and MetLife—would readily join the Quote Exchange.  DX329 at 4; *see also* Trial Tr. 801:8-11 (Shriver).

Endless River alone created the January 2013 projection, without TransUnion's involvement, and well before Endless River even first approached TransUnion about the Quote Exchange.  Trial Tr. at 692:10-17 (Malec).  The projection was created before the parties started writing any computer code or building the Quote Exchange and predated any agreement between TransUnion and Endless River by more than a year.  *Id.* at 692:18-693:3 (Malec).  Properly understood, the January 2013 projection constituted little more than "educated guesswork" "done as a pitch … to get TransUnion or somebody to get involved."  *Id.* at 148:18-149:4 (Court).

II.     **TransUnion And Endless River Enter A Development Agreement Containing An Unambiguous Limitation On Liability Barring Consequential Damages.**

On March 31, 2014, over a year after Endless River's initial pitch, the parties entered into the Development Agreement.  Trial Tr. at 681:19-22 (Malec).  Both Endless River and TransUnion expressly agreed to limit liability in Section 8.2:

> Waiver of Liability.  **IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, AND BOTH [TRANSUNION] AND [ENDLESS RIVER] HEREBY WAIVE AS TO THE OTHER PARTY, ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTY AND ARISING OUT OF THE PERFORMANCE OF THIS CONTRACT**, INCLUDING BUT NOT LIMITED TO LOSS OF GOOD WILL AND LOST PROFITS OR REVENUE, WHETHER OT NOT SUCH LOSS OR DAMAGES IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. **THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.**

PX201 at 2, Development Agreement § 8.2 (emphasis added).

In addition to this clear and unambiguous liability waiver, TransUnion bargained for other protections in case the unproven Quote Exchange idea failed.  For instance, TransUnion retained the right to terminate the Agreement "at any time" if "the Quote Exchange does not meet expectations" "in TransUnion's sole discretion" on 180 days' written notice.  *Id.* at 1, 8.  Further, the parties agreed that Illinois law would govern disputes related to the Agreement.  *Id.* at 3.  This was critical, as Illinois applies the "new business rule," which holds as a matter of law that "a new business has ***no right*** to recover lost profits."  *TAS Distrib. Co., Inc.  v. Cummins Engine Co., Inc.*, 491 F.3d 625, 634 (7th Cir. 2007) (emphasis added).

III.    **The Quote Exchange Performs More Than 900-Times Worse Than The January 2013 Projections And TransUnion Terminates The Development Agreement.**

Through late 2017, the parties worked together to develop and market the Quote Exchange. TransUnion devoted significant time and resources to the project, spending over $8 million on it.

Trial Tr. 168:14-21, 282:20-22 (Bonitz).  About $1.8 million of that spend went directly to Endless River.  *Id.* at 244:24-245:8 (Bonitz).

Despite Endless River and TransUnion's joint efforts, the Quote Exchange earned just $240,000 in revenue over three and a half years.  *Id.* at 242:4-12, 242:19-25 (Bonitz); *id.* at 573:24-573:1 (Wintering).  Ultimately, Endless River's "Year 5"-only revenue estimate from January 2013 proved more than ***900 times larger*** than the actual revenues the Quote Exchange earned over its ***entire lifetime***.  *Id.* at 243:2-8 (Bonitz); *id.* at 704:17-706:9 (Malec); *id.* at 807:12-17 (Shriver); *see also id.* at 845:15-847:15 (Denis) ("[T]hat's just an enormous difference between the projections that were made in 2013 and the reality that we observe in the intervening years.").

On October 4, 2017, TransUnion formally gave notice of termination.  PX185; PX201 at 1, 8.  During the 180-day notice period, TransUnion continued to pay Endless River $37,500 a month in consulting fees even though Endless River "didn't do any more work on the Quote Exchange."  PX185; Trial Tr. at 536:3-19 (Wintering).  On April 2, 2018 termination became effective.  However, the parties disagreed about the proper way to read the Development Agreement, with both TransUnion and Endless River believing that they retained ownership rights in the Quote Exchange source code.  *See* Trial Tr. at 466:8-15, 502:6-12 (Wintering) (describing ownership dispute).  After this Court held in February 2022 that—upon the "event of termination" on April 2, 2018—the "Quote Exchange source code was to revert to ERT," Dkt. 170, TransUnion gave Endless River the code.  Trial Tr. at 488:25-489:3 (Wintering).

## IV.  In April 2018, Endless River Brings A Single Contract Claim Related To The Untimely Return Of The Quote Exchange Source Code.

Just three short weeks after termination, Endless River brought this lawsuit, *id.* at 659:13-14 (Wintering), alleging that TransUnion breached the Development Agreement by failing to timely give Endless River the Quote Exchange source code.  Dkt. 1 ¶ 47; Dkt. 114 ¶ 63.

Endless River advanced no other claims of breach.  Trial Tr. at 4:7-13 (Rosenfeld) ("The breach of contract claim is that the defendants did not return the software as per the contract."); *id.* at 145:11-15 (Court) ("[T]his is your contract claim, the value of the QE when they left and they didn't return it to you."); *id.* at 150:21-24 ("THE COURT: Because the – that's your only claim for breach of contract, that they didn't return it in a timely fashion.  MR. ROSENFELD: That's right…."); *id.* at 477:12-17 ("There is no claim in this case that TransUnion breached the Development Agreement by terminating the agreement.  Further, there is no claim that TransUnion breached or failed to perform[] as required during the term of the Development Agreement.").

As a result, only one question is relevant to determining damages: what contractual harm did Endless River suffer ***as of April 2, 2018***, when the source code was not timely returned to Endless River?  *See id.* at 153:17-157:19 (counsel and court discussion on what would be a relevant measure of damages).  To date, Endless River has ***never*** answered this question.  *See infra* at Part VI (Background); Part III (Argument).

## V.     Endless River Abandons Any Attempt To Mitigate And Exclusively Pursues Lawsuit Damages Starting In "Late 2018."

After termination, Endless River approached just two companies—neither an insurance carrier—about continuing the Quote Exchange.  Trial Tr. at 539:1-5 (Wintering).  Neither preliminary conversation went anywhere.

***First***, Endless River had a single coffee meeting with LeadCloud at an industry conference in Las Vegas.  *Id.* at 482:25-483:7 (Wintering) (emphasizing he drank "several cups of coffee" at the meeting).  LeadCloud's CEO could not recall this inconsequential meeting, testifying that he didn't even think it occurred.  *Id.* at 308:18-23, 309:21-25 (Ocheltree).

***Second***, Endless River explored "a product opportunity" with ITC.  *Id.* at 246:15-18 (Bonitz).  In fall 2018, Endless River repeatedly represented to ITC that Endless River could

completely "replicate" the Quote Exchange without TransUnion, using "better, more affordable tech" within six months and for only $1.75-$1.85 million, DX198 at 7; DX200 at 7. Both LeadCloud and ITC declined to pursue a partnership with Endless River, for reasons completely unrelated to TransUnion. Trial Tr. at 316:4-317:5 (Ocheltree); *id*. at 351:7-352:2 (Rixford).

Instead of rebuilding the Quote Exchange, Endless River opted for litigation. Only a few short months after termination, Endless River abandoned the Quote Exchange entirely and turned its focus ***exclusively*** to litigation damages. *Id.* at 273:4-12 (Bonitz); *id.* at 559:3-14 (Wintering). On January 16, 2019, Endless River submitted a sworn interrogatory response, signed and verified by Rich Bonitz, that quantified its damages at approximately $21 million. DX205 at 19; DX206. Endless River also incorporated a comprehensive "Damages Model" in this response. *Id.*

## VI.    Four Years Into Litigation, Endless River Triples Its Damages Claim.

The parties engaged in fact discovery for another two years, until March 2021. Dkt. 71. After the parties fully briefed summary judgment, Endless River disclosed a new litigation expert, Dr. Andrew Malec. Endless River revealed Malec's retention and served his expert report on the ***same day*** that it unveiled its new, nearly $60 million damages number. Ex. 1, 12/1/21 Amended Answer to TU's Interrog. No. 20 at 5.

### A.    Endless River Instructs Malec To Rely On The Highest, Maximum January 2013 Projections, So He Does.

Malec's new damages estimate was predicated from the start on instructions he received from Endless River's principals instead of independent expert analysis. Trial Tr. at 194:6-195:2 (Bonitz) (explaining that he prepared and gave Malec an "expert witness primer" on October 12, 2021, "because [Malec's] not an expert in the insurance industry"); *id.* at 286:23-287:21 (Bonitz) (admitting he reviewed a draft Malec report as early as October 25, 2021). Most notably, at Bonitz's directive, Malec used as the foundational starting point of his calculation Endless River's

eight-years-stale January 2013 projection, which counterfactually posited that the Quote Exchange would have earned $213 million in 2018 alone.  *Id*. at 191:7-15 (Bonitz); *id.* at 200:8-10 (Bonitz) ("Q. [Dr. Malec] was supposed to use the January 2013 number because that's the one you wanted him to use; right?  A. Yes."); *id.* at 203:17-22 (Bonitz) ("Q. So when … did you tell Dr. Malec to switch to the $213 million number? A. I don't recall.  Q. But he wouldn't have known to switch to it unless you told him; right?   A. I -- probably."); *id.* at 692:1-3 ("Q. And for that first foundational step you relied on the January 2013 projection? A. I did.") (Malec).

As Bonitz candidly admitted, the "***only reason***" Malec used the January 2013 projection's $213 million revenue estimate—the highest, maximum revenue estimate for the Quote Exchange ever generated—was because Endless River expressly "***told him*** *to*".  *Id.* at 191:13-18 (Bonitz) (emphasis added).  Malec himself was forced to acknowledge that he had to ask Endless River "you know, ***help me understand this projection, basically what is it***" and relied on Endless River's own, self-serving explanations to understand "why they believed that that projection was a projection that made sense" "as well as kind of how they came up with that projection." *Id.* at 727:17-22 (Malec) (emphasis added).

### B. Malec Adopts A Counterfactual World To Value The Quote Exchange As Of An Irrelevant Date: March 31, 2014.

After blindly accepting Endless River's highest, maximum projection as true, Malec then purported to apply the "Venture Capital approach"—a valuation method used "by economists to value start-up companies"—to determine the value of the Quote Exchange.  *Id.* at 640:14-641:7. Bizarrely, however, Malec made ***no*** attempt to determine the value of the Quote Exchange as of the date of termination, April 2, 2018.  Instead, Malec assumed that "Year 0" of Endless River's January 2013 projections began in ***2014***, the year that Endless River and TransUnion originally executed the Development Agreement:

9

Schedule 1
Endless River Technologies, LLC v. Trans Union, LLC
Value of the QE Program - Updated to Date of Trial
Original Projection

| Timeframe | Notes: | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
|---|---|---|---|---|---|---|
| | Notes: | Initial Development | Year 1 | Year 2 | Year 3 | Year 4 |
| Projected Revenue | [1] | $ - | $ 16,754,100 | $ 54,802,372 | $ 136,992,160 | $ 213,332,042 |
| | | | | | | |
| 2018 Projected Revenue [A] | | $ 213,332,042 | | | | |
| 2018 Enterprise Value/Revenue Multiple [B] | [2] | 1.1 | | | | |
| 2018 Enterprise Value [C = (A x B)] | | $ 234,665,246 | | | | |
| | | | | | | |
| Target Rate of Return [D] | [3] | 70.0% | | | | |
| Present Value Interest Factor [E = 1/(1+D)^4.75] | | 0.0804 | | | | |
| | | | | | | |
| Present Value of 2018 Enterprise Value as of March 31, 2014 [F = C x E] | | $ 18,871,934 | | | | |
| | | | | | | |
| Value as of September 12, 2022 | [4] | $ 55,166,095 | | | | |
| | | | | | | |
| Value as of September 12, 2022 (Rounded) | | $ 55,200,000 | | | | |

*See* Ex. 2, 9/5/22 Malec Calculation at Schedule 1 (red annotations and highlighting added); *see also* Trial Tr. at 713:7-12 (Malec).  Malec then counterfactually assumed that the Quote Exchange had ***met*** the January 2013 revenue projections in 2014, 2015, 2016, 2017, and 2018—ignoring the Quote Exchange's actual performance and deeming it "irrelevant."  Trial Tr. at 706:2-9 (Malec); *id.* at 705:9-15 (Malec) (claiming it would "be ***an error to take into account the actual performance*** of the Quote Exchange," even though the "actual results were ***a thousand times smaller***" than what was projected) (emphasis added).

After closing his eyes to the real world and adopting a false, hypothetical view where the Quote Exchange was wildly successful (instead of an abject failure) by 2018, Malec next applied to the revenue estimate a multiple based solely on publicly traded companies that were successful in 2018.  *See generally id.* at 657:8-658:13 (Malec).  This further inflated his estimate of the Quote Exchange's value.  *Id.* at 848:24-850:15 (Denis).  From there, Malec discounted the total by 70% "to determine the value of the QE Program ***as of March 31, 2014***"—the date the parties signed the Development Agreement, and ***over four years before*** any alleged breach.  *Id.* at 713:7-12 (Malec)

(emphasis added).  This resulted in an estimated value for the Quote Exchange of $18.9 million as of March 31, 2014 in Malec's counterfactual world:

| Timeframe | | Notes: | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
|---|---|---|---|---|---|---|---|
| **Schedule 1** | | | | | | | |
| **Endless River Technologies, LLC v. Trans Union, LLC** | | | | | | | |
| **Value of the QE Program - Updated to Date of Trial** | | | | | | | |
| **Original Projection** | | | | | | | |
| | | Notes: | Initial Development | Year 1 | Year 2 | Year 3 | Year 4 |
| Projected Revenue | | [1] | $          - | $ 16,754,100 | $ 54,802,372 | $ 136,992,160 | $ 213,332,042 |
| 2018 Projected Revenue [A] | | | $ 213,332,042 | | | | |
| 2018 Enterprise Value/Revenue Multiple [B] | | [2] | 1.1 | | | | |
| 2018 Enterprise Value [C = (A x B)] | | | $ 234,665,246 | | | | |
| Target Rate of Return [D] | | [3] | 70.0% | | | | |
| Present Value Interest Factor [E = 1/(1+D)^4.75] | | | 0.0804 | | | | |
| Present Value of 2018 Enterprise Value as of March 31, 2014 [F = C x E] | | | $ 18,871,934 | | | | |
| Value as of September 12, 2022 | | [4] | $ 55,166,095 | | | | |
| Value as of September 12, 2022 (Rounded) | | | $ 55,200,000 | | | | |

*See* Ex. 2, 9/5/22 Malec Calculation at Schedule 1 (red annotations and highlighting added); Trial Tr. at 661:6-9 (Malec).

### C.  Malec Invents A "Gross Up" Step To Further Increase His Damages.

Malec wasn't done.  Abandoning all pretense of a principled methodology, Malec next purported to adjust his calculation to "recogniz[e] the value of an asset will change over time based on the market performance," *id.* at 661:16-662:2 (Malec), even as he admitted that this step was ***not*** "technically one of the delineated steps in the venture capital approach," *id.* at 646:6-10 (Malec); *see also id.* at 851:24-852:2 (Denis).  Instead of applying "any sort of legal or statutory rate of interest for [his] growth" at this step, *id.* at 719:25-720:4 (Malec), Malec claimed to determine the "annual revenue growth rates" of various publicly traded companies and assumed the Quote Exchange would grow in ***precisely*** the same manner for ***nine consecutive years*** up to September 12, 2022, *id.* at 661:21-662:2 (Malec); *id.* at 721:13-18 (Malec); *see also id.* at 850:21-

851:23 (Denis).  By creating and adding this unprincipled and legally erroneous "gross up" step to the VC Approach, Malec inflated his estimated damages even further.  *Id.* at 851:18-23 (Denis).

Under Malec's made-up methodology, the value calculated for the Quote Exchange "grew" "each and every year all the way up until … 2022," which "tripled the number [Malec] started with" and caused Endless River's claimed damages to balloon to $55.2 million.  *Id.* at 720:5-19 (Malec); *see also id.* at 738:22-739:5 (Malec) (admitting he steadily grew the estimated March 31, 2014 value "from 2014 all the way through to … Monday, September 12, [2022]").

| Schedule 2<br>Endless River Technologies, LLC v. Trans Union, LLC<br>Value of the QE Program - Updated to Date of Trial<br>Original Projection<br>Growth in Value (2018 to Date of Trial) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Timeframe | Notes: | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 9/12/2022 |
| Present Value of 2018 Enterprise Value as of March 31, 2014 | $18,871,934 [1] | | | | | | | | |
| Market Growth Rates | [2] | 3.01% | 5.57% | 7.43% | 31.21% | 32.65% | 32.53% | 18.21% | -8.24% |
| Estimated Value | | $19,440,902 | $20,523,999 | $22,048,889 | $28,929,606 | $38,375,522 | $50,859,319 | $60,122,322 | $55,166,095 |
| Notes: | | | | | | | | | |
| [1] Schedule 1 | | | | | | | | | |
| [2] Schedule 9 | | | | | | | | | |

*See* Ex. 2, 9/5/22 Malec Calculation at Schedule 2 (highlighting added).  Importantly, at least four years of Malec's growth "occurred during a time when the parties were working together under the contract."  *Id.* at 720:24-721:20 (Malec); *id.* at 852:3-7 (Denis).  Malec thus artificially inflated Endless River's damages by including a contrary-to-law growth factor both ***before*** the alleged breach and ***after*** the alleged breach.  *Id.* at 739:2-5 (Malec).

### D.    Malec Entirely Ignores Contrary Evidence Without Analysis Or Explanation.

In addition to adopting a counterfactual and hypothetical world to reach his damages estimates, *see supra* at Part VI.B; Trial Tr. at 706:6-9 (Malec) ("I am asking [the jury] to ignore the actual results based on my testimony"), Malec blinded himself to all of the record evidence that directly contradicted his inflated valuation.  For instance, Malec ignored:

- **Endless River's Own February 2013 Projections.**  Endless River twice modified its January 2013 projection just ***days*** after sharing it with TransUnion—once on February

1, 2013 and again on February 12, 2013.  Trial Tr. at 697:7-20 (Malec).  Malec dismissed these substantially downgraded projections.  *Id.* at 697:10-698:2 (Malec).

- **Endless River's Own Sworn Interrogatory Response.**  Endless River provided TransUnion with a detailed "Damages Model" in its January 2019 interrogatory responses, which reflected market assumptions and data that Bonitz himself swore under penalty of perjury were "true and correct."  DX205 at 19.  Malec claimed he never even saw the Interrogatory model or response before issuing his reports—yet rejected this information out of hand.  Trial Tr. at 700:3-14 (Malec).

- **Dozens Of Damages Models Endless River Created After Initiating Litigation.**  Endless River created dozens of Endless River Damages Models ("EDMs") after it filed this lawsuit, from July 2018 up through October 2021.  DX340.  Malec claimed he was unaware of these models until shortly before trial, at which point he ignored them at his client's direction.  Trial Tr. 702:8-14 (Malec).

- **Contemporaneous Documents Where Endless River Valued The Quote Exchange At $5 Million.**  Only four months before TransUnion gave notice of termination, Wintering assessed the value of the Quote Exchange at $5 million or less, telling Bonitz that he would be a "minor deity" if he secured a buyout at that price.  DX147.  Malec deemed this "irrelevant," too.  Trial Tr. at 707:23-711:9 (Malec).

- **Party Admissions About The Low Costs Of "Replicat[ing]" The Quote Exchange Code.**  Malec also dismissed out of hand the evidence that "Endless River, in the fall of 2018, said they could replicate the technology for only $1.85 million."  *Id.* at 711:20-712:8 (Malec); *see also id.* at 709:2-17 (Malec).

- **Contract Provisions That Govern The But-For World.**  As Dr. David Denis testified, Malec ignored critical contract provisions, resulting in him measuring the value of the Quote Exchange as of the wrong date; failing to account for Endless River's development fees repayment obligation; and wrongly assuming that Endless River would retain 100% of all revenue generated by the Quote Exchange.  *See id.* at 841:2-844:24 (Denis).  All of these errors further inflate Malec's damages estimate.  *Id.*

## VII.  The Court Permits Malec To Present His Entire $55.2 Million Damages Estimate Despite TransUnion's Repeated Requests For Exclusion Or Limitation.

### A.     The Court "Reserves Ruling" On TransUnion's Challenges To Malec.

TransUnion moved to exclude Malec's opinions under *Daubert* because his analysis was irrelevant to the claims at issue, fundamentally flawed, and contrary to law.  Dkts. 182, 187, 202-1 (memoranda in support of motion to exclude Malec).  The Court ultimately resolved TransUnion's *Daubert* motion on the narrow question of "whether this venture capital approach is

appropriate in this case." Dkt. 214 at 105:4-10. At the same time, the Court reserved the right to "keep an open mind … to re-evaluate [its] decision based upon a lot of different factors that may come out during the course of the trial," including because Endless River's damages "[s]eem to be" a "moving target." *Id.* at 105:4-16, 107:22-25. Given the Court's statements, TransUnion filed two motions in *limine* targeting key issues that arose during the *Daubert* hearing: (1) Malec's calculation of unlawful prejudgment interest and (2) Malec's undisclosed opinion about the value of the Quote Exchange as of the date of termination in April 2018. Dkt. 218.

The Court again reserved ruling on TransUnion's pretrial motions, but repeatedly questioned Malec's analysis at trial outside the presence of the jury. Before *voir dire*, the Court confirmed that Malec's post-breach growth should not "come before the jury" because prejudgment interest is set by statute and handled by the court. Trial Tr. at 7:23-8:8 (Court). The Court later questioned Malec's reliance on the January 2013 projection because it required one to believe that the Quote Exchange was "going to make $213 million in the last year" when the Quote Exchange "***didn't make any money***" in real life. *Id.* at 156:25-157:7 (Court) (emphasis added). The Court raised even more significant concerns about the Development Agreement's liability-limitation provision, correctly noting that Endless River's damages "sound[] like classic consequential damages" barred by the Agreement. *Id.* at 759:18-24 (Court). Nevertheless, the Court "reserve[d] ruling on that" "until the conclusion of the case," and prohibited TransUnion from arguing the damages limitations in closing argument because it was a "legal issue" reserved for the Court. *Id.* at 759:18-24, 887:1-22 (Court). Consequently, over TransUnion's continuing objection, Malec's full, unsupported damages calculation went to the jury without limitation.

**B.     Malec And Endless River's Counsel Repeatedly Misrepresent Malec's Calculation And Analysis To The Court And The Jury.**

To ensure that Malec's irrelevant and legally erroneous damages figure would remain in the case, Endless River repeatedly misrepresented Malec's methodology and calculations to the Court and the jury.  Indeed, Endless River continually offered new, contradictory, and wholly made-up explanations of Malec's calculation to avoid exclusion.  The record tells the tale.

*December 2021: Malec Opening Report.*  In his initial expert report, Malec admitted that he estimated the "value of the QE Program as of March 31, 2014" and then "grossed-up the value of the QE Program as of March 31, 2014 to December 1, 2021 … to arrive at an estimated value of the QE Program as of December 1, 2021."  Dkt. 201-9, 12/1/21 Malec Rpt. ¶¶ 43-44.

*February 2022: First Malec Deposition.*  At his first deposition, Malec conceded that he valued the Quote Exchange using a March 31, 2014 date assuming an entirely hypothetical world.  Malec openly acknowledged that he did not compute damages as of the date termination was noticed (October 2017) or as of termination itself (April 2018).  *See* 2/25/22 Malec Dep. at 63:2-4 ("Q. Did you ever do a valuation of the Quote Exchange program as of October of 2017? A. I did not.").  Malec explained that he "utilized a *March 31, 2014* number because that is the date of the agreement" and thus used the January 2013 projections to reflect Endless River's "expectations of what the Quote Exchange program was looking to do *at that point in time*."  *Id.* at 58:14-19 (emphasis added); *see also id.* at 67:6-11 ("I would utilize the date that I believe is the right date to use, which is the day of the agreement which ERT and TransUnion entered into that agreement and then utilized that to come up with my value in my opinion.").

*July 2022: Daubert Briefing and Malec Rebuttal Report.*  TransUnion argued that Malec's damages estimate was entirely untethered from the sole contract breach alleged in the case—the failure to timely return the source code to Endless River in April 2018.  *See* Dkt. 182, 187, 202-1.

15

Upon hearing this challenge, Endless River reversed course, insisting for the first time that Malec "used the 2013 and 2014 projections to calculate Quote Exchange's value *as of … October 2017*." Dkt. 185 at 7-8 (emphasis added).  But October 2017 is not a relevant date to Endless River's damages assessment, either.  Dkt. 187 at 4; Dkt. 218 at 7.  As this Court has held, Endless River was only to receive the Quote Exchange code as of the *actual date of termination*, not as of the notice of termination date months earlier.  *See* Dkt. 170 at 13-14.

TransUnion made this very point in its *Daubert* reply briefing.  Dkt. 187 at 4; *see also* Dkt. 218 at 6-7.  But instead of correcting this error, Malec and Endless River doubled down.  Less than two weeks after TransUnion filed its reply brief, Malec issued a new rebuttal report reiterating his prior opinions.  In this report, Malec again latched on to the wrong date, newly stating that "[i]n an optimal world, I would have utilized joint ERT and TU expectations regarding the QE as of the date of termination *on October 4, 2017*."  Ex. 3, 7/15/22 Malec Rebuttal Rpt. ¶ 21 (emphasis added).  Malec also offered a brand-new rationale to explain his decision to rely on the January 2013 projections exclusively; he insisted that this "Original Projection … was the only relevant projection that reasonably took into consideration the *joint expectations* of the QE by both ERT and TU."  *Id.* ¶ 20 (emphasis added).

*August 2022: Malec Second Deposition.*  TransUnion deposed Malec on his rebuttal report on August 18, 2022.  Malec's timing failures were brought to stark light: he admitted that it would "not … affect [his] damage calculation" if TransUnion terminated the contract "yesterday" or "one month after it was signed."  Dkt. 218-1, 8/18/2022 Malec Tr. at 477:4-478:14; *see also* Dkt. 202-1 at 3.  Malec also defended his reliance on the January 2013 projections with yet a new justification, claiming that he decided to use them because, "[w]hen I had conversations with the Endless River principals, they believed that the assumptions that they put forth in *their 2013 projection still beared fruit as of the date of termination in '17*."  *Id.* at 374:14-375:19 (emphasis

added).  Throughout his second deposition, Malec parroted the new party line from Endless River's *Daubert* opposition, and repeatedly testified that his damages estimate assumed that the Development Agreement terminated in October 2017.  *Id.* at 474:23-475:6; *see also id.* at 514:2-7.  When specifically asked whether his calculations would change if the date of termination was in fact April 2018, Malec admitted he did not know, because he had ***never performed*** that calculation:

> Q.     And if the date of termination was April 2018, would you need to change your damages model?
>
> A.     ***I didn't do any damage calculation as of 2018***.  So my questions to them were that if the asset would have came to them in 2017, as of the date of termination, was there a window they could monetize? … ***I didn't ask them about different dates in between.… I can't speak to a different date I didn't have a conversation with them on because that's a hypothetical***.

*Id.* at 514:8-515:10 (emphasis added); *see also* Dkt. 202-1; Dkt. 218 at 7-8.

At this point, Endless River's counsel insisted that the parties break.  *Id.* at 517:10-18 ("MR. ROSENFELD:  I'd like to take a two-minute break.  MS. CRAMER:  ***To go advise your expert to say something different?***  MR. ROSENFELD:  I'd like to take a two-minute break.") (emphasis added).  Upon returning from the break, Malec admitted that Endless River's counsel had directed him to change his answers:

> Q.     Dr. Malec, we just took a two-minute break at the request of your counsel, right? … And you went and had a conversation with your counsel, true? … What did you discuss with your counsel?  …
>
> A.     So I had a conversation with counsel and he informed me that when you stated your question, I misunderstood the question that you stated.  And so then ***my response would have been different had I interpreted your question appropriately***.  I didn't take into consideration something with the question.
>
> Q.     What didn't you take into consideration?
>
> A.     … what I didn't take into account was the 180-day period from the date of termination.  Because I had the October 4th, '17, date stuck in my head.

> *But the reality would have been that because of that 180 days, that would have pushed it into 2018.*

*Id.* at 518:7-520:12 (emphasis added).

**September 1, 2022: Daubert Hearing**.  This Court held a *Daubert* hearing on September 1, 2022.  At that hearing, Malec attempted to offer new opinions—claiming he had "come to a conclusion that the January 2013 projections reasonably estimated the market opportunity in 2018 for the Quote Exchange in Endless River's hands" and "believe[d] to a reasonable degree of economic certainty that the damage figure [he estimated] represents the market opportunity of the Quote Exchange as of April of 2018 carried forward to the date of [his] report" "in the hands of Endless River."  Dkt. 214 at 16:6-25; 31:17-32:1.

TransUnion repeatedly objected to Malec's attempt to offer undisclosed expert testimony and to recast his existing calculation as purporting to value the Quote Exchange as of April 2018. But, while the Court initially sustained TransUnion's objection, *id.*, it subsequently allowed Malec to offer all of his brand-new opinions on the record.  *E.g.*, *id.* at 23:23-24:16; 28:1-12; 29:23-31:9. Throughout the hearing, counsel and Malec gratuitously peppered the direct and redirect with references to April 2018 an astounding ***twenty times***.  *See generally id.* at 5-31, 91-93.

On cross, TransUnion counsel impeached Malec with his unequivocal deposition testimony—elicited only two weeks prior—that he "didn't do any damage calculation as of 2018." *Id.* at 33:17-36:20.  Malec tried to explain away his testimony and prior written statements by claiming he somehow suffered a "memory lapse" about the one date his entire damages calculation should have been based on.  *Id.* at 44:3-23.  He was forced to admit, however, that he had ***never*** opined on the value of the Quote Exchange as of April 2018 in ***any*** expert report:

> Q.   And Dr. Malec, if you grab your reports again, can you – take your time. I want you to go through both of your reports, and tell me where it says that you calculated the value of the Quote Exchange as of April 2018. Is that in either of those reports?

A. *I do not have that referenced in either my report, original report, or my rebuttal report.*

*Id.* at 55:7-13 (emphasis added); *see* Dkt. 218 at 7-8.

**September 12-16, 2022: Trial.** Malec and Endless River's ever-changing characterization of Malec's analysis continued during trial. Contrary to reality, Malec and Endless River's counsel continued to disingenuously insist that Malec had always calculated damages as of April 2018. *See* Trial Tr. 651:23-34, 638:21-25, 639:9-13, 650:4-8, 652:9-12, 686:2-10, 688:12-14, 690:8-9, 712:13-18, 714:4-7 (Malec); *see also id.* at 639:9-640:4, 662:10-22 (Rosenfeld).

Malec thus was permitted to present his undisclosed, new-as-of-September-2022 valuation opinion to the jury. TransUnion repeatedly objected to the opinion as undisclosed—which it was, having never been discussed in *any* of Malec's reports or depositions prior to improper counsel interference, *see* Dkt. 214 at 55:7-13—but was repeatedly overruled. Trial Tr. at 639:19-640:3, 662:10-21. Yet the absence of any April 2018 calculation is clear from Malec's own disclosures:



*See* Ex. 2, 9/5/22 Malec Calculation at Schedule 2 (red annotations and highlighting added).

The misdirection didn't stop there. Under Court questioning, Endless River's counsel claimed that Malec's damages calculation purported to measure "the value of the Quote Exchange, the *diminishment of value* from the date that we should have had it until now." Trial Tr. at 157:8-158:1 (emphasis added). This too was new. *See id.* (" THE COURT: Was your expert ever asked that question? MR. ROSENFELD: Yes. … THE COURT: I don't remember it, but ….").

What's more, Endless River again changed its story for why Malec relied on the January 2013 projections to the exclusion of all other evidence, claiming that Malec "vetted" the market and performed "independent research" to "conclude[]that this projection provided – it was to a reasonable degree of economic certainty it took into consideration the market opportunity of Quote Exchange in 2018." *Id.* at 651:2-10 (emphasis added). In reality, Malec had only *just* learned that the April 2018 date was relevant. Indeed, even Bonitz candidly admitted that the "*only reason*" Malec used the $213 million revenue estimate from the January 2013 projection was because Endless River expressly "*told him*" *to*. *Id.* at 191:13-18 (Bonitz) (emphasis added); *see also id.* at 194:25-195:2 (Bonitz) (admitting that Malec is "not an expert in the insurance industry" and thus had to rely on information provided by Endless River's principals).

## VIII.  After A One-Week Trial, The Jury Issues An Unsupported Verdict Of $18.3 Million.

Throughout trial, Endless River sought to convince the jury of one damages figure only: $55.2 million. Endless River presented no evidence to support any alternative damages number, or any way to reduce the one damage number it supplied. Trial Tr. at 726:20-24 (Malec).

Following the presentation of evidence, the Court instructed the jury that it "may only award damages if you find, by the greater weight of the evidence, that damages were suffered, and only in an amount which is reasonably certain and has been proved to you by the greater weight of the evidence." *Id.* at 909:16-20 (Court). The Court further warned that the jury "may not award damages that are remote or speculative." *Id.* Despite this unopposed instruction, Endless River's counsel begged the jury to award it *any* value, be it Malec's $55.2 million or any other number the jury could conjure up, not only for the value of the Quote Exchange but also to compensate Endless River for "the marital strife [Wintering] faced" and Bonitz's divorce—events Endless River inexplicably blamed on TransUnion's contract breach. *Id.* at 911:21-949:8 (Rosenfeld). The jury verdict awarded Endless River $18.3 million, a number unsupported by any evidence.

20

## LEGAL STANDARD

A moving party is entitled to judgment as a matter of law when there is "no legally sufficient evidentiary basis for a reasonable jury to find on that issue." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999); *see also DeMyrick v. Guest Quarters Suite Hotels*, 944 F. Supp. 661, 666 n.3 (N.D. Ill. 1996); *Xudong Song v. Rom*, 2018 WL 1518963, at *2 n.3 (N.D. Ohio Mar. 28, 2018) (noting standard under Rule 50 "mirrors" the summary judgment standard).

## ARGUMENT

**I.  Section 8.2 Of The Development Agreement Bars The Damage Award.**

Endless River's sole damages theory is that, if it had received the Quote Exchange code in April 2018, it would have gone on to make hundreds of millions of dollars by relaunching the Quote Exchange with new and different third parties.  *See* Trial Tr. 647:14-652:12 (Malec).  As this Court observed, these "lost profit" damages are "***classic consequential damages***."  *Id.* at 759:18-21 (Court) (emphasis added); *see also* Dkt. 84 at 41-43; Dkt. 116 at 28; Dkt. 180 at 6-7; Dkt. 230 at 11-12.  They are thus expressly foreclosed under the contract, where Endless River waived its rights to "ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES ... INCLUDING BUT NOT LIMITED TO LOSS OF GOOD WILL AND LOST PROFITS OR REVENUE."  PX201 § 8.2.  Recognizing "the strong public policy favoring freedom of contract," courts routinely enforce "[c]lauses limiting damages" like Section 8.2. *Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1174 (Ill. App. Ct. 2015).

Malec's $55.2 million damages estimate plainly purports to measure consequential damages barred by Section 8.2.  The very "first step" in Dr. Malec's analysis was "to determine ***expected revenue*** over a 5-year period" for the Quote Exchange, Trial Tr. at 642:12-14 (Malec) (emphasis added), even though the Agreement prohibits the recovery of "LOST ... REVENUE,"

PX201 § 8.2.  And there can be no serious debate, these are consequential lost profits.  Malec's damages theory requires the jury and this Court to assume, at a minimum, that:

- ***First***, Endless River would have "figure[d] out how we get the software off [TransUnion's] servers and onto [its] serv[ers], how to get back to carriers and switch those contracts from the carriers to ERT."  Trial Tr. at 500:8-501:13 (Wintering).

- ***Second***, Endless River would have identified, pitched, and secured a third-party business partner to host the source code and help run the Quote Exchange day-to-day.  *Id.* at 178:9-18 (Bonitz); *id.* at 467:2-13, 539:1-5 (Wintering); DX200.

- ***Third***, Endless River would have entered yet another "strategic partnership with somebody who could provide th[e] third-party data" TransUnion previously had furnished, which was one of the only unique competitive advantages of the Quote Exchange.  Trial Tr. at 422:6-9, 458:13-24 (Wintering); *id.* at 323:21-24 (Ocheltree).

- ***Fourth***, Endless River would have successfully convinced major national insurers to participate on the Quote Exchange, despite a decade of being unable to do just that— both with and without TransUnion.  *Id*. at 538:4-6, 500:8-501:13 (Wintering); DX348.

- ***Fifth***, the Quote Exchange would obtain significant participation from quoting carriers, referring carriers, and customers in volumes and at prices never obtained during the Quote Exchange's period of actual performance.  Trial Tr. at 82:21-89:14 (Bonitz).

This is a highly attenuated series of events, ***all of which*** would have to come true before Endless River's claimed damages could ever come to fruition.  Consequently, the hundreds of millions of dollars in revenue that Endless River contends it missed in future business opportunities with other companies neither flowed "***immediately***" from the breach nor were "utterly foreseeable, indeed ***certain*** to stem from a breach of the contract," as Illinois law requires to deem damages direct.  *See Tate & Lyle Americas LLC v. Glatt Air Techniques, Inc.*, 2016 WL 7422289, at *4 (C.D. Ill. May 20, 2016) (collecting cases) (emphasis added).

At trial, Endless River tried to dodge this inevitable conclusion by repeatedly citing to *Westlake*, 25 N.E.3d at 1174.  *E.g.* Trial Tr. at 747:4-16, 748:11-749:19 (Rosenfeld).  But that case is no help.  Rather, *Westlake* demonstrates the very distinction between direct and consequential damages that Endless River asks the Court to elide.  There, the court underscored that "direct

damages were the benefit of the bargain that the party *lost from the contract itself*, while consequential damages were economic harm *beyond the contract's immediate scope*." *Westlake*, 25 N.E.3d at 1175 (emphasis added) (citing *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.)); Dkt. 187 at 12-13.

Here, unlike in *Westlake*, no provision in the Development Agreement "guaranteed" payments or profits to Endless River beyond the consulting payment requirement during the parties 180-days termination notice period, which TransUnion fully satisfied. *See* Trial Tr. at 536:3-22 (Wintering); *cf. Westlake*, 25 N.E.3d at 1169, 1175, 1178 (holding "direct lost profit" was "arguably present" where plaintiff alleged it lost "at least 24 months of commissions on benefits as guaranteed by the [contract]"). And it is plain that Endless River's alleged harm extends far beyond the scope of the Development Agreement. Endless River's lost profits all depend on what revenues it would have secured under *some other agreement* with a third-party software host, *some other agreement* with a third-party data provider, and *some other agreements* with various third-party insurance carriers that refused to participate during the Development Agreement—even though none of these contracts exist or have ever existed, even in a draft form. Thus, there is no basis to deem any part of Malec's $55.2 million damage estimate "direct damages." *See* Trial Tr. at 642:12-14 (Malec) (acknowledging that the "first step" in his analysis was to "to determine expected revenue" for the Quote Exchange based on January 2013 projections, rather than anything in the parties' contract).

## II.    The "New Business Rule" Bars The Damage Award.

Endless River's damages are independently barred by application of the "new business rule." As a matter of blackletter Illinois law, which governs the contract here, "expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery." *TAS Distrib.*, 491 F.3d at 633; *Glen Hollow P'ship v. Wal-Mart Stores, Inc.*, 139 F.3d

901 (7th Cir. 1998); *see also* Dkt. 182 at 7; Dkt. 187 at 12-13. Indeed, the new business rule "precludes expert speculation about possible lost profits where there is no historical data to demonstrate a likelihood of future profits." *Meriturn Partners, LLC v. Banner & Witcoff, Ltd*., 31 N.E.3d 451, 459 (Ill. App. Ct. 2015). "The idea is that a business must have been established before it is interrupted so that the evidence of lost profits is not speculative." *Id.*

Malec's valuation is exactly the type of speculative damages estimate that Illinois law is designed to prevent. As Malec repeatedly testified, he purported to value the Quote Exchange as a "***start-up company***," and thus relied exclusively on projections that predated the build of the Quote Exchange and the parties' agreement by more than a year. Trial Tr. at 640:14-641:12, 704:4-7, 692:10-24 (Malec) (emphasis added). Not only that, but Malec also expressly ***ignored*** all evidence of actual performance, deeming it "irrelevant"—even though it demonstrated that the projections Malec relied on were fantastical, created before Endless River even met with TransUnion, and assumed revenues more than ***900 times larger*** than what the Quote Exchange ever actually achieved. *Id.* at 243:2-8 (Bonitz); *id.* at 705:9-15 (Malec). Where, as here, "the projections that plaintiffs claim support their right to lost profits are all future suppositions" that are merely "possible" but "[n]ot probable nor reasonably certain," the Illinois new business rule bars recovery. *See Meriturn*, 31 N.E.3d at 459 (affirming trial court holding that new business rule barred "sales projection theory" of damages).

That's doubly true where, as here, speculative past projections "have been proven ***inaccurate*** by actual sales." *Dunn v. CCH Inc.*, 834 F. Supp. 2d 657, 667-68 (E.D. Mich. 2011) (Illinois law) (emphasis added); *see* Dkt. 187 at 13. Put simply, Illinois law forecloses Endless River's attempt to rely exclusively on projections that constitute little more than "guesswork" "done as a pitch ... to get TransUnion or somebody involved" in the project while it was in the

24

concept stage.  Trial Tr. at 148:18-24 (Court).  Judgment as a matter of law for TransUnion is required.  *Glen Hollow P'ship*, 139 F.3d 901 (reversing jury verdict and applying new business rule); *TAS Distrib.*, 491 F.3d at 633 (affirming summary judgment); *M.S. Distrib. Co. v. Web Recs., Inc.*, 2003 WL 21087961, at *10 (N.D. Ill. May 12, 2003) (holding plaintiff's damages were "barred by the Illinois new business rule"); *Ivey v. Transunion Rental Screening Sols., Inc.*, 186 N.E.3d 1076, 1086 (Ill. App. Ct. 2021) (affirming summary judgment); *see also ONVI, Inc. v. Radius Project Dev. Inc.*, 2022 WL 4182433, at *2 (N.D. Ill. Sept. 13, 2022) (barring evidence of lost profits for new business); *Euroholdings Cap. & Inv. Corp. v. Harris Trust & Sav. Bank*, 602 F. Supp. 2d 928, 940 (N.D. Ill. 2009) (same); *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 560 (N.D. Ill. 2008) (excluding evidence of lost profits because plaintiff "ha[d] yet to earn any profits to demonstrate what its future earnings will be.").

## III.   The Damage Award Must Also Be Vacated Because It Is Untethered From The Claimed Breach In This Case.

Illinois law is clear: "the proper date for determining damages in a breach of contract action is the date of the breach, not the date of trial."  *Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*, 886 F. Supp. 2d 873, 886 (N.D. Ill. 2012) (Illinois law); *Kagan v. Edison Bros. Stores Inc.*, 907 F.2d 690, 692 (7th Cir. 1990) (Illinois law) ("Damages are measured as of the date of breach, not as of some later time."); *see also* Dkt. 187 at 2-4; Dkt. 218 at 2-3.  Malec's calculation says ***nothing whatsoever*** about the value of the Quote Exchange as of April 2, 2018, the date the Agreement terminated and the date of breach.  Instead, Malec purported to value the Quote exchange on two, and only two, dates:

- **March 31, 2014** (the date the Development Agreement was signed), assuming a hypothetical and counterfactual world where the January 2013 projections came true starting in 2014, Trial Tr. at 738:22-24 (Malec); Dkt. 201-9, Malec Rpt. ¶¶ 43-44;

- **September 12, 2022** (the first day of trial), assuming that the Quote Exchange experienced nine years' of growth in Malec's hypothetical world starting in 2014 and continuing to 2022, Trial Tr. at 739:2-5 (Malec).

Although Malec insisted at trial that the date of breach "does matter" to his analysis, *id.* at 725:21-24, his other admissions reveal that the exact opposite is true. Malec admitted at trial that his "damages calculation is $55.2 million" regardless of **when** the breach occurred, conceding that "if TransUnion had terminated the contract one month after it was signed," or even "one **week** after it was signed," that would have **no impact** on Endless River's damages. *Id.* at 725:25-726:7 (emphasis added). As a matter of simple math and legal logic, Malec cannot have calculated damages "as of the date of breach" if the date of breach is irrelevant to his analysis.

Malec's schedules and expert reports further confirm that the damages estimate he offers is untethered from the relevant April 2, 2018 date. As Malec was forced to admit on the stand, he never stated "in either [his] report, original report, or [his] rebuttal report" that he "calculated the value of the Quote Exchange as of April 2018." Dkt. 214 at 55:7-13; Dkt. 218 at 7. That's because he did not. Tellingly, even Malec's late-breaking "updated to date of trial" damages schedule—provided to TransUnion less than a week before opening arguments—contains **no reference** to April 2018:



*See* Ex. 2, 9/5/22 Malec Calculation at Schedule 2 (red annotations and highlighting added).

26

Because the jury awarded damages based in part on a legally irrelevant calculation, its verdict must be vacated. *Heaver v. Ward*, 386 N.E.2d 134, 139 (Ill. App. Ct. 1979) ("When incompetent evidence which may be prejudicial is received, the verdict is set aside, without proof that the jury gave it any weight in reaching the verdict."). At a minimum, this Court must grant a new trial, as TransUnion "was prejudiced by an error of law" when Endless River was permitted to present the jury with an inflated and erroneous damages figure untethered to its claims in this case. *See Black-Hosang v. Mendenhall*, 2005 WL 3299070, at *1 (S.D. Ohio Dec. 5, 2005).

**IV.  The Jury's Damage Award Is Tainted By Improper Pre-Judgment Interest.**

The law provides a clear directive on how a party may seek to account for "the time value of money between the period of breach and ... the date of judgment": prejudgment interest. *See* Trial Tr. at 9:15-24 (Court); *Servbest Foods, Inc. v. Emessee Indus., Inc.*, 403 N.E.2d 1, 6 (Ill. App. Ct. 1980) (affirming prejudgment interest accrues "from the date of the breach");[2] *Pickett v. Sheridan Health Care Ctr.*, 813 F.3d 640, 646 (7th Cir. 2016) ("Prejudgment interest is simply an ingredient of full compensation that corrects judgments for the time value of money."); Dkt. 218 at 1-6.[3] An award of prejudgment interest is both a legal matter in "the Court's province" and "directed by statute." Trial Tr. at 9:15-24 (Court). Consequently, an expert's attempt to increase

---

[2]  *See also Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935-36 (7th Cir. 2003) ("[P]rejudgment interest typically accrues from the date of the loss or from the date on which the claim accrued [namely] from the date that its injury occurred."); *Blackwell v. Kalinowski*, 2012 WL 469962, at *12 (N.D. Ill. Feb. 13, 2012) ("Prejudgment interest typically accrues from the date of loss or the date on which the claim accrued in order to put a party in the position he would have been had it been paid immediately."); *Ryan M. v. Bd. of Educ. of City of Chicago, Dist. 299*, 731 F. Supp. 2d 776, 796 (N.D. Ill. 2010) ("[P]rejudgment interest typically accrues from the date of loss or the date on which the claim accrued.").

[3]  *Matter of P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.*, 140 F.3d 1111, 1123 (7th Cir. 1998) ("[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money."); *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 2021 WL 4302871, at *1 (N.D. Ill. Aug. 10, 2021), *appeal dismissed*, 2022 WL 671458 (7th Cir. Feb. 16, 2022) ("The purpose of prejudgment interest is to correct judgments for the time value of money."); *LinkEpic Inc. v. Vyasil, LLC*, 2020 WL 8455109, at *4 (N.D. Ill. Oct. 2, 2020) ("[T]he purpose of prejudgment interest is to compensate plaintiffs for the lost time value of money … .")

damages by "grossing up" his valuation or calculation to "the date of trial would run afoul of the well-established law" that only prejudgment interest, set by agreement of the parties or by statute, is recoverable after the date of the allegedly wrongful conduct. *Sys. Dev.*, 886 F. Supp. 2d at 886; Dkt. 218 at 1-3.

That is precisely what Malec did here. Dkt. 214 at 6:18-24, 7:5-9, 7:10-17, 11:7-17, 26:7-15 (Malec) (explaining that he applied a "growth rate" step in his calculation to account for the "time value of money"); Dkt. 218 at 2-3. As Malec repeatedly admitted, he first valued the Quote Exchange as of March 31, 2014, and then grew that number *each year* through the first day of trial. Trial Tr. at 719:4-10, 739:2-5 (Malec); *id.* at 152:3-4 (Court) (noting Malec said "several times" that he grew damages from "*2014 to the date of trial*") (emphasis added).



That growth step alone nearly "tripled the number [Malec] started with," further inflating Endless River's unsupported and speculative damages. *Id.* at 720:5-19 (Malec).

There can be no serious debate that Malec's "growth rate" or "gross up" step usurps the function properly reserved for prejudgment interest alone. Though Endless River's counsel tried

to skirt the issue by insisting that "Malec … did not include prejudgment interest," *id.* at 748:3-4, the legal error infecting Malec's calculation does not disappear simply because Malec did not describe his "growth rate" using those magic words.  *E.g.*, *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 674 N.E.2d 948, 953 (Ill. App. Ct. 1996) (rejecting plaintiff's "'inflationary factor' [a]s little more than a thinly veiled attempt to secure prejudgment interest"); Dkt. 218 at 2. The simple fact is this: Malec did not apply any "legal or statutory rate of interest for [his] growth" and instead applied figures three to six times *greater* than the legally mandated prejudgment interest rate to reach his $55.2 million damages estimate.  Trial Tr. at 719:25-720:4 (Malec); Dkt. 218 at 4.  In so doing, Malec inflated the only damage calculation Endless River put to the jury by *over $35 million*.  *See* Dkt. 218 at 3-4.

| Year | Malec's "Growth Rate" 9/5/22 Calc. at Schedule 2 | Prejudgment Interest 815 ILCS 205/2 | Malec's Damages |
|------|---------------------------------------------------|-------------------------------------|-----------------|
| 2015 | 3.01% | *Not recoverable.* | $19.4M |
| 2016 | 5.57% | *Not recoverable.* | $20.5M |
| 2017 | 7.43% | *Not recoverable.* | $22.0M |
| 2018 | 31.21% | 5.0% | $28.9M |
| 2019 | 32.65% | 5.0% | $38.4M |
| 2020 | 32.53% | 5.0% | $50.9M |
| 2021 | 16.75% or 18.21%* | 5.0% | $59.4M |
| 2022 | -8.24%* | 5.0% | $55.2M |

The jury awarded Endless River millions of dollars based on Malec's testimony.  It is impossible to tell *what* portion of that includes prejudgment interest, *how* the improper prejudgment interest affected the jury's thinking, or *whether* the jury would have awarded any damages at all if presented with a calculation consistent with the law.  *See* Trial Tr. at 6:6-12 (TransUnion: "[W]e think that there's sort of no way to unscramble the egg.  Once that damage number is out there, we think it includes a bunch of legally improper essentially prejudgment interests that they've had their expert calculate that's the Court's province and actually not the jury's province.  THE COURT: Well, that's absolutely true."); *id.* at 156:1-14; 755:19-4.  The

29

Court must set aside the jury's verdict or order a new trial. *See Heaver*, 386 N.E.2d at 139; *Black-Hosang*, 2005 WL 3299070, at *1.

**V.      The Jury's Damages Award Is Unsupported By Evidence And Entirely Speculative.**

As the Court instructed, the jury "may not award damages that are remote or speculative." Trial Tr. at 909:19-20 (Court). Only damages suffered "in an amount which is reasonably certain and has been proved … by the greater weight of the evidence" may be awarded. *Id.* at 909:16-19 (Court); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("[T]he jury may not render a verdict based on speculation or guesswork."); *Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir. 1984) ("[D]amages must be proved; they must not be speculative."). Here, the jury's $18.3 million verdict must be set aside, as it is unsupported by the evidence and impermissibly speculative.

Endless River only ever offered a ***single*** damages number in this case: $55.2 million. *See* Trial Tr. at 726:17-24 (Malec) ("A. [M]y opinion on economic damages is $55.2 million, based on my testimony. Q. That's the ***only number*** you think is appropriate as a damage measure in this case. True? A. Yes.") (emphasis added). Not only that, but Endless River failed to provide the jury with ***any methodology or opinion*** that would allow the jury to reduce damages in any way. *See id.* at 726:17-21 (Malec). And the amount awarded by the jury, $18.3 million, appears ***nowhere*** in the record. *Compare* DX147 (discussing $5 million buy-out value); DX200 (discussing $1.85 million rebuild cost); Trial Tr. at 251:9-16 (Bonitz) (discussing $1.75 rebuild cost); *id.* at 834:2-10 (Denis) (damages estimate of $1.8 million); *id.* at 640:5-6 (Malec) (damages estimate of $55.2 million). Thus, there is ***no*** competent evidence the jury could rely on to reach its $18.3 million number, much less evidence sufficient to establish that Endless River "proved" damages in that amount with "reasonable certainty," as the law requires. *Id.* at 909:16-19 (Court).

Instead, the trial record suggests that the jury simply plucked its $18.3 million number out of thin air, at Endless River's urging. *See id.* at 989:14-19, 989:1-21 (Rosenfeld). But a "plaintiff cannot simply pick any number out of the air and be compensated for that amount, without any proof." *See generally Huss v. Sessler Ford, Inc.*, 799 N.E.2d 444, 449 (Ill. App. Ct. 2003). Where, as here, a verdict "compromises the damages and does not base them on evidence, it is ***error***." *Shaker v. Butler*, 2020 IL App (1st) 190967-U, ¶¶ 44-45 (reducing portion of verdict "not adequately supported by the evidence") (emphasis added); *Franzen v. Dunbar Builders Corp.*, 270 N.E.2d 118, 126 (Ill. App. Ct. 1971) (reversing and remanding for recalculation of damages). Vacating the verdict, remanding for a new trial, or remitting the damages is therefore required.

The jury's speculative verdict is plainly problematic and unsupported for additional reasons, too. During closing, Endless River's counsel begged the jury to compensate Endless River for unpled, unproven emotional distress damages, referencing Bonitz and Wintering's respective marital strife no fewer than ***five times***. Trial Tr. at 927:15-17 (Rosenfeld) ("You heard him -- you saw him break down on the stand when he testified the marital strife he faced and that Mr. Bonitz lost his marriage over this."), *id.* at 928:4-5 ("Is it fantasy that he lost his marriage?"), *id.* at 948:12-13 ("Can't get back your relationships, can't get back your marriage"), *id.* at 984:21-22 ("Proud of the fact that my clients have lost their marriage?"), *id.* at 989:18 ("for devastating my three clients"). This alone compels vacating the jury verdict. *See Smith v. Fifth Third Mortg. Co.*, 2021 IL App (1st) 200771-U, ¶¶ 87-88 (reversing jury award where plaintiff's attorney "attempted to have the jury quantify" plaintiff's unproven "emotional distress damages").

That's not all. Endless River's counsel also made repeated references to the comparative size and financial wealth of the parties, even though such evidence was entirely irrelevant and prejudicial. The Court bifurcated the compensatory and punitive phases of trial, thereby barring

Endless River from "present[ing] evidence that relates solely to the issue of whether the plaintiff is entitled to recover punitive or exemplary damages," Dkt. 232 at 14-15, including evidence of TransUnion's size and wealth, *Stryker Corp. v. Ridgeway*, 2016 WL 6584657, at *2 (W.D. Mich. Jan. 25, 2016); *Pioneer Res. Corp. v. Nami Res. Co., LLC*, 2006 WL 1635651, at *1 (E.D. Ky. June 8, 2006). Endless River nevertheless urged the jury to punish TransUnion because of its size and wealth alone. Trial Tr. at 925:1-3 (Rosenfeld) ("That's no different than a schoolyard bully going up to a little kid, stealing his lunch, and then saying pay me a hundred dollars."), *id.* at 936:12-13 (Closing) ("Mr. Wintering, Mr. Bonitz, Mr. Somich, they're not a multi-billion-dollar corporation."); *see also id.* at 17:8-10 (Opening) ("Endless River knew that as the little guy, exposing its valuable concept to the multi-billion dollar conglomerate, it needed protection.").

Counsel's irrelevant and repeated "reference to the comparative size and financial wealth of [the parties] was improper" and prejudicial to TransUnion. *Adams Lab'ys, Inc. v. Jacobs Eng'g Co., Inc.*, 761 F.2d 1218, 1226 (7th Cir. 1985) (collecting circuit court cases); *Pingatore v. Montgomery Ward & Co., Inc.*, 419 F.2d 1138, 1142 (6th Cir. 1969) (references to defendant "as a corporation and a large organization" were one of several types of improper closing remarks that required a new trial). "Counsel [wa]s bound to refrain from making reference to such size and wealth, or bear the risk of an unfavorable appellate reception." *Adams*, 761 F.2d at 1225 (reversing verdict where counsel argued that plaintiff was a "small corporation … dealing with one large corporation") (emphasis omitted). This too compels vacating the verdict. *Pingatore*, 419 F.2d at 1144 (vacating damages award); *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 898 (D.C. Cir. 2010) (vacating verdict) ("[A]rguments to the jury about a defendant's wealth are grounds for new trial.").

## VI.     The Damages Award Improperly Ignores Endless River's Ongoing Duty To Mitigate.

The duty to mitigate "forbids the victim of a breach of contract … to allow his damages to balloon (when he could easily prevent that from happening), as he might be tempted to do in order to force a lucrative settlement."  *R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc*., 641 F. Supp. 2d 707, 717 (N.D. Ill. 2009); *see also* Dkt. 194 at 5-6; Dkt. 204 at 7.  But Endless River did just that.

In fall 2018, about six months after it filed suit, Endless River concluded that it could "replicate" the code "with better, more affordable tech" for just $1.75-$1.85 million:



DX200 at 7 (highlighting added); *see also* DX198 at 7.  Endless River claimed at trial that a rebuilt Quote Exchange would "absolutely" have been successful.  Trial Tr. at 244:13-16 (Bonitz) ("Q. You and Mr. Wintering and Mr. Somich were going to create a technology product that was going to succeed where Google had failed?  A. Absolutely.").  But instead of rebuilding the code, Endless

River chose to pursue litigation.  *Id.* at 559:3-14 (Wintering); *id.* at 711:20-712:8 (Malec); *id.* at 273:4-10 (Bonitz) ("by late 2018" Endless River was only interested in lawsuit damages).

Because Endless River could have avoided 100% of the damages it sought had it only mitigated its damages, Endless River's jury award must be reduced by 100%.  *Mayster v. Santacruz*, 163 N.E.3d 246, 256 (Ill. App. Ct. 2020) ("[I]f 100% of [plaintiff's] loss was proximately caused by [plaintiff's] failure to mitigate its damages, [plaintiff's] damages would not be recoverable … whether a court reduces the plaintiffs' damages to zero, or bars them …."); *R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc.*, 641 F. Supp. 2d 707, 722 (N.D. Ill. 2009) (entering judgment for defendant when plaintiff could have completely mitigated damages by spending only a small fraction of the same).

At an absolute minimum, the Court must remit the jury award to $1.85 million.  *Katch v. Speidel, Div. of Textron, Inc.*, 746 F.2d 1136, 1144 (6th Cir. 1984) (remitting jury verdict where plaintiff failed to mitigate damages).  ***Both*** of Endless River's principals and ***its own expert*** expressly admitted that Endless River could have "spent $1.85 million to replicate the technology," but chose not to do so.  Trial Tr. at 711:24-712:8 (Malec); *id.* at 251:9-252:4 (Bonitz) (impeached with prior testimony establishing that "1.75 would be [Endless River's] build cost" to replicate the source code); *id.* at 556:24-557:21 (Wintering) (acknowledging Endless River could have "replicate[d] the code with better, more-affordable tech for $1.85 million in 6 months"); *id.* at 112:7-12 (Bonitz) (testifying that "it would be safe to say" that it would cost "1.5 to 2" million to build the Quote Exchange from scratch); *accord id.* at 628:5-629:3 (Court asking how Endless River plans to counter evidence showing a $1.75 million cost to rebuild the source code).  Where, as here, the "defects in the [jury's] award are readily identified and measured, remittitur is more appropriate than a new trial."  *Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir. 1998).

34

## <u>CONCLUSION</u>

Endless River's damages are barred by Section 8.2 of the Agreement and the Illinois new business rule.  TransUnion thus asks the Court to grant it judgment notwithstanding the verdict under Rule 50.

Alternatively, the numerous legal errors in Malec's analysis—the only evidence Endless River presented on its damages—compel either (1) reducing the verdict to $0; (2) remitting the verdict to $1.85 million; or (3) granting a new trial untainted by Malec's legally flawed and prejudicial damages evidence.

DATED:  September 29, 2022

/s/ *Mark Premo-Hopkins*

Mark Premo-Hopkins (IL ARDC No. 6293574)
*Admitted Pro Hac Vice*
James F. Hurst (IL ARDC No. 6202190)
*Admitted Pro Hac Vice*
Britt Cramer (IL ARDC No. 6315284)
*Admitted Pro Hac Vice*
Cameron Ginder (IL ARDC No. 6323949)
*Admitted Pro Hac Vice*
Evelyn T. Cai (IL ARDC No. 6335644)
*Admitted Pro Hac Vice*
Amarto Bhattacharyya (IL ARDC No. 6326592)
*Admitted Pro Hac Vice*
Danielle O'Neal (IL ARDC No. 6330223)
*Admitted Pro Hac Vice*
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312.862.5230
Facsimile: 312.862.2200
E-mail:  mark.premohopkins@kirkland.com
        james.hurst@kirkland.com
        britt.cramer@kirkland.com
        cameron.ginder@kirkland.com
        evelyn.cai@kirkland.com
        amarto.bhattacharyya@kirkland.com
        danielle.oneal@kirkland.com


Courtenay Y. Jalics (0077507)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: 216.592.5000
Facsimile: 216.592.5009
E-mail:  courtenay.jalics@tuckerellis.com

Tonya G. Newman (IL ARDC No. 6286958)
*Admitted Pro Hac Vice*
Kyle D. Rettberg (IL ARDC No. 6256572)
*Admitted Pro Hac Vice*
Lee Barrington Stark (IL ARDC No. 6336810)
*Admitted Pro Hac Vice*
NEAL GERBER & EISENBERG LLP
2 North LaSalle Street, Suite 1700
Chicago, IL 60602
Telephone: 312.269.2913
Facsimile: 312.429.3532
E-mail:  tnewman@nge.com
       krettberg@nge.com
       lstark@nge.com

*Attorneys for Defendant TransUnion LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2022, a copy of the foregoing was filed with the Court via the Court's electronic filing system.  Notice of the court filing will be served on all counsel of record via email.

*/s/ Mark Premo-Hopkins*

Mark Premo-Hopkins
